# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SHAFIQ RASUL, SKINA BIBI, as Next
Friend of Shafiq Rasul, *et al.*,

    Petitioners,

      v.

GEORGE WALKER BUSH, President of the
United States, *et al.*,

    Respondents.

Civil Action No. 02-299 (CKK)

**FILED** ✓

**'JUL 3 0 2002**

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

FAWZI KHALID ABDULLAH FAHAD AL
ODAH, *et al.*,

    Plaintiffs,

      v.

UNITED STATES OF AMERICA, *et al.*,

    Defendants.

Civil Action No. 02-828 (CKK)

## MEMORANDUM OPINION
(July 30, 2002)

### I. INTRODUCTION

Presently before the Court are two cases involving the federal government's detention of

certain individuals at the United States Naval Base at Guantanamo Bay, Cuba.  The question

presented to the Court by these two cases is whether aliens held outside the sovereign territory of

the United States can use the courts of the United States to pursue claims brought under the

United States Constitution.  The Court answers that question in the negative and finds that it is



without jurisdiction to consider the merits of these two cases.  Additionally, as the Court finds that no court would have jurisdiction to hear these actions, the Court shall dismiss both suits with prejudice.

Throughout their pleadings and at oral argument, Petitioners and Plaintiffs contend that unless the Court assumes jurisdiction over their suits, they will be left without any rights and thereby be held *incommunicado*.  In response to this admittedly serious concern, the government at oral argument, conceded that "there's a body of international law that governs the rights of people who are seized during the course of combative activities."  Transcript of Motion Hearing, June 26, 2002 ("Tr.") at 92.  It is the government's position that "the scope of those rights are for the miliary and political branches to determine–and certainly that reflects the idea that other countries would play a role in that process."  *Id*. at 91.  Therefore, the government recognizes that these aliens fall within the protections of certain provisions of international law and that diplomatic channels remain an ongoing and viable means to address the claims raised by these aliens.[1]  While these two cases provide no opportunity for the Court to address these issues, the Court would point out that the notion that these aliens could be held *incommunicado* from the rest of the world would appear to be inaccurate.

After reviewing the extensive briefings in these cases, considering the oral arguments of

---

[1] The Court notes that, at least for Petitioner David Hicks in the *Rasul* case, diplomatic efforts by the Australian government have already commenced.  First Am. Pet. for Writ of Habeas Corpus ("Am. Pet."), Ex. C., "Affidavit of Stephen James Kenny," Attach. 2 (Letter from Robert Cornall, Australian Attorney-General's Office to Stephen Kenny, counsel for Petitioner Terry Hicks) ("Australia has indicated to the United States that it is appropriate that Mr Hicks remain in US military custody with other detainees while Australia works through complex legal issues and conducts further investigations. . . . Australian authorities have been granted access to Mr Hicks and will be granted further access if required.").

the parties and their oral responses to the Court's questions, and reflecting on the relevant case law, the Court shall grant the government's motion to dismiss in both cases on the ground that the Court is without jurisdiction to entertain these claims.[2]

## II. PROCEDURAL HISTORY

Petitioners in *Rasul v. Bush*, Civil Action No. 02-299, filed their case on February 19, 2002, and have styled their action as a petition for writ of habeas corpus. Petitioner Shafiq Rasul and Asif Iqbal are citizens of the United Kingdom and are presently held in Respondents' custody at the United States Naval Base at Guantanamo Bay, Cuba. Am. Pet. ¶¶ 10, 14. Petitioner David Hicks is an Australian citizen who is also detained by Respondents at the military base at Guantanamo Bay. *Id.* ¶ 5. Also included in the Petition are Skina Bibi, mother of Shafiq Rasul, Mohammed Iqbal, father of Asif Iqbal, and Terry Hicks, father of David Hicks. Petitioners request, *inter alia*, that this Court "[o]rder the detained petitioners released from

---

[2] In reaching its decision in the *Rasul* case, the Court considered the First Amended Petition for Writ of Habeas Corpus, the Exhibits to the Amended Petition for Writ of Habeas Corpus, the Memorandum in Support of the Amended Petition for Writ of Habeas Corpus, Respondents' Motion to Dismiss Petitioners' First Amended Petition for Writ of Habeas Corpus, Petitioners' Memorandum in Opposition to Respondents' Motion to Dismiss, and Respondents' Reply in Support of Their Motion to Dismiss Petitioners' First Amended Petition for Writ of Habeas Corpus. In reaching its decision in the *Odah* case, the Court considered the Amended Complaint, Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs' Request for Expeditious Hearing on Plaintiffs' Motion for a Preliminary Injunction and Supporting Statement of the Facts that Make Expedition Essential, Defendants' Motion to Dismiss Plaintiffs' Complaint and Motion for a Preliminary Injunction, Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint and Motion for a Preliminary Injunction, Defendants' Reply in Support of Motion to Dismiss, Plaintiffs' Opposition to Defendants' Motion for Leave to Late File Their Reply In Support of Defendants' Motion to Dismiss and Response to Plaintiffs' Request for Expeditious Hearing, Plaintiffs' Consent Motion for Leave to File Post-Argument Brief Correcting Erroneous Statements by Defense Counsel at Oral Argument, Defendants' Response to Plaintiffs' Post-Argument Brief, and Plaintiffs' Reply to Defendants' Response to Plaintiffs' Post-Argument Brief.

respondents' unlawful custody," "[o]rder respondents to allow counsel to meet and confer with the detained petitioners, in private and unmonitored attorney-client conversations," and "[o]rder respondents to cease all interrogations of the detained petitioners, direct or indirect, while this litigation is pending." Am. Pet., Prayer for Relief, ¶¶ 4-6.

Plaintiffs in *Odah v. United States*, Civil Action No. 02-828, filed their action on May 1, 2002. The *Odah* case involves the detention of twelve Kuwaiti nationals who are currently being held in the custody of the United States at the United States Naval Base at Guantanamo Bay, Cuba. Am. Compl. at 4. The action is concurrently brought by twelve of their family members who join the suit and speak on behalf of the individuals in United States custody. *Id.* Unlike Petitioners in *Rasul*, the *Odah* Plaintiffs disclaim that their suit seeks release from confinement. Rather, Plaintiffs in *Odah* ask this Court to enter a preliminary and permanent injunction prohibiting the government from refusing to allow the Kuwaiti nationals to "meet with their families," "be informed of the charges, if any, against them," "designate and consult with counsel of their choice," and "have access to the courts or some other impartial tribunal." *Id.* ¶ 40.[3]

---

[3] After full briefing and oral argument on Defendants' Motion to Dismiss in the *Odah* case, Plaintiffs filed an Amended Complaint, which they filed as of right pursuant to Rule 15 of the Federal Rules of Civil Procedure. In a conference call with the Court, Plaintiffs represented that there were three specific differences between the Amended Complaint and the original Complaint. First, the Amended Complaint added two new plaintiffs to the action, a Kuwaiti national held at the military base at Guantanamo Bay and a member of his family who brings the suit on his behalf. Originally, there had only been twenty-two Plaintiffs. *Compare* Compl. ¶¶ 3, 4, *with* Am. Compl. ¶¶ 3, 4. Second, Plaintiffs abandoned their request that the Court order Defendants to turn Plaintiffs, held at the military base at Guantanamo Bay, over to the Kuwaiti government. Compl. ¶ 44. Third, Plaintiffs made an effort to clarify the four specific requests for relief that they seek in this case. *Compare* Compl. ¶ 42, *with* Am. Compl. ¶ 40.

Ordinarily, when the Court receives an amended complaint after a defendant files a motion to dismiss, it denies the motion to dismiss without prejudice and requests that the defendant re-file the motion based on the allegations presented in the amended complaint. In this case, based on the Court's review of the Amended Complaint, it appears that such a procedure

Plaintiffs' Amended Complaint contains three counts. First, Plaintiffs contend that Defendants' conduct denies the twelve Kuwaiti nationals due process in violation of the Fifth Amendment to the Constitution. *Id.* ¶ 37. Second, Plaintiffs argue that Defendants' actions violate the Alien Tort Claims Act, 28 U.S.C. § 1350. *Id.* ¶ 38. Lastly, Plaintiffs allege that Defendants' conduct constitutes arbitrary, unlawful, and unconstitutional behavior in violation of the Administrative Procedure Act, 5 U.S.C. §§ 555, 702, 706. *Id.* ¶ 39.

In the *Rasul* case, Respondents moved to dismiss the First Amended Petition for Writ of Habeas Corpus on March 18, 2002. This motion was fully briefed on April 29, 2002. On May 1, 2002, the *Odah* case was filed and Plaintiffs designated it as related to the *Rasul* matter. Thus, *Odah* was assigned to this Court. Plaintiffs in *Odah* moved for a preliminary injunction at the time they filed their suit. Instead of filing a memorandum in opposition to the motion for preliminary injunction, Defendants in the *Odah* case moved to dismiss the action. That motion was fully briefed on June 14, 2002.[4]

---

would be a useless exercise since the legal theories underlying Defendants' present motion to dismiss will not be affected by the filing of the Amended Complaint. Defendants agree with the Court and contend that the amendments will not impact upon the Court's ruling on the motion to dismiss. Accordingly, the Court will apply Defendants' motion to dismiss to Plaintiffs' Amended Complaint. *See Nix v. Hoke*, 62 F. Supp. 2d 110, 115 (D.D.C. 1999) (citing cases); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1476 (2d ed. 1990) ("[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending. If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance.").

[4] The Court's initial briefing schedule in the *Odah* case did not contemplate that Defendants would be moving to dismiss the entire action. Rather the Court's briefing schedule set forth a date for Defendants to respond to Plaintiffs' motion for preliminary injunction. *Odah v. United States*, Civ. No. 02-828 (D.D.C. May 14, 2002) (order setting forth briefing schedule). Instead of filing an opposition to the motion for a preliminary injunction, on the date that their

At the time the Court received the motion to dismiss in the *Odah* matter, it became

obvious to the Court that the government was moving to dismiss both cases primarily on

jurisdictional grounds.  Accordingly, the Court found it appropriate to make a threshold ruling on

the jurisdictional question in both cases before conducting any further proceedings.  Mindful of

the importance of these suits, which raise concerns about the actions of the Executive Branch, the

Court heard oral argument on the government's motion to dismiss in both cases on June 26,

2002.

### III.  FACTUAL BACKGROUND[5]

**A.**      ***Rasul v. Bush***

Little is known about Petitioner David Hicks except that he was allegedly living in

Afghanistan at the time of his seizure by the United States Government.  Am. Pet. ¶ 22.  As for

Petitioner Rasul, in the summer of 2001, he allegedly took a hiatus from studying for his

computer engineering degree to travel.  *Id.* ¶ 24.  Allegedly, Petitioner Rasul's brother convinced

him to move to Pakistan "to visit relatives and explore his culture."  *Id.*  Petitioner Rasul left the

---

opposition to the preliminary injunction was due, Defendants moved to dismiss the entire case
(and, by inference, the motion for preliminary injunction).  Plaintiffs filed a timely opposition to
Defendant's motion.  Defendants then filed a reply, which Plaintiffs argued was inappropriate
since the Court's initial briefing schedule did not set a date for Defendants to file a reply.
However, when the Court set the initial briefing schedule, it was only concerned with receiving a
response to the motion for preliminary injunction.  Defendants were clearly within their right to
move for dismissal of the entire action, which would permit them the opportunity to file a reply
to their motion to dismiss.  Although Defendants filed their reply late, the Court shall grant them
leave to file the reply.  To the extent that Plaintiffs' opposition to Defendants' filing of a reply
brief responds to new issues first raised in Defendants' reply, the Court shall consider Plaintiffs'
response as a surreply to Defendants' motion to dismiss.

[5] For purposes of the instant motions to dismiss, the allegations of the Amended
Petition/Amended Complaint are taken as true.  The facts in this section are presented
accordingly, and do not constitute factual findings by this Court.

United Kingdom after September 11, 2001, and allegedly traveled to Pakistan solely to attempt to

continue his education at less expense than it would cost to take similar courses in the United

Kingdom.  *Id.*  Petitioner Rasul allegedly stayed with an Aunt in Lahore, Pakistan before

engaging in further travel within that country.  *Id.*  Allegedly, forces fighting against the United

States captured and kidnapped Petitioner Rasul after he left Lahore.  *Id.*

As for Petitioner Iqbal, it is alleged that in July of 2001, his family arranged for him to

marry a woman living in the same village in Pakistan as Petitioner Iqbal's father.  *Id.* ¶ 23.  After

September 11, 2001, Petitioner Iqbal left the United Kingdom and allegedly traveled to Pakistan

solely for the purpose of getting married.  *Id.*  In early October of 2001, shortly before the

marriage, Petitioner Iqbal's father allegedly allowed Petitioner Iqbal to leave the village briefly.

*Id.*  After leaving the village, forces working in opposition to the United States allegedly captured

Petitioner Iqbal.  *Id.*

Petitioners Rasul, Iqbal, and Hicks were picked up in a region of the world where the

United States is actively engaged in military hostilities authorized by a Joint Resolution of the

United States Congress, passed on September 18, 2001, in the wake of the September 11, 2001,

terrorist attacks.  The Joint Resolution authorizes the President to:

> use all necessary and appropriate force against those nations,
> organizations, or persons he determines planned, authorized,
> committed, or aided the terrorist attacks that occurred on September
> 11, 2001, or harbored such organizations or persons, in order to
> prevent any future acts of international terrorism against the United
> States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub. L. No. 107-40, § 2, 115 Stat. 224 (2001) (cited in

Am. Pet. ¶ 25).  In the course of the military campaign authorized by the Joint Resolution, the

United States attacked the Taliban, the ruling government of Afghanistan. Am. Pet. ¶ 25.  While seeking to overthrow the Taliban, the United States provided military assistance to the Northern Alliance, "a loosely knit coalition of Afghani and other military groups opposed to the Taliban Government."  *Id.* ¶ 26.

The Northern Alliance captured Petitioner David Hicks in Afghanistan and transferred custody of him to the United States on December 17, 2001.  *Id.* ¶ 27.  The precise circumstances surrounding Petitioner Rasul's and Petitioner Iqbal's capture are unknown.  However, they appear to have been transferred to United States control in early December of 2001.  *Id.* ¶ 28.

It is alleged in the Amended Petition that at no time did any of the Petitioners in United States custody voluntarily join any terrorist force.  *Id.* ¶ 30.[6]  Additionally, if any of the Petitioners in United States custody "ever took up arms in the Afghani struggle, it was only on the approach of the enemy, when they spontaneously took up arms to resist the invading forces, without having had time to form themselves into regular armed units, and carrying their arms openly and respecting all laws and customs of war."  *Id.*  Additionally, it is alleged in the Amended Petition that if Petitioners Rasul, Iqbal, and David Hicks were in Afghanistan prior to being captured, "it was in order to facilitate humanitarian assistance to the Afghani people."  *Id.* ¶

---

[6] While denying a role in any terrorist activity, Petitioners in their Amended Petition for Writ of Habeas Corpus conspicuously neglect to deny that they took up arms for the Taliban.  In fact, in an exhibit attached to the Amended Petition, Petitioner Terry Hicks, who has brought this suit on behalf of his son, indicates that his son had joined the Taliban forces. Am. Pet., Ex. C., "Affidavit of Stephen James Kenny," Attach. 8 (Letter from Stephen Kenny, counsel for Petitioner Terry Hicks to Respondent Bush) ("It is our client's understanding that his son subsequently joined the Taliban forces and on 8 December 2001 was captured by members of the Northern Alliance.").  Interestingly, this fact has been omitted from the text of the Amended Petition, but can be found only by a careful reading of an exhibit attached to the Amended Petition.  *Id.*

31. Furthermore, these Petitioners allegedly "have taken no step that was not fully protected as their free exercise of their religious and personal beliefs." *Id.*

**B.**     ***Odah v. United States***

The twelve Kuwaiti nationals in the *Odah* case, who are in United States custody at the military base at Guantanamo Bay, were in Afghanistan and Pakistan, some before and some after, September 11, 2001. Am. Compl. ¶ 14. These individuals were allegedly in those countries as volunteers for charitable purposes to provide humanitarian aid to the people of those countries. *Id.* The government of Kuwait allegedly supports such volunteer service by continuing to pay the salaries of its Kuwaiti employees while they engage in this type of volunteer service abroad. *Id.*

According to the Amended Complaint, none of those held in United States custody are, or have ever been, a combatant or belligerent against the United States, or a supporter of the Taliban or any terrorist organization. *Id.* ¶ 15. Villagers seeking bounties or other promised financial rewards allegedly seized the twelve Kuwaiti Plaintiffs against their will in Afghanistan or Pakistan. *Id.* ¶ 16. Subsequently these twelve Plaintiffs were transferred into the custody of the United States. *Id.* At various points in time, beginning in January of 2002, these twelve Plaintiffs were transferred to Guantanamo Bay. *Id.* ¶¶ 19-21.[7]

## IV.  LEGAL STANDARD DISTRICT COURTS USE IN EVALUATING MOTIONS TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

In both matters before the Court, the government has moved to dismiss on jurisdictional grounds. Before a federal court can hear a case, it must ascertain that it has jurisdiction over the underlying subject matter of the action. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534,

---

[7] It has not been confirmed that Plaintiff Mohammed Funaitel Al Dihani is currently in custody at Guantanamo Bay. Am. Compl. ¶ 21.

541 (1986) ("Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.").

Motions to dismiss for lack of jurisdiction over the subject matter of the action are proper under Federal Rule of Civil Procedure 12(b)(1). In the Rule 12(b)(1) context, the plaintiff bears the burden of proving jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936). In both matters, the government challenges the actual complaint (and/or petition) itself, without relying on matters outside the pleadings. *See generally Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987) (explaining that materials *aliunde* pleadings can be considered on a Rule 12(b)(1) motion). One commentator has referred to this type of motion as a "facial challenge" to a complaint, because a district court is not asked to review documents outside the pleadings. 2 James Wm. Moore et al., *Moore's Federal Practice*, § 12.30[4], at 39 (3rd ed. 2002) ("A facial attack questions the sufficiency of the pleading."). As both motions to dismiss before the Court present such "facial challenges," the Court must accept all of the Amended Petition's/Amended Complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in Petitioners'/Plaintiffs' favor. *United Transp. Union v. Gateway Western R.R.*, 78 F.3d 1208, 1210 (7th Cir. 1996) (*citing Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993)).[8]

---

[8] Notably, there are a few attachments to the Amended Petition for Writ of Habeas Corpus which the Court cites in this Memorandum Opinion. The Court does not consider these matters to be outside the pleadings because they were attached as exhibits to the Amended Petition.

## V. DISCUSSION

A.   **Alien Tort Statute and Administrative Procedure Act Claims**

    1.   ***Rasul v. Bush***

The Amended Petition for a Writ of Habeas Corpus in the *Rasul* action states that "Petitioners bring this action under 28 U.S.C. §§ 2241 and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202, 5 U.S.C. § 702; as well as the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the International Covenant on Civil and Political Rights ("ICCPR"), the American Declaration on the Rights and Duties of Man ("ADRDM"), and Customary International Law." Am. Pet. ¶ 2. While Petitioners seek to invoke this Court's jurisdiction under a host of separate provisions, the suit is *brought* explicitly as a petition for writs of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2242.

It has long been held that challenges to an individual's custody can only be brought under the habeas provisions. *See Chatman-Bey v. Thornburgh*, 864 F.2d 804, 807 (D.C. Cir. 1988) (*en banc*) ("Habeas is . . . 'a fundamental safeguard against unlawful custody.'") (quoting Justice Harlan's dissent in *Fay v. Noia*, 372 U.S. 391, 449 (1963)); *Monk v. Secretary of the Navy*, 793 F.2d 364, 366 (D.C. Cir. 1986) ("In adopting the federal habeas corpus statute, Congress determined that habeas corpus is the appropriate federal remedy for a prisoner who claims that he is 'in custody in violation of the Constitution . . . of the United States.'") (quoting 28 U.S.C. § 2241(c)(3)). As Petitioners seek to be "released from respondents' unlawful custody," the Court can consider this case only as a petition for writs of habeas corpus and not as an action brought pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, or any of the other jurisdictional bases

11

suggested in the Amended Petition. The exclusive means for securing the relief Petitioners seek is through a writ of habeas corpus.

### 2.    *Odah v. United States*

Seeking to avoid having the Court consider their case as a petition for writ of habeas corpus, Plaintiffs in *Odah* disclaim any desire to be released from confinement. Am. Compl. at 4. In fact, Plaintiffs have filed an Amended Complaint that eliminates an earlier request that this Court consider transferring the twelve Kuwaiti detainees to Kuwait. By eliminating this request, Plaintiffs endeavor to distance themselves from anything that might be construed as an effort to seek their release from United States custody. Instead, Plaintiffs in *Odah* ask this Court to enter a preliminary and permanent injunction prohibiting the government from refusing to allow the Kuwaiti nationals to "meet with their families," "be informed of the charges, if any, against them," "designate and consult with counsel of their choice," and "have access to the courts or some other impartial tribunal." Am. Compl. ¶ 40.

While purporting not to seek release from confinement, Plaintiffs in their Amended Complaint plainly challenge the lawfulness of their custody. The Supreme Court has held that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). As the United States Court of Appeals for the District of Columbia Circuit stated in *Chatman-Bey*, "[a]s previously suggested, the modern habeas cases teach, broadly, that habeas is designed to test the lawfulness of the government's asserted right to *detain* an individual." *Chatman-Bey*, 864 F.2d at 809 (emphasis in original); *see also Razzoli v. Federal Bureau of Prisons*, 230 F.3d 371, 373 (D.C. Cir. 2000) ("[W]e adhere to *Chatman-Bey*: for a federal prisoner, habeas is indeed exclusive even when a

12

non-habeas claim would have a merely probabilistic impact on the duration of custody.").

In the present case, Plaintiffs' fourth request for relief squarely challenges the validity of Plaintiffs' detention.  Plaintiffs seek to have "access to the courts or some other impartial tribunal." Am. Compl. ¶ 40.  Elaborating on this request, Plaintiffs have told the Court that they seek access to an impartial tribunal in order to "expeditiously establish their innocence and be able to return to Kuwait and their families." Pls.' Mem. of P. & A. in Supp. of Mot. for a Prelim. Inj. ("Pls.' Mem.") at 2.  Without question, this prayer for relief is nothing more than a frontal assault on their confinement.  While Plaintiffs in this case state that they do not seek immediate release, neither did the plaintiffs in *Chatman-Bey* or *Monk*.  Nevertheless, the District of Columbia Circuit in both of those cases found that the federal habeas statute was the only lawful way for the petitioners to challenge their confinement. *Chatman-Bey*, 864 F.2d at 809; *Monk*, 793 F.2d at 366.  In the *Odah* case, Plaintiffs seek to be presented immediately before a court to exonerate themselves "expeditiously."  This type of claim is within the exclusive province of the writ of habeas corpus.[9]

The other provisions of Plaintiffs' request for relief, namely that they be permitted to "meet with their families," "be informed of the charges, if any, against them," and "designate and consult with counsel of their choice," Am. Compl. ¶ 40, are directly related to their request to be brought before a court which would determine the extent of their entitlement to rights.  Plaintiffs cannot escape having the Court convert their action into writs for habeas corpus by adding these

---

[9] Plaintiffs cite to the habeas statutes as a basis for the Court's jurisdiction over their claims.  Am. Compl. ¶ 1.  Even though Plaintiffs have disavowed that their action is one sounding in habeas, the *Amended* Complaint continues to rely on the habeas statutes to provide this Court with jurisdiction.

13

three additional requests for relief.

Plaintiffs argue that they merely seek to challenge the *conditions* of their confinement relying principally on *Gerstein v. Pugh*, 420 U.S. 103 (1975). Pls.' Opp'n to Defs.' Mot. to Dismiss Pls.' Compl. and Mot. for a Prelim. Inj. ("Pls.' Opp'n") at 19-20. The Supreme Court in *Gerstein* found that, pursuant to 42 U.S.C. § 1983, a declaratory judgment action against state officials was a permissible means to address whether a person arrested and held for trial under a prosecutor's information was constitutionally entitled to a probable cause hearing before a judge. *Gerstein*, 420 U.S. at 107 n.5. Thus, the Supreme Court concluded that such an action did not need to be filed as a habeas petition. *Id.* n.6 ("Respondents did not ask for release from state custody, even as an alternative remedy. They asked only that the state authorities be ordered to give them a probable cause determination.").

There are clear differences between the claims presented in *Odah* and those addressed by the Court in *Gerstein*. As the Third Circuit has noted, "[I]n *Gerstein v. Pugh*, the constitutional validity of a method of pretrial procedure, *rather than its application to any particular case, was the focus of the challenge.*" *Tedford v. Hepting*, 990 F.2d 745, 749 (3d Cir. 1993) (emphasis added). The *Gerstein* Court recognized that the pretrial custody of the named plaintiffs had long since expired. *Gerstein*, 420 U.S. at 110 n.11. Accordingly, the claims the *Gerstein* Court addressed were focused on the constitutional adequacy of a pretrial procedure as it existed in the abstract. Plaintiffs in *Odah*, on the other hand, each seek a hearing on the merits of their individualized detentions.

In addition, Plaintiffs have not brought a declaratory judgment action seeking to invalidate some procedure that would not impact the duration of their confinement. The issue in

*Odah* is Plaintiffs' desire to have a hearing before a neutral tribunal. For such a claim, a petition

for writ of a habeas corpus is the exclusive avenue for relief.[10] Thus, as it does in *Rasul*, the

Court shall review the jurisdictional basis of the *Odah* case as if it were styled as a petition for

writ of habeas corpus.[11]

---

[10] Plaintiffs' citation to *Brown v. Plaut* is similarly unavailing. Pls.' Opp'n at 20 (citing *Brown v. Plaut*, 131 F.3d 163 (D.C. Cir. 1997)). The *Brown* case involved a prisoner's challenge to a decision to place him in administrative segregation. The Court of Appeals held that such action did not have to be brought as a petition for writ of habeas corpus. *Id.* at 167. In that case, the appellate panel observed that the Supreme Court "has never deviated from *Preiser*'s clear line between challenges to the fact or length of custody and challenges to the conditions of confinement." *Id.* at 168. Plaintiffs' broad request to be produced before a tribunal is obviously a challenge "to the fact . . . of custody." *Id.* Accordingly, *Brown* does not apply to this case.

[11] Alternatively, the Court notes that in order for the government to be sued under the Alien Tort Statute, the government must waive its sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Plaintiffs argue that Section 702 of the Administrative Procedure Act provides such a waiver. Pls.' Opp'n at 24 (citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (Scalia, J.) (stating that while the Alien Tort Statute does not provide a waiver of sovereign immunity, "[w]ith respect to claims against federal [officials] for *nonmonetary* relief . . . the waiver of the Administrative Procedure Act . . . is arguably available") (emphasis in original)).
Assuming that Section 702 of the Administrative Procedure Act provides a waiver, the Court finds that the actions of the government in this case would be exempt by 5 U.S.C. § 701(b)(1)(G) (providing an exemption for, "military authority exercised in the field in time of war or in occupied territory"). Cases that have analyzed Section 701(b)(1)(G) have had occasion to address it only in the context of "judicial interference with the relationship between soldiers and their military superiors." *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991). Despite the absence of pertinent case law, the language of Section 701(b)(1)(G) supports the view that this Court is unable to review the claim Plaintiffs make under the Administrative Procedure Act. There is no dispute that Plaintiffs were captured in areas where the United States was (and is) engaged in military hostilities pursuant to the Joint Resolution of Congress. Am. Compl. ¶ 16 ("the Kuwaiti Detainees were seized against their will in Afghanistan or Pakistan"). This situation plainly falls within Section 701(b)(1)(G).
The Court was unable to find any material in the legislative history that addressed Section 701(b)(1)(G) of the Administrative Procedure Act, *see, e.g.*, S. Rep. No. 89-1350, at 32-33 (1966); H.R. Rep. No. 89-901, at 16 (1965), and the parties have not provided any legislative history, that would change the Court's view of this provision. Furthermore, granting Plaintiffs relief under the Administrative Procedure Act would produce a bizarre anomaly: United States

**B.**   **The Ability of Courts to Entertain Petitions for Writs of Habeas Corpus Made By Aliens Held Outside the Sovereign Territory of the United States**

The Court, therefore, considers both cases as petitions for writs of habeas corpus on behalf of aliens detained by the United States at the military base at Guantanamo Bay, Cuba. In viewing both cases from this perspective, the Court concludes that the Supreme Court's ruling in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and its progeny, are controlling and bars the Court's consideration of the merits of these two cases. The Court shall briefly provide an overview of the *Eisentrager* decision, discuss the distinction in *Eisentrager* between the rights of citizens and aliens, analyze whether *Eisentrager* applies only to enemy aliens, and lastly, discuss the meaning of the concept of "sovereign territory" as presented in *Eisentrager*.

**1.**   ***Johnson v. Eisentrager***

The *Eisentrager* case involved a petition for writs of habeas corpus filed by twenty-one German nationals in the United States District Court for the District of Columbia. *Eisentrager*, 339 U.S. at 765. The prisoners in *Eisentrager* had been captured in China for engaging in espionage against the United States following the surrender of Germany, but before the surrender of Japan, at the end of World War II. *Id.* at 766. Since the United States was at peace with Germany, the actions of the *Eisentrager* petitioners violated the laws of war. *Id.* Following a

---

soldiers would be unable to use the courts of the United States to sue about events arising on the battlefield, while aliens, with no connection to the United States, could sue their United States military captors while hostilities continued. Such an outcome defies common sense.

Accordingly, even if the Court did not treat the *Odah* case as a petition for writs of habeas corpus, Count III, brought pursuant to the Administrative Procedure Act, fails because the actions complained of by Plaintiffs are exempt pursuant to 5 U.S.C. § 701(b)(1)(G). Additionally, as Plaintiffs have not set forth another basis for the government's waiver of its sovereign immunity outside the Administrative Procedure Act, Count II brought pursuant to the Alien Tort Statute would be subject to dismissal.

16

trial and conviction by a United States military commission sitting in China, with the express permission of the Chinese government, the prisoners were repatriated to Germany to serve their sentences at Landsberg Prison. *Id.* Their immediate custodian at Landsberg Prison was a United States Army officer under the Commanding General, Third United States Army, and the Commanding General, European Command. *Id.*

The district court dismissed the petition for want of jurisdiction. *Id.* at 767. An appellate panel reversed the decision of the district court and remanded the case for further proceedings. *See Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir. 1949). In an opinion by Judge E. Barrett Prettyman, the Court of Appeals for the District of Columbia Circuit held that "any person who is deprived of his liberty by officials of the United States, acting under purported authority of that Government, and who can show that his confinement is in violation of a prohibition of the Constitution, has a right to the writ." *Id.* at 963.

A divided panel of the Supreme Court reversed the decision of the District of Columbia Circuit and affirmed the judgment of the district court. *Eisentrager*, 339 U.S. at 791. In finding that *no* court had jurisdiction to entertain the claims of the German nationals, the Supreme Court, in an opinion by Justice Robert Jackson, found that a court was unable to extend the writ of habeas corpus to aliens held outside the sovereign territory of the United States. *Id.* at 778.

### 2.    The Critical Distinction Between Citizens and Aliens

Justice Jackson began his opinion by noting the legal differences between citizens and aliens, and between friendly aliens and enemy aliens. *Id.* at 769. Noting that citizenship provides its own basis for jurisdiction, Justice Jackson observed that "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." *Id.*

17

Such protections, Justice Jackson noted, also apply to an individual seeking a fair hearing on his or her claim to citizenship. *Id.* 769-70 (citing *Chin Yow v. United States*, 208 U.S. 8 (1908)).

In the case of the alien, Justice Jackson wrote that "[t]he alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society." *Id.* at 770. For example, presence within the country provides an alien with certain rights that expand and become more secure as he or she declares an intent to become a citizen, culminating in the full panoply of rights afforded to the citizen upon the alien's naturalization. *Id.* In extending constitutional protections beyond the citizenry, Justice Jackson noted that the Supreme Court "has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." *Id.* at 771.

Justice Jackson's sentiment is borne out by the case law. Courts of the United States have exercised jurisdiction in cases involving individuals seeking to prove their citizenship, *Chin Yow*, 208 U.S. at 13 (1908) (habeas action permitted for one seeking admission to the country to assure a hearing on his claims to citizenship), or in situations where aliens held in a port of the United States sought entry into the country, *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) ("An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful."). In the cases at bar it is undisputed that the individuals held at Guantanamo Bay do not seek to become citizens. Nor have Petitioners or Plaintiffs suggested that they have ever been to the United States or have any desire to enter the country. Petitioners and Plaintiffs do not fall into any of the categories of cases where the courts have entertained the claims of individuals seeking access to the country.

18

### 3.    Does the *Eisentrager* Opinion Apply Only to "Enemy" Aliens?

Justice Jackson continued his analysis in *Eisentrager* by noting that enemy aliens

captured incident to war do not have even a qualified access to the courts of the United States as

compared to an alien who has lawful residence within the United States. *Eisentrager*, 339 U.S.

at 776 ("[T]he nonresident enemy alien, especially one who has remained in the service of the

enemy, does not have . . . this qualified access to our courts, for he neither has comparable claims

upon our institutions nor could his use of them fail to be helpful to the enemy."); *id.* (quoting

*Clarke v. Morey*, 10 Johns. 69, 72 (N.Y. Sup. Ct. 1813) ("A lawful residence implies protection,

and a capacity to sue and be sued.  A contrary doctrine would be repugnant to sound policy, no

less than to justice and humanity.")).  Petitioners in *Rasul* and Plaintiffs in *Odah* argue that the

determination by the military commission in China that the petitioners in *Eisentrager* were

enemy aliens is fatal to the government's reliance on *Eisentrager*.  Pet'rs Mem. in Opp'n to

Resp'ts Mot. to Dismiss ("Pet'rs Opp'n") at 12; Pls.' Opp'n at 6-7.  Insisting that no

determination has been made about the aliens presently held by the government at Guantanamo

Bay, Plaintiffs and Petitioners argue that the holding in *Eisentrager* is inapplicable to the instant

cases.

To the contrary, the Supreme Court's conclusion in *Eisentrager,* that the district court

was without jurisdiction to consider the petition for writs of habeas corpus on behalf of the

twenty-one German nationals, did not hinge on the fact that the petitioners were enemy aliens,

but on the fact that they were aliens outside territory over which the United States was sovereign.

The Supreme Court held:

We have pointed out that the privilege of litigation has been extended

> to aliens, whether friendly or enemy, only because permitting their
> presence in the country implied protection.  No such basis can be
> invoked here, for these prisoners at no relevant time were within any
> territory over which the United States is sovereign, and the sences of
> their offense, their capture, their trial and their punishment were all
> beyond the territorial jurisdiction of any court of the United States.

*Id.* at 777-78.  In fact, the Supreme Court has consistently taken the position that *Eisentrager*

does not apply only to those aliens deemed to be "enemies" by a competent tribunal.  *See*

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (Breyer, J.); *United States v. Verdugo-Urquidez*,

494 U.S. 259, 270 (1990) (Rehnquist, C.J.).  These later Supreme Court cases reinforce the

conclusion that there is no meaningful distinction between the cases at bar and the *Eisentrager*

decision on the mere basis that the petitioners in *Eisentrager* had been found by a military

commission to be "enemy" aliens.[12]

In *Zadvydas*, the Court cited *Eisentrager* for the proposition that "[i]t is well established

that certain constitutional protections available to persons inside the United States are

unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693 (discussing

---

[12] The government has encouraged this Court to take "judicial notice" that these individuals are "enemy combatants."  Tr. 9-10.  In reviewing this case, the Court has taken the allegations in the Amended Petition and Amended Complaint as true as required by Rule 12(b)(1).  Petitioners and Plaintiffs allege that the individuals held at Guantanamo Bay were initially taken into custody and detained in Afghanistan and Pakistan where military hostilities were in progress.  Am. Pet. ¶¶ 22-24; Am. Compl. ¶ 16.  David Hicks, who had joined the Taliban, *see supra* note 6, arguably may be appropriately considered an "enemy combatant."  The paucity, ambiguity, and contradictory information provided by the Amended Petition and the Amended Complaint about Petitioners Rasul and Iqbal and the twelve Kuwaiti Plaintiffs held at the military base at Guantanamo Bay prevents the Court from likewise concluding that these individuals were engaged in hostilities against the United States, or were instead participating in the benign activities suggested in the pleadings.  While another court with apparently the same factual record has labeled, without explanation, the individuals held at Guantanamo Bay "enemy combatants," *Coalition of Clergy v. Bush*, 189 F. Supp. 2d, 1036, 1048 (C.D. Cal. 2002), this Court on the record before it, declines to take that step because taking judicial notice of a fact requires that the fact be "not subject to reasonable dispute."  Fed. R. Evid. 201.

also that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"). In *Verdugo-Urquidez*, the Court quoted a passage from *Eisentrager* for the proposition that the Supreme Court has emphatically rejected "extraterritorial application of the Fifth Amendment." *Verdugo-Urquidez*, 494 U.S. at 269. The Court of Appeals for the District of Columbia Circuit has taken a similarly broad view of *Eisentrager*. *Harbury v. Deutch*, 233 F.3d 596, 605 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 122 S. Ct. 2179 (2002) (observing that the Supreme Court's citation to *Eisentrager* in *Verdugo-Urquidez* was binding, and expressing its view that extraterritorial application of the Fifth Amendment was not available for aliens).

If there exists any doubt as to the sweeping nature of the holding in *Eisentrager*, the dissent in that opinion clearly crystalizes the extent of the decision. Justice Douglas, writing for himself and two other Justices, stated:

> If the [majority's] opinion thus means, and it apparently does, that these petitioners are deprived of the privilege of habeas corpus solely because they were convicted and imprisoned overseas, the Court is adopting a broad and dangerous principle. . . . [T]he Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared.

*Eisentrager*, 339 U.S. at 795-96 (Douglas, J., dissenting). Thus, even Justice Douglas noted that according to the majority's opinion in *Eisentrager*, the Great Writ had no extraterritorial application to aliens.

Accordingly, the Court finds that *Eisentrager* is applicable to the aliens in these cases,

who are held at Guantanamo Bay, even in the absence of a determination by a military

commission that they are "enemies."[13] While it is true that the petitioners in *Eisentrager* had

already been convicted by a military commission, *id*. at 766, the *Eisentrager* Court did not base

its decision on that distinction. Rather, *Eisentrager* broadly applies to prevent aliens detained

outside the sovereign territory of the United States from invoking a petition for a writ of habeas

corpus.

In sum, the *Eisentrager* decision establishes a two-dimensional paradigm for determining

the rights of an individual under the habeas laws. If an individual is a citizen or falls within a

narrow class of individuals who are akin to citizens, i.e. those persons seeking to prove their

citizenship and those aliens detained at the nation's ports, courts have focused on status and have

not been as concerned with the situs of the individual. However, if the individual is an alien

without any connection to the United States, courts have generally focused on the location of the

alien seeking to invoke the jurisdiction of the courts of the United States. If an alien is outside

the country's sovereign territory, then courts have generally concluded that the alien is not

permitted access to the courts of the United States to enforce the Constitution. Given that

*Eisentrager* applies to the aliens presently detained at the military base at Guantanamo Bay, the

only question remaining for the Court's resolution is whether Guantanamo Bay, Cuba is part of

the sovereign territory of the United States.

---

[13] The United States confronts an untraditional war that presents unique challenges in identifying a nebulous enemy. In earlier times when the United States was at war, discerning "the enemy" was far easier than today. "[I]n war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy.'" *Eisentrager* 339 U.S. at 772 (quoting *The Rapid*, 8 Cranch 155, 161 (1814)). The two cases at bar contain nationals from three friendly countries at peace with the United States, demonstrating the difficulty in determining who is the "enemy."

4.      **Is Guantanamo Bay Part of the Sovereign Territory of the United States?**

The Court in *Eisentrager* discusses the territory of the United States in terms of sovereignty. *Id.* at 778 ("for these prisoners at no relevant time were within any territory over which the United States is sovereign"). It is undisputed, even by the parties, that Guantanamo Bay is not part of the sovereign territory of the United States.[14] Thus, the only question remaining for resolution is whether this fact alone is an absolute bar to these suits, or whether aliens on a United States military base situated in a foreign country are considered to be within the territorial jurisdiction of the United States, under a *de facto* theory of sovereignty.

Petitioners and Plaintiffs assert that the United States has *de facto* sovereignty over the military base at Guantanamo Bay, and that this provides the Court with the basis needed to assert jurisdiction. Pet'rs Opp'n at 21; Pls.' Opp'n at 11. In other words, Petitioners and Plaintiffs argue that even if the United States does not have *de jure* sovereignty over the military facility at Guantanamo Bay, it maintains *de facto* sovereignty due to the unique nature of the control and jurisdiction the United States exercises over this military base. According to Petitioners and

---

[14] The United States occupies Guantanamo Bay under a lease entered into with the Cuban government in 1903. Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16-23, 1903, U.S.-Cuba, art. III, T.S. 418. The lease provides:

> While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over [the military base at Guantanamo Bay], on the other hand the Republic of Cuba consents that during the period of occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas with the right to acquire . . . for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

*Id.* As is clear from this agreement, the United States does not have sovereignty over the military base at Guantanamo Bay.

Plaintiffs, if the United States has *de facto* sovereignty over the military facility at Guantanamo Bay, then *Eisentrager* is inapplicable to their cases and the Court is able to assume jurisdiction over their claims. However, the cases relied on by Petitioners and Plaintiffs to support their thesis are belied not only by *Eisentrager*, which never qualified its definition of sovereignty in such a manner, but also by the very case law relied on by Petitioners and Plaintiffs.

At oral argument, when asked for a case that supported the view that *de facto* sovereignty would suffice to provide the Court with jurisdiction, both Petitioners and Plaintiffs directed the Court to *Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977). Tr. at 33, 62-63. The *Ralpho* case involves a claim brought under the Micronesian Claims Act of 1971, which was enacted by the United States Congress to establish a fund to compensate Micronesians for losses incurred during the hostilities of World War II. *Ralpho*, 569 F.2d at 611. The plaintiff in that case, a citizen of Micronesia, argued that the Micronesian Claims Commission, established by the Act to adjudicate settlement claims, violated his due process rights by relying on secret evidence in deciding his claim. *Id.* at 615. While the United States did not have sovereignty over Micronesia, the District of Columbia Circuit found that the plaintiff was entitled to the protections of the due process clause. *Id.* at 618-19.

Petitioners and Plaintiffs have seized upon this case as an example of a court granting an alien due process rights in a geographic area where the United States was not sovereign. Petitioners and Plaintiffs contend that if the plaintiff in *Ralpho* was able to secure constitutional rights in an area where the United States was not sovereign, constitutional rights are arguably available to aliens located in places where the United States is the *de facto* sovereign. The problem for Petitioners and Plaintiffs is that *Ralpho* does not stand for the proposition that a

24

court can grant constitutional rights over a geographical area where *de facto* sovereignty is present. Rather, *Ralpho* stands for a limited extension of the uncontested proposition that aliens residing in the sovereign territories of the United States are entitled to certain basic constitutional rights.

As the Court of Appeals explained in *Ralpho*, "[t]hat the United States is answerable to the United Nations for its treatment of the Micronesians does not give Congress greater leeway to disregard the fundamental rights and liberties of a people as much American subjects as those in other American territories." *Id.* After this observation, the *Ralpho* Court quoted the remarks of the United States Representative to the United Nations Security Council Meeting that considered whether to award trusteeship to the United States: "My government feels that it has a duty toward the peoples of the Trust Territory to govern them with no less consideration than it would govern any part of its sovereign territory." *Id.* n.72 (internal citation omitted). Additionally, when the United States was appointed by the United Nations to administer Micronesia as a trust territory, no other nation had sovereignty over Micronesia, and the United States had "full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of [the trust] agreement." Trusteeship Agreement for the Former Japanese Mandated Islands Approved at the One Hundred and Twenty-Fourth Meeting of the Security Council, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665, art. 3; *id.*, preamble (noting that "Japan, as a result of the Second World War, has ceased to exercise any authority in these islands").

As clearly set forth in the case, the *Ralpho* Court treated Micronesia as the equivalent of a United States territory, such as Puerto Rico or Guam. In fact, *Ralpho* relies solely on the cases establishing constitutional rights for persons living in the territories of the United States as

support for the view that the plaintiff located in Micronesia was deserving of certain due process

rights. *Ralpho*, 569 F.2d at 619 n.70 (citing, *inter alia*, *Balzac v. Porto Rico*, 258 U.S. 298, 313

(1922)). The *Balzac* case, which predates *Eisentrager*, stands for the proposition that the limits

of due process apply to the sovereign territories of the United States. *Balzac*, 258 U.S. at 313; *id*

at 312 ("The Constitution, however, contains grants of power, and limitations which in the nature

of things are not always and everywhere applicable and the real issue in the Insular Cases was not

whether the Constitution extended to the Philippines or [Puerto] Rico when we went there, but

which ones of its provisions were applicable by way of limitation upon the exercise of executive

and legislative power in dealing with new conditions and requirements.").[15]

Thus, the Court in *Ralpho* analogized the situation before it to those cases granting

constitutional rights to the peoples of United States territories, even though the trust agreement

with the United Nations did not provide for sovereignty over Micronesia. *Ralpho*, 569 F.2d at

---

[15] In *Harbury*, the Court of Appeals referred to *Balzac* as a situation where foreign nationals were under "de facto U.S. political control." *Harbury*, 233 F. 3d at 603. This phrase does not imply that in situations where "*de facto* sovereignty" might arguably be present, constitutional rights are available to aliens. In making this statement, the Court of Appeals cited to two cases involving Puerto Rico, *Examining Bd. of Eng'rs., Architects & Surveyors v. Otero*, 426 U.S. 572, 599 n.30 (1976) and *Balzac*, 258 U.S. at 312-13, and another case involving a special court of the United States that was held in Berlin, *United States v. Tiede*, 86 F.R.D. 227, 242-44 (U.S. Ct. Berlin 1979). In the two cases involving Puerto Rico, it is undisputed that the United States had sovereignty over the territory. In the case involving the special court convened in Berlin, the court was a United States court convened in an occupation zone controlled by the United States. *Tiede*, 86 F.R.D. at 244-45 ("The sole but novel question before the Court is whether friendly aliens, charged with civil offenses in a United States court in Berlin, under the unique circumstances of the continuing United States occupation of Berlin, have a right to a jury trial."). Accordingly, the fact that the panel in *Harbury* used the phrase "de facto U.S. political control" to describe a category of cases where constitutional rights were provided to non-citizens does not aid Petitioners and Plaintiffs. The cases relied upon by the Court of Appeals in *Harbury* for this statement do not support the view that where the United States has *de facto* sovereignty, courts of the United States have jurisdiction to entertain the claims of aliens.

619 n.71.  The cases involving the territories of the United States, relied on by the *Ralpho* Court,

are fundamentally different from the two cases presently before the Court.  The military base at

Guantanamo Bay, Cuba, is nothing remotely akin to a territory of the United States, where the

United States provides certain rights to the inhabitants.  Rather, the United States merely leases

an area of land for use as a naval base.  Accordingly, the Court is hard-pressed to adopt

Petitioners' and Plaintiffs' view that the holding in *Ralpho* favors their claims.

In fact, another district court considering whether a *de facto* sovereignty test should be

used to analyze claims occurring at the military base at Guantanamo Bay flatly rejected the idea.

*Bird v. United States*, 923 F. Supp. 338 (D. Conn. 1996).  In *Bird*, a plaintiff alleged a

misdiagnosis of a brain tumor at the United States Medical Facility at Guantanamo Bay.  *Id.* at

339.  Seeking to sue under the Federal Tort Claims Act ("FTCA"), the plaintiff sought to

distinguish prior case law which held that injuries occurring on leased military bases were

exempt from the FTCA under the "foreign country" exemption.  In order to circumvent this case

law, the plaintiff in *Bird* argued that the unique territorial status of the military base at

Guantanamo Bay brought injuries occurring on its soil within the FTCA.  *Id.* at 340.  Rejecting

the plaintiff's argument that the United States had *de facto* sovereignty over the military base at

Guantanamo Bay, the court wrote, "[b]ecause the 1903 Lease of Lands Agreement clearly

establishes Cuba as the *de jure* sovereign over Guantanamo Bay, this Court need not speculate

whether the United States is the *de facto* sovereign over the area."  *Id.* at 343.  While *Bird* dealt

with the foreign country exemption to the FTCA, it expressly disavowed a *de facto* sovereignty

test, when it was clear that Cuba was the *de jure* sovereign over Guantanamo Bay.

The *Bird* case is not the only court to reject a *de facto* sovereignty test for claims

involving aliens located at the military base at Guantanamo Bay. *Cuban American Bar Ass'n,*

*Inc. v. Christopher*, 43 F.3d 1412 (11th Cir. 1995), *cert. denied*, 515 U.S. 1142 (1995). The

*Cuban American Bar Association* case involved Cuban and Haitian migrants held in "safe

haven" at Guantanamo Bay after they left their respective countries and were intercepted in

international waters by the United States Coast Guard. *Id.* at 1417, 1419. The Eleventh Circuit

specifically addressed the question of whether migrants "outside the physical borders of the

United States have any cognizable statutory or constitutional rights." *Id.* at 1421. In *Cuban*

*American Bar Association*, the Eleventh Circuit held:

> The district court here erred in concluding that Guantanamo Bay was
> a "United States territory." We disagree that "control and
> jurisdiction" [as set forth in the lease between the United States and
> Cuba] is equivalent to sovereignty. . . . [W]e again reject the
> argument that our leased military bases abroad which continue under
> the sovereignty of foreign nations, hostile or friendly, are
> "functional[ly] equivalent" to being land borders or ports of entry of
> the United States or otherwise within the United States.

*Id.* at 1425 (internal citations omitted). Thus, *Cuban American Bar Association* stands for the

proposition that the military base at Guantanamo Bay is not within the territorial jurisdiction of

the United States simply because the United States exercises jurisdiction and control over that

facility.

Plaintiffs seek to distinguish *Cuban American Bar Assoication* by citing a Second Circuit

opinion that has been vacated as moot by the Supreme Court. Pls.' Opp'n at 12-13 (citing

*Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *vacated as moot sub*

*nom. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993) [hereinafter "*HCC*"]).

Ordinarily the Court would give short shrift to a case that has been vacated by the Supreme Court

and not issued by the District of Columbia Circuit.  However, since Plaintiffs in their papers, emphasize the importance of the reasoning in this vacated decision, the Court  considers it necessary to briefly address the case.

The Court determines that *HCC* is distinguishable on its facts.  In *HCC*, migrants were housed at the military base on Guantanamo Bay and determinations were made by Immigration and Naturalization Service ("INS") officers regarding their status.  *Id*. at 1332-33.  Those migrants that an INS officer deemed to have a credible fear of political persecution were "screened in" and were to be brought to the United States to pursue asylum claims.  Those who did not fit within this class were repatriated to Haiti.  *Id*.

The crucial distinction in their rights as aliens is that the aliens in *HCC* had been given some form of process by the government of the United States.  Once the United States made determinations that the migrants had a credible fear of political persecution and could claim asylum in the United States, these migrants became vested with a liberty interest that the government was unable to simply deny without due process of law.  The situation in *HCC* is fundamentally different from the cases presently before the Court.  The individuals held at Guantanamo Bay have no desire to enter the United States and no final decision as to their status has been made.  At this stage of their detention, those held at Guantanamo Bay more closely approximate the migrants in *Cuban American Bar Association* than the migrants "screened in" for admission to the United States in *HCC*.[16]

_____

[16]While there is dicta in the *HCC* opinion which indicates a broader holding with regard to the constitutional rights of individuals detained at the military base on Guantanamo Bay, such dicta in *HCC* is not persuasive and not binding.  *HCC*, 969 F.2d at 1343.  The Supreme Court in *Eisentrager*, *Verdugo-Urquidez*, and *Zadvydas*, and the District of Columbia Circuit in *Harbury*, have all held that there is no extraterritorial application of the Fifth Amendment to aliens.

## VI. CONCLUSION

The Court concludes that the military base at Guantanamo Bay, Cuba is outside the sovereign territory of the United States. Given that under *Eisentrager*, writs of habeas corpus are not available to aliens held outside the sovereign territory of the United States, this Court does not have jurisdiction to entertain the claims made by Petitioners in *Rasul* or Plaintiffs in *Odah*. Of course, just as the *Eisentrager* Court did not hold "that these prisoners have no right which the military authorities are bound to respect," *Eisentrager*, 339 U.S. at 789 n.14, this opinion, too, should not be read as stating that these aliens do not have some form of rights under international law. Rather, the Court's decision solely involves whether it has jurisdiction to consider the constitutional claims that are presented to the Court for resolution.

Petitioners and Plaintiffs argue that as long as the United States has *de facto* sovereignty over Guantanamo Bay, Fifth Amendment protections should apply. For this proposition, Petitioners and Plaintiffs rely on *Ralpho*, a case that involves land so similar to United States territory that the District of Columbia Circuit extended constitutional protections to its inhabitants. Clearly, Guantanamo Bay does not fall into that category. The Court, therefore, rejects the holding in *Ralpho* as a basis for this Court to exercise jurisdiction over the claims made by Petitioners and Plaintiffs. Accordingly, both cases shall be dismissed for want of jurisdiction.

COLLEEN KOLLAR-KOTELLY
United States District Judge

Copies to:

L. Barrett Boss
Suite 200
ASBILL, JUNKIN, MOFFITT & BOSS, CHARTERED
1615 New Hampshire Avenue, N.W.
Washington, DC 20009

Thomas B. Wilner
Neil H. Koslowe
Kristine A. Huskey
Heather L. Kafele
SHEARMAN & STERLING
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Robert D. Okun, AUSA
UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 4th Street, N.W.
Washington, D.C. 20001