UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | Civil Action Nos. |
| ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** ) | **04-CV-1144 (RWR), 04-CV-1164 (RBW),** |
| ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| ) | **04-CV-1254 (HHK)** |
| ) | |
| ) | |

## MEMORANDUM OPINION DENYING IN PART AND GRANTING IN PART RESPONDENTS' MOTION TO DISMISS OR FOR JUDGMENT AS A MATTER OF LAW

These eleven coordinated <u>habeas</u> cases were filed by detainees held as "enemy combatants" at the United States Naval Base at Guantanamo Bay, Cuba. Presently pending is the government's motion to dismiss or for judgment as a matter of law regarding all claims filed by all petitioners, including claims based on the United States Constitution, treaties, statutes, regulations, the common law, and customary international law. Counsel filed numerous briefs addressing issues raised in the motion and argued their positions at a hearing in early December 2004. Upon consideration of all filings submitted in these cases and the arguments made at the hearing, and for the reasons stated below, the Court concludes that the petitioners have stated valid claims under the Fifth Amendment to the United States Constitution and that the procedures implemented by the government to confirm that the petitioners are "enemy combatants" subject to indefinite detention violate the petitioners' rights to due process of law. The Court also holds that at least some of the petitioners have stated valid claims under the Third

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Geneva Convention. Finally, the Court holds that the government is entitled to the dismissal of the petitioners' remaining claims.

Because this Memorandum Opinion references classified material, it is being issued in two versions. The official version is unredacted and is being filed with the Court Security Officer at the U.S. Department of Justice responsible for the management of classified information in these cases. The Court Security Officer will maintain possession of the original, distribute copies to counsel with the appropriate security clearances in accordance with the procedures earlier established in these cases, and ensure that the document is transmitted to the Court of Appeals should an appeal be taken. Classified information in the official version is highlighted in gray to alert the reader to the specific material that may not be released to the public. The other version of the Memorandum Opinion contains redactions of all classified information and, in an abundance of caution, portions of any discussions that might lead to the discovery of classified information. The redacted version is being posted in the electronic dockets of the cases and is available for public review.

## I. BACKGROUND

In response to the horrific and unprecedented terrorist attacks by al Qaeda against the United States of America on September 11, 2001, Congress passed a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . , or

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

harbored such organizations or persons, in order to prevent any future acts of international

terrorism against the United States by such nations, organizations or persons." Authorization for

Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (hereinafter "AUMF").

In accordance with the AUMF, President George W. Bush ordered the commencement of

military operations in Afghanistan against al Qaeda and the Taliban regime, which harbored the

terrorist organization.  During the course of the military campaign, United States forces took

custody of numerous individuals who were actively fighting against allied forces on Afghan soil.

Many of these individuals were deemed by military authorities to be "enemy combatants" and,

beginning in early 2002, were transferred to facilities at the United States Naval Base at

Guantanamo Bay, Cuba, where they continue to be detained by U.S. authorities.

In addition to belligerents captured during the heat of war in Afghanistan, the U.S.

authorities are also detaining at Guantanamo Bay pursuant to the AUMF numerous individuals

who were captured hundreds or thousands of miles from a battle zone in the traditional sense of

that term.  For example, detainees at Guantanamo Bay who are presently seeking habeas relief in

the United States District Court for the District of Columbia include men who were taken into

custody as far away from Afghanistan as Gambia,[1] Zambia,[2] Bosnia,[3] and Thailand.[4]  Some have

---

[1] Jamil El-Banna and Bisher Al-Rawi, petitioners in El-Banna v. Bush, 04-CV-1144 (RWR).

[2] Martin Mubanga, petitioner in El-Banna v. Bush, 04-CV-1144 (RWR).

[3] Lakhdar Boumediene, Mohammed Nechle, Hadj Boudella, Belkacem Bensayah, Mustafa Ait Idr, and Saber Lahmar, petitioners in Boumediene v. Bush, 04-CV-1166 (RJL).

[4] Saifullah Paracha, petitioner in Paracha v. Bush, 04-CV-2022 (PLF).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

already been detained as long as three years[5] while others have been captured as recently as

September 2004.[6] Although many of these individuals may never have been close to an actual

battlefield and may never have raised conventional arms against the United States or its allies,

the military nonetheless has deemed them detainable as "enemy combatants" based on

conclusions that they have ties to al Qaeda or other terrorist organizations.

All of the individuals who have been detained at Guantanamo Bay have been categorized

to fall within a general class of people the administration calls "enemy combatants." It is the

government's position that once someone has been properly designated as such, that person can

be held indefinitely until the end of America's war on terrorism or until the military determines

on a case by case basis that the particular detainee no longer poses a threat to the United States or

its allies. Within the general set of "enemy combatants" is a subset of individuals whom the

administration decided to prosecute for war crimes before a military commission established

pursuant to a Military Order issued by President Bush on November 13, 2001. Detention,

Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833

(Nov. 13, 2001). Should individuals be prosecuted and convicted in accordance with the Military

Order, they would be subject to sentences with fixed terms of incarceration or other specific

penalties.

Since the beginning of the military's detention operations at Guantanamo Bay in early

2002, detainees subject to criminal prosecution have been bestowed with more rights than

---

[5] E.g., the petitioners in <u>Al Odah v. Bush</u>, 02-CV-0828 (CKK).

[6] E.g., Saifullah Paracha in <u>Paracha v. Bush</u>, 04-CV-2022 (PLF).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

detainees whom the military did not intend to prosecute formally for war crimes.  For example,

the military regulations governing the prosecutions of detainees required a formal notice of

charges, a presumption of innocence of any crime until proven guilty, a right to counsel, pretrial

disclosure to the defense team of exculpatory evidence and of evidence the prosecution intends to

use at trial, the right to call reasonably available witnesses, the right to have defense counsel

cross-examine prosecution witnesses, the right to have defense counsel attend every portion of

the trial proceedings even where classified information is presented, and the right to an open trial

with the press present, at least for those portions not involving classified information.  See

Procedures for Trials by Military Commissions of Certain Non-United States Citizens in the War

Against Terrorism, 32 C.F.R. §§ 9.1 et seq. (2005).  Although detainees at Guantanamo Bay not

subject to prosecution could suffer the same fate as those convicted of war crimes – potentially

life in prison, depending on how long America's war on terrorism lasts – they were not given any

significant procedural rights to challenge their status as alleged "enemy combatants," at least

until relatively recently.  From the beginning of 2002 through at least June 2004, the substantial

majority of detainees not charged with war crimes were not informed of the bases upon which

they were detained, were not permitted access to counsel, were not given a formal opportunity to

challenge their "enemy combatant" status, and were alleged to be held virtually incommunicado

from the outside world.  Whether those individuals deemed "enemy combatants" are entitled

under the United States Constitution and other laws to any rights and, if so, the scope of those

5

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

rights is the focus of the government's motion to dismiss and this Memorandum Opinion.[7]

The first of these coordinated cases challenging the legality of the detention of alleged "enemy combatants" at Guantanamo Bay and the terms and conditions of that detention commenced nearly three years ago on February 19, 2002. Rasul v. Bush, 02-CV-0299 (CKK). The action, brought by relatives on behalf of one Australian and two British nationals as their "next friends,"[8] was styled as a petition for writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2242. The initial relief sought included an order requiring the release of the detainees, an order permitting counsel to meet with the detainees in private and without government monitoring, and an order directing the cessation of interrogations of the detainees during the pendency of litigation. The asserted substantive bases for the requested relief ultimately included the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and

---

[7] In a decision issued on November 8, 2004, Judge James Robertson ruled that the procedures for trying Guantanamo detainees for alleged war crimes by military commission were unlawful for failing to comply with the requirements for courts martial set forth in the Uniform Code of Military Justice. Hamdan v. Rumsfeld, 344 F. Supp.2d 152 (D.D.C. 2004). Only one of the detainees in the above-captioned cases has been given notice that he will be tried for war crimes. That detainee, David Hicks, a petitioner in Hicks v. Bush, 02-CV-0299 (CKK), has filed a separate motion for partial summary judgment challenging the legality of the military commission procedures. Pursuant to an order issued in that case on December 15, 2004, resolution of that motion is being held in abeyance pending final resolution of all appeals in Hamdan. This Memorandum Opinion does not address the legality of the military commission proceedings but rather focuses on the issue of the rights of detainees with respect to their classification as "enemy combatants" regardless of whether they have been formally charged with a war crime.

[8] 28 U.S.C. § 2242 provides that a habeas petition may be brought "by the person for whose relief it is intended or by someone acting in his behalf."

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Duties of Man, and customary international law.

Less than three months after the commencement of <u>Rasul,</u> the second of these

coordinated cases was filed.  <u>Al Odah v. Bush,</u> 02-CV-0828 (CKK).  The individuals filing suit

on behalf of the twelve Kuwaiti detainees in that case did not expressly request release from

custody but rather sought judicial enforcement of the detainees' asserted rights to meet with

family members, be informed of any charges against them, and have access to the courts or some

other impartial tribunal to exonerate themselves of any wrongdoing.  The alleged bases for these

rights included the Fifth Amendment to the United States Constitution, the Alien Tort Claims

Act, and the Administrative Procedure Act.

The government filed a motion to dismiss the two cases, arguing that both of them should

be classified as <u>habeas</u> actions and asserting that because all of the detainees were aliens being

held outside the sovereign territory of the United States, the District Court should dismiss the

actions for lack of jurisdiction to hear their claims.  The government's motion relied heavily on

<u>Johnson v. Eisentrager,</u> 339 U.S. 763 (1950), a Supreme Court case involving German nationals

convicted by a United States military commission sitting in China for acts committed in China

after Germany's surrender in World War II.  The German nationals were eventually incarcerated

in Landsberg prison in Germany and sought <u>habeas</u> relief, claiming their trial, conviction, and

imprisonment violated Articles I and III of the United States Constitution, the Fifth Amendment,

other laws of the United States, and the Geneva Convention governing the treatment of prisoners

of war.  The Supreme Court ultimately held that the petitioners in <u>Eisentrager</u> had no standing to

file a claim for <u>habeas</u> relief in a United States court.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

In a thoughtful analysis of Eisentrager and its progeny, Judge Colleen Kollar-Kotelly

granted the government's motion to dismiss both cases. Rasul v. Bush, 215 F. Supp.2d 55

(D.D.C. 2002).   The decision was based on an interpretation that Eisentrager barred claims of

any alien seeking to enforce the United States Constitution in a habeas proceeding unless the

alien is in custody in sovereign United States territory.  Id. at 68.  Recognizing that Guantanamo

Bay is not part of the sovereign territory of the United States, id. at 69, the District Court

dismissed the cases for lack of "jurisdiction to consider the constitutional claims that are

presented to the Court for resolution."  Id. at 73.  After issuing a show cause order as to why an

additional pending habeas case filed by a Guantanamo detainee, Habib v. Bush, 02-CV-1130

(CKK), should not be dismissed in light of the decision in Rasul and Al Odah, the District Court

also dismissed that case, and all three cases were appealed to the United States Court of Appeals

for the District of Columbia Circuit.

On appeal, the D.C. Circuit affirmed the District Court's decisions in all three cases.

Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003).  Reviewing recent precedent

involving aliens and constitutional rights, the Court of Appeals announced, "The law of the

circuit now is that a 'foreign entity without property or presence in this country has no

constitutional rights, under the due process clause or otherwise.'"  Id. at 1141 (citing People's

Mojahedin Org. v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) and 32 County Sovereignty

Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002)).  "The consequence," the court

continued, "is that no court in this country has jurisdiction to grant habeas relief, under 28 U.S.C.

§ 2241, to the Guantanamo detainees, even if they have not been adjudicated enemies of the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

United States." Id. at 1141.

The Supreme Court reversed the D.C. Circuit's decision and held that the District Court did have jurisdiction to hear the detainees' habeas claims. Rasul v. Bush, ___ U.S. ___, 124 S. Ct. 2686 (2004). The majority opinion, issued June 28, 2004, noted several facts that distinguished the Guantanamo detainees from the petitioners in Eisentrager more than fifty years earlier:

> [The Guantanamo petitioners] are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing; and for more than two years they have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control.

124 S. Ct. at 2693. Emphasizing that "[b]y the express terms of its agreements with Cuba, the United States exercises 'complete jurisdiction and control' over the Guantanamo Bay Naval Base," and highlighting that the government conceded at oral argument that "the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base," the Court concluded, "Aliens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under [the habeas statute]." 124 S. Ct. at 2696.

The Supreme Court expressly acknowledged that the allegations contained in the petitions for writs of habeas corpus "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States'" as required by the habeas statute, 124 S. Ct. at 2698 n.15 (quoting 28 U.S.C. § 2241(c)(3)), and concluded by instructing:

> Whether and what further proceedings may become necessary after respondents make their response to the merits of petitioners' claims are matters that we need

9

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

not address now. What is presently at stake is only whether the federal courts
have jurisdiction to determine the legality of the Executive's potentially indefinite
detention of individuals who claim to be wholly innocent of wrongdoing.
Answering that question in the affirmative, we reverse the judgment of the Court
of Appeals and remand for the District Court to consider in the first instance the
merits of petitioners' claims.

124 S. Ct. at 2699.

On July 7, 2004, nine days after the issuance of the <u>Rasul</u> decision, Deputy Secretary of

Defense Paul Wolfowitz issued an Order creating a military tribunal called the Combatant Status

Review Tribunal (hereinafter "CSRT") to review the status of each detainee at Guantanamo Bay

as an "enemy combatant."[9]  It appears that this is the first formal document to officially define

the term "enemy combatant" as used by the respondents. That definition is as follows:

> [T]he term "enemy combatant" shall mean an individual who was part of or
> supporting Taliban or al Qaeda forces, or associated forces that are engaged in
> hostilities against the United States or its coalition partners. This includes any
> person who has committed a belligerent act or has directly supported hostilities in
> aid of enemy armed forces.

The Deputy Secretary's Order notes that all Guantanamo detainees were previously determined

to be "enemy combatants" through what the Order describes without additional specificity as

"multiple levels of review by officers of the Department of Defense." Order at 1. The Order sets

forth procedures by which detainees can contest this status before a panel of three commissioned

military officers.

The CSRT procedures will be described in more detail below, but in brief, under the

terms of the July 7 Order and a July 29, 2004 Memorandum issued by Secretary of the Navy

---

[9] The document is attached as Exhibit A to the respondents' motion to dismiss and can
also be found at http://www.defenselink.mil/news/Jul2004/d20040707review.pdf.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Gordon England implementing the Order,[10] detainees for the first time have the right to hear the factual bases for their detention, at least to the extent that those facts do not involve information deemed classified by the administration. Detainees also have the right to testify why they contend they should not be considered "enemy combatants" and may present additional evidence they believe might exculpate them, at least to the extent the tribunal finds such evidence relevant and "reasonably available." The detainees do not have a right to counsel in the proceedings, although each is assigned a military officer who serves as a "Personal Representative" to assist the detainee in understanding the process and presenting his case. Formal rules of evidence do not apply, and there is a presumption in favor of the government's conclusion that a detainee is in fact an "enemy combatant." Although the tribunal is free to consider classified evidence supporting a contention that an individual is an "enemy combatant," that individual is not entitled to have access to or know the details of that classified evidence.

The record of the CSRT proceedings, including the tribunal's decision regarding "enemy combatant" status, is reviewed for legal sufficiency by the Staff Judge Advocate for the Convening Authority, the body designated by the Secretary of the Navy to appoint tribunal members and Personal Representatives. After that review, the Staff Judge Advocate makes a recommendation to the Convening Authority, which is then required either to approve the panel's decision or to send the decision back to the panel for further proceedings. It is the government's position that in the event a conclusion by the tribunal that a detainee is an "enemy combatant" is

---

[10] The Implementing Memorandum is attached as Exhibit B to the motion to dismiss and can also be found at http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

affirmed, it is legal to hold the detainee in custody until the war on terrorism has been declared

by the President to have concluded or until the President or his designees have determined that

the detainee is no longer a threat to national security.  If the tribunal finally determines that a

detainee should no longer be deemed an "enemy combatant," a written report of the decision is

forwarded to the Secretary of Defense or his designee, who is then obligated to contact the

Secretary of State for coordination of the transfer of the detainee either to his country of

citizenship or elsewhere in accordance with law and U.S. foreign policy.

In the wake of the Supreme Court's decision in Rasul, several new habeas cases were

filed on behalf of Guantanamo detainees in addition to those cases that were remanded by the

Court as part of Rasul.  As of the end of July 2004, thirteen cases involving more than sixty

detainees were pending before eight Judges in this District Court.  On July 23, 2004, the

respondents filed a motion to consolidate all of the cases pending at that time.  The motion was

denied without prejudice three days later.  On August 4, 2004, the respondents filed a motion

seeking coordination of legal issues common to all cases.  By order dated August 17, 2004, Judge

Gladys Kessler on behalf of the Calendar and Case Management Committee granted the motion

in part, designating this Judge to coordinate and manage all proceedings in the pending matters

and, to the extent necessary, rule on procedural and substantive issues common to the cases.  An

Executive Session Resolution dated September 15, 2004 further clarified that this Judge would

identify and delineate both procedural and substantive issues common to all or some of these

cases and, as consented to by the transferring judge in each case, rule on common procedural

issues.  The Resolution also provided that to the extent additional consent was given by the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

transferring Judges, this Judge would address specified common substantive issues. The

Resolution concluded by stating that any Judge who did not agree with any substantive decision

made by this Judge could resolve the issue in his or her own case as he or she deemed

appropriate. Although issues and motions were transferred to this Judge, the cases themselves

have remained before the assigned Judges.

After two informal status conferences discussing, among other issues, the factual bases

for the government's detention of the petitioners, this Judge issued a scheduling order requiring

the respondents to file responsive pleadings showing cause why writs of <u>habeas corpus</u> and the

relief sought by petitioners should not be granted. The order also incorporated the respondents'

proposed schedule for the filing of factual returns identifying the specific bases upon which they

claim the government is entitled to detain each petitioner at Guantanamo Bay as an "enemy

combatant." Although most of the detainees had already been held as "enemy combatants" for

more than two years and had been subjected to unspecified "multiple levels of review," the

respondents chose to submit as factual support for their detention of the petitioners the records

from the CSRT proceedings, which had only commenced in late August or early September

2004. Those factual returns were filed with the Court on a rolling basis as the CSRT proceedings

were completed, with the earliest submitted on September 17, 2004 and the latest on

December 30, 2004. Because every complete CSRT record contained classified information,

respondents filed redacted, unclassified versions on the public record, submitted the full,

classified versions for the Court's <u>in camera</u> review, and served on counsel for the petitioners

with appropriate security clearances versions containing most of the classified information

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

disclosed in the Court's copies but redacting some classified information that respondents alleged would not exculpate the detainees from their "enemy combatant" status.

During the fall, the Court resolved numerous procedural issues common to all cases. Among other matters, the Court ruled that the cases should not be transferred to the Eastern District of Virginia, where the primary respondent, Secretary of Defense Donald Rumsfeld, maintains his office,[11] ruled on protective order issues,[12] and granted the petitioners certain rights relating to access to counsel to assist in the litigation of these cases.[13]

On October 4, 2004, the respondents filed their Response to Petitions for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law in all thirteen cases pending before the Court at that time. Counsel for petitioners filed a joint opposition on November 5, 2004, which was supplemented by additional filings specific to the petitions filed in Al Odah v. United States, 02-CV-0828 (CKK); El-Banna v. Bush, 04-CV-1144 (RWR); and Boumediene v. Bush, 04-CV-1166 (RJL). Respondents filed replies in support of their original motion. The motions to dismiss in eleven of the thirteen cases were transferred by separate orders issued by the assigned Judges in accordance with the procedures set forth for the resolution of substantive

---

[11]  Gherebi v. Bush, 338 F. Supp.2d 91 (D.D.C. 2004).

[12]  November 8, 2004 Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, 344 F. Supp.2d 174 (D.D.C. 2004).

[13]  Id.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

matters in the September 15, 2004 Executive Resolution.[14]  This Court held oral argument for the

eleven cases with transferred motions on December 1, 2004.  Subsequently, eight more habeas

cases were filed on behalf of Guantanamo detainees.[15]  Although this Memorandum Opinion

addresses issues common to those new cases, counsel in those cases have not yet had the

opportunity to fully brief or argue the issues on their own behalf.  Accordingly, while the Judges

assigned to those cases are free, of course, to adopt the reasoning contained in this Memorandum

Opinion in resolving those motions, this Memorandum Opinion technically applies only to the

eleven cases contained in the above caption.


## II. ANALYSIS


The petitioners in these eleven cases allege that the detention at Guantanamo Bay and the

conditions thereof violate a variety of laws.  All petitions assert violations of the Fifth

Amendment, and a majority claim violations of the Alien Tort Claims Act,[16] the Administrative

---

[14]  As was his prerogative, Judge Richard Leon did not transfer the motions to dismiss in
his two Guantanamo cases, Khalid v. Bush, 04-CV-1142 (RJL) and Boumediene v. Bush, 04-
CV-1166 (RJL), and this Memorandum Opinion therefore does not apply to those two cases.

[15]  Belmar v. Bush, 04-CV-1897 (RMC); Al Qosi v. Bush, 04-CV-1937 (PLF); Paracha v.
Bush, 04-CV-2022 (PLF); Al-Marri v. Bush, 04-CV-2035 (GK); Zemiri v. Bush, 04-CV-2046
(CKK); Deghayes v. Bush, 04-CV-2215 (RMC); Mustapha v. Bush, 05-CV-0022 (JR); and
Abdullah v. Bush, 05-CV-0023 (RWR).

[16]  28 U.S.C. § 1350 (1993).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Procedure Act,[17] and the Geneva Conventions.[18]  In addition, certain petitions allege violations of

the Sixth, Eighth, and Fourteenth Amendments; the War Powers Clause;[19] the Suspension

Clause;[20] Army Regulation 190-8, entitled "Enemy Prisoners of War, Retained Personnel,

Civilian Internees and Other Detainees;" the International Covenant on Civil and Political Rights

("ICCPR");[21] the American Declaration on the Rights and Duties of Man ("ADRDM");[22] the

Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children

in Armed Conflict;[23] the International Labour Organization's Convention 182, Concerning the

Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour;[24] and

customary international law.  The respondents contend that none of these provisions constitutes a

valid basis for any of the petitioners' claims and seek dismissal of all counts as a matter of law

under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can be granted.  In the

alternative, the respondents seek a judgment based on the pleadings pursuant to Fed. R. Civ. P.

---

[17]  5 U.S.C. §§ 555, 702, 706 (1996).

[18]  (Third) Geneva Convention Relative to the Treatment of Prisoners of War of Aug. 12, 1949, 6 U.S.T. 3316; and Fourth Geneva Convention, 1956 WL 54810 (U.S. Treaty), T.I.A.S. No. 3365, 6 U.S.T. 3516.

[19]  U.S. Const. art. I, § 8, cl. 11.

[20]  U.S. Const. art. I, § 9, cl. 2.

[21]  999 U.N.T.S. 171, 6 I.L.M. 368 (1992), and 102d Cong., 138 Cong. Rec. S4781 (Apr. 2, 1992).

[22]  O.A.S. Off. Rec. OEA/Ser. LV/I.4 Rev. (1965).

[23]  S. Treaty Doc. No. 106-37, 2000 WL 33366017.

[24]  S. Treaty Doc. No. 106-5, 1999 WL 33292717.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

12(c).  The respondents have not requested entry of summary judgment pursuant to Fed. R. Civ.

P. 56, and they have opposed requests for discovery made by counsel for the petitioners on the

ground that those requests are premature at this stage of the proceedings.  See, e.g., Respondents'

Memorandum in Opposition to Petitioners' Motion for Leave to Take Discovery and For

Preservation Order, filed January 12, 2005, at 6.

 In addressing a motion to dismiss for failure to state a claim upon which relief can be

granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all factual allegations

contained in a petition and must resolve every factual inference in the petitioner's favor.

Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  The moving party is

entitled to dismissal "only if it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations."  Croixland Properties Ltd. Partnership v.

Corcoran, 174 F.3d 213, 215 (D.C. Cir. 1999) (quoting Hishon v. King & Spalding, 467 U.S. 69

(1984)).  Similarly, in resolving a motion for judgment on the pleadings pursuant to Fed. R. Civ.

P. 12(c), the Court must "accept as true the allegations in the opponent's pleadings, and as false

all controverted assertions of the movant" and must "accord the benefit of all reasonable

inferences to the non-moving party."  Haynesworth v. Miller, 820 F.2d 1245, 1249 n.11 (D.C.

Cir. 1987).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

## A.    EXTRATERRITORIAL APPLICATION OF THE CONSTITUTION TO ALIENS

Notwithstanding the Supreme Court's decision in Rasul that the District Court's

dismissal of the petitioners' claims was incorrect as a matter of law, the respondents argue in

their October 2004 motion that the Rasul decision resolved only whether individuals detained at

Guantanamo Bay had the right merely to allege in a United States District Court under the habeas

statute that they are being detained in violation of the Constitution and other laws. Respondents

argue that the decision was silent on the issue of whether the detainees actually possess any

underlying substantive rights, and they further contend that earlier Supreme Court precedent and

the law of this Circuit make clear that the detainees do not hold any such substantive rights.

Accordingly, it is the respondents' position that although Rasul clarified that a detainee has every

right to file papers in the Clerk's Office alleging violations of the Constitution, statutes, treaties

and other laws, and although the Court has jurisdiction to accept the filing and to consider those

papers, the Court must not permit the case to proceed beyond a declaration that no underlying

substantive rights exist. While the Court would have welcomed a clearer declaration in the Rasul

opinion regarding the specific constitutional and other substantive rights of the petitioners, it

does not interpret the Supreme Court's decision as narrowly as the respondents suggest it should.

To the contrary, the Court interprets Rasul, in conjunction with other precedent, to require the

recognition that the detainees at Guantanamo Bay possess enforceable constitutional rights.

The significance and scope of the Rasul decision is best understood after a review of

earlier case law addressing the applicability of the Constitution outside of the United States and

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

to individuals who are not American citizens. At the end of the nineteenth century, the Supreme

Court interpreted the Constitution to have no applicability outside of the United States, even to

activities undertaken by the United States government with respect to American citizens. In

Ross v. McIntyre, 140 U.S. 453, 464 (1891), a habeas case involving a U.S. citizen convicted of

murder by an American consular tribunal in Japan, the Court declared, "By the constitution a

government is ordained and established 'for the United States of America,' and not for countries

outside of their limits. The guaranties it affords . . . apply only to citizens and others within the

United States, or who are brought there for trial for alleged offenses committed elsewhere, and

not to residents or temporary sojourners abroad. The constitution can have no operation in

another country." 140 U.S. at 464 (citing Cook v. United States 138 U.S. 157, 181 (1891)).

The Supreme Court reexamined this broad declaration beginning a decade later and

recognized the potential for a more liberal view of the Constitution's applicability outside of the

United States in a line of precedent known as the "Insular Cases." One of the earliest of those

cases, Downes v. Bidwell, 182 U.S. 244 (1901), addressed whether the imposition of duties on

products from Puerto Rico after it became a U.S. territory was a violation of the Constitution's

Uniformity Clause, which requires that "all duties, imposts, and excises shall be uniform

throughout the United States." Art. I, § 8, cl. 2. As part of its analysis, the Court held that the

"unincorporated" territory of Puerto Rico – meaning a territory not destined for statehood – was

not part of the "United States" and that, as a result, the imposition of duties on Puerto Rican

goods did not violate the Constitution. In dicta, the Court acknowledged that Congress had

traditionally interpreted the Constitution to apply to territories "only when and so far as Congress

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

shall so direct." 182 U.S. at 278-79. The Court noted the apprehension of "many eminent men"

caused by such an interpretation, however, and it described that concern as "a fear lest an

unrestrained possession of power on the part of Congress may lead to unjust and oppressive

legislation in which the natural rights of territories, or their inhabitants, may be engulfed in a

centralized despotism." Id. At 280. Significant to the resolution of the cases brought by the

Guantanamo detainees, the Court went on to minimize such concern by suggesting that the

Constitution prevented Congress from denying inhabitants of unincorporated U.S. territories

certain "fundamental" rights, including "the right to personal liberty . . . ; to free access to courts

of justice, [and] to due process of law." Id. at 282. Because such fundamental rights were not at

issue in Downes v. Bidwell, the Court did not address this concept in greater detail at that time.

Three years later, the Court faced more directly the applicability of the Constitution

outside of the United States when it resolved whether the defendant in a criminal libel action in a

Philippines court was entitled to a trial by jury under Article III and the Sixth Amendment of the

U.S. Constitution. Dorr v. United States, 195 U.S. 138 (1904). At the time of the litigation, the

United States had control of the Philippines as an unincorporated territory after the conclusion of

the Spanish-American War. Congress, however, had enacted legislation expressly exempting

application of the U.S. Constitution to the area. The defendant in that case was prosecuted for

libel under the previously existing Spanish system and was not permitted a trial by jury. On

appeal, the defendant argued that the right to trial by jury was a "fundamental" right guaranteed

by the U.S. Constitution and that Congress did not have the power to deny that right by statute.

Although the Court ultimately ruled that the Constitution did not require a right to jury trial in the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Philippines, it did so only after examining the legal traditions employed in the Philippines prior to annexation as a U.S. territory, the significance of the constitutional right asserted, and the ability of the existing system to accept the burdens of applying new constitutional constraints.  In reaching its conclusion that a right to trial by jury was not a "fundamental" right guaranteed outside of the United States, the Court emphasized that the legal system pursuant to which the defendant was prosecuted already provided numerous procedural safeguards, including fact finding by judges, a right of appeal, a right to testify, a right to retain counsel, a right to confront witnesses, a right against self-incrimination, and a right to due process.  Id. at 145.  After suggesting that a large majority of the population would be unfit to serve as jurors, the Court further noted that recognizing a fundamental constitutional right to a jury trial might, in fact, "work injustice and provoke disturbance rather than . . . aid the orderly administration of justice."  Id. at 148.[25]

That holding was reaffirmed in a similar criminal case involving a prosecution for libel in Puerto Rico.  Balzac v. People of Porto Rico, 258 U.S. 298 (1922).[26]  Like the defendant in Dorr, the defendant in the Puerto Rican case claimed his denial of a jury trial violated Article III and the Sixth Amendment of the U.S. Constitution.  Unlike the defendant in Dorr, however, the defendant in Balzac was a United States citizen.  The Court rejected that this distinction held any

---

[25] At a time critics might call less enlightened, the Dorr opinion expressed a fear that further expansion of the application of the Constitution might result in requiring "savages" to serve as jurors.  Id.

[26] Citations to most, if not all, Insular Cases decided during the period between Dorr and Balzac can be found in United States v. Pollard, 209 F. Supp.2d 525, 539 n.17 (D. Virgin Islands 2002), rev'd, 326 F.3d 397 (3rd Cir. 2003).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

significance, reiterating that a right to trial by jury was not a "fundamental" right and

emphasizing that U.S. citizens had no constitutional right to a trial by jury in a proceeding

outside of the United States.  As the Court explained, "It is locality that is determinative of the

application of the Constitution, in such matters as judicial procedure, and not the status of the

people who live in it."  258 U.S. at 309.

A plurality opinion issued by the Supreme Court in Reid v. Covert, 354 U.S. 7 (1957)

sharply criticized this portion of the Balzac opinion and argued for the further liberalization of

the application of the Constitution outside of the United States.  Reid involved two wives

charged with the capital murders of their husbands.  Both men were soldiers in the United States

military and were killed at overseas posts, one in England and the other in Japan.  The wives,

who were American citizens, were tried and convicted abroad by courts martial under the

Uniform Code of Military Justice and subsequently sought habeas relief, arguing that as civilians

they were entitled under the Constitution to civilian trials.  Initially, a majority of the Court ruled

in the Japanese case during the previous term that the guarantees of an indictment by grand jury

and subsequent jury trial under the Fifth and Sixth Amendments in a prosecution by the United

States government did not apply in foreign lands for acts committed outside the United States.

Kinsella v. Krueger, 351 U.S. 470 (1956).  Upon further argument and reconsideration the

following term, however, the Court overruled its earlier decision, with four Justices subscribing

to a plurality opinion and two Justices issuing separate opinions concurring in the result.

**UNCLASSIFIED VERSION
FOR PUBLIC RELEASE**

The plurality began its analysis of the issues with the following pronouncement, a marked contrast from the language used a half century earlier in <u>Ross</u>:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government.

354 U.S. at 5-6 (footnotes omitted). After noting the language of the Fifth Amendment expressly states that "no person" shall be tried for a capital crime without a grand jury indictment and acknowledging that the Sixth Amendment requires that "in all criminal prosecutions" the defendant shall enjoy the right to a speedy and public trial, <u>id</u>. at 7, the plurality was critical of the narrower, "fundamental rights" approach taken in the previous Insular Cases, at least as applied to U.S. citizens, and explained, "While it has been suggested that only those constitutional rights which are 'fundamental' protect Americans abroad, we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of 'Thou shalt nots' which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments." <u>Id</u>. at 8-9. The plurality went on to clarify that the "fundamental" rights approach limiting the full application of the Constitution to territories under U.S. control had been intended to avoid disruption of long established practices and to expedite the carrying out of justice in the insular possessions. <u>Id</u>. at 13. Accordingly, the plurality suggested that any further abridgement of constitutional rights under a "fundamental" rights

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

approach should not be countenanced. They reasoned, "If our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes." Id. at 14.

In his concurring opinion, Justice Harlan, who had voted to deny habeas relief in the case during the previous term, explained that his change of opinion was based on an increased concern about the fact that the underlying crimes for which the defendants were charged were capital offenses. Id. at 65. He was careful to emphasize, however, his belief that the Insular Cases still had "vitality," id. at 67, and that the precedent remained "good authority for the proposition that there is no rigid rule that jury trial must always be provided in the trial of an American overseas, if the circumstances are such that trial by jury would be impractical and anomalous." Id. at 75 (emphasis in the original). Justice Harlan posited further that the types of constitutional rights that should apply overseas depended on "the particular local setting, the practical necessities, and the possible alternatives." Id. Agreeing with what Justice Frankfurter wrote in a separately concurring opinion, Justice Harlan commented that the issue was analogous to a due process inquiry in which the courts must look to the particular circumstances of a particular case to determine what constitutional safeguards should apply. Id.

Because of the lack of a five Justice majority in Reid, Balzac continues to be interpreted as binding authority. Thus, for example, the Fifth Circuit held that a U.S. citizen charged with distribution of cocaine in the United States District Court for the Canal Zone District at Balboa was not entitled to the nonfundamental rights to a grand jury indictment and to a jury that had the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

potential to include military personnel. Government of the Canal Zone v. Scott, 502 F.2d 566,

568 (5th Cir. 1974) ("non-citizens and citizens of the United States resident in such territories are

treated alike, since it is the territorial nature of the Canal Zone and not the citizenship of the

defendant that is dispositive"). Indeed, although Reid far from settled the issue of the

Constitution's application abroad, it certainly did not weaken the long held doctrine that

fundamental constitutional rights cannot be denied in territories under the control of the

American government, even where the United States technically is not considered "sovereign"

and where the claimant is not a United States citizen.

The District of Columbia Circuit so recognized in a case this Court finds to be

particularly relevant to the litigation presently under consideration. Ralpho v. Bell, 569 F.2d 607

(D.C. Cir. 1977), required the application of the Fifth Amendment to U.S. government activities

in Micronesia, a "Trust Territory" pursuant to a United Nations designation under which the

United States acted as administrator. More specifically, the case involved a constitutional

challenge to the procedures undertaken by a commission created by Congress to compensate

residents who suffered property damage as a result of American military activities against Japan

during World War II. The plaintiff in that case owned a home that had been destroyed by the

American offensive, and although the commission ultimately awarded compensation, the

commission's valuation of the plaintiff's loss was lower than what he had claimed. More

significantly, the valuation was based on evidence that the plaintiff was not permitted to examine

or rebut. In addressing whether the Due Process Clause of the Fifth Amendment regulated the

commission's valuation procedures, the D.C. Circuit expressly recognized that the United States

25

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

was not technically "sovereign" over Micronesia, 569 F.2d at 619 n.71, and noted that the exact

scope of the Constitution's foreign reach was a "matter of some controversy," commenting on

the criticism in the Reid plurality opinion of the more limited "fundamental" rights approach

taken in the Insular Cases. Id. at 618 & n.69. Nonetheless, the court concluded that at a

minimum, due process was a "fundamental" right even with respect to property and that "it is

settled that 'there cannot exist under the American flag any governmental authority untrammeled

by the requirements of due process of law.'" Id. at 618-19 (quoting Calero-Toledo v. Pearson

Yacht Leasing Co., 416 U.S. 663, 669 n.5 (1974)). Thus, the court required the commission to

give the plaintiff access to the evidence upon which its decision relied.[27]

The Supreme Court again tried to bring some clarity to the issue of extraterritorial

application of the Constitution when it reviewed the legality of the search and seizure by

American government officials of items in the Mexican residence of a Mexican citizen charged

with various narcotics-related offenses under U.S. law. United States v. Verdugo-Urquidez, 494

---

[27] At least twice since the Ralpho decision, the D.C. Circuit recognized the continuing murkiness of whether the Constitution provides protection to noncitizens abroad in cases involving action by American authorities in locales far from the absolute control of the U.S. Congress. Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C. Cir. 1985), involved a claim by Nicaraguan citizens and residents that the alleged support of the Contras by American government officials violated Fourth and Fifth Amendment rights. The Court of Appeals found it unnecessary to resolve whether the Constitution applied in Nicaragua by concluding that even if it did, other grounds prevented the plaintiffs from recovering the relief they sought. Id. at 208. The second case, United States v. Yunis, 859 F.2d 953 (D.C. Cir. 1988), involved the seizure and alleged mistreatment of a Lebanese citizen by FBI agents on a boat off the coast of Cyprus. At his trial in District Court for alleged hijacking, the defendant sought the suppression of a confession he provided while in international waters on the ground that his interrogation violated asserted Fifth Amendment rights. Again, the majority avoided the threshold issue of extraterritorial application of the Constitution by accepting a stipulation between the prosecution and defendant that the Fifth Amendment was applicable. Id. at 957.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

U.S. 259 (1990).  Citing language from Reid that "the Constitution imposes substantive

constraints on the Federal Government, even when it operates abroad," the Court of Appeals for

the Ninth Circuit had ruled that the Fourth Amendment required the suppression of the evidence

gained through the search, notwithstanding its conclusion that a search warrant obtained in the

United States would have had no legal validity in Mexico.  856 F.2d 1214, 1218 (9th Cir. 1988).

The Supreme Court reversed and began its analysis with a comparison of the language in the

Fourth Amendment with the terminology in the Fifth and Sixth Amendments, noting that the

Fourth Amendment is written to apply to "the people" while the Fifth and Sixth Amendments

protect "person[s]" and the "accused."  494 U.S. at 265-66.  The Court interpreted the linguistic

differences as evidence that the drafters of the Fourth Amendment intended it to protect the

people of the United States rather than to impose restrictions on the government against

nonresident aliens.  Id. at 266.

Perhaps more significant for purposes of these Guantanamo detainee cases, the majority

opinion then addressed the Insular Cases and reaffirmed that in U.S. territories, only

"fundamental" constitutional rights are guaranteed.  Accordingly, the Court concluded that the

ability of noncitizens in foreign countries to invoke Fourth Amendment rights must be even

weaker.  Id. at 268.  Citing Johnson v. Eisentrager, 339 U.S. 763 (1950), the Court then declared,

"Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the

sovereign territory of the United States."  494 U.S. at 269.  The Court described its rejection in

Eisentrager of the extraterritorial application of the Fifth Amendment as "emphatic," and

concluded that if the Fifth Amendment, with the universal term "person," did not apply to aliens

27

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

extraterritorially, then neither should the Fourth Amendment, which applies only to "the people." Id.

Justice Kennedy joined the majority opinion but also wrote a separate concurring opinion. Minimizing the majority opinion's reliance on the term "the people" as used in the Fourth Amendment, Justice Kennedy preferred to focus on the Insular Cases and Reid, giving particular attention to Justice Harlan's concurring opinion.  More specifically, Justice Kennedy invoked a contextual due process analysis to resolve the issue, making specific reference to Justice Harlan's comments that there is no rigid and abstract rule that requires Congress to provide all constitutional guarantees overseas where to do so would be "impracticable and anomalous." Id. at 277-78 (quoting Reid, 354 U.S. at 74).  Ultimately, Justice Kennedy concluded that under the facts of the case, it would have been impracticable and anomalous to require the U.S. authorities to obtain a warrant for a search of property in Mexico, citing the lack of Mexican judicial officials to issue such warrants, potentially differing concepts of privacy and what would constitute an "unreasonable" search, and practical difficulties involved in dealing with foreign officials.  Id. at 278.

So existed the state of relevant constitutional law at the time of Judge Kollar-Kotelly's dismissals of Rasul, Al Odah, and Habib.  As a technical matter, her dismissals were not based on a finding that the Guantanamo detainees lacked underlying substantive constitutional rights, although the opinion does make brief references to some of the Insular Cases and to the Supreme Court's reference in Verdugo-Urquidez to the lack of extraterritorial Fifth Amendment rights. Rather, the District Court dismissed on the basis that it lacked jurisdiction under the habeas

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

statute, 28 U.S.C. §§ 2241 and 2242, in light of the Supreme Court's decision in <u>Eisentrager</u>.  In

that case, the Supreme Court held that federal courts did not have the authority to entertain the

<u>habeas</u> claims of German nationals captured in China, convicted of war crimes by a U.S. military

commission in China, and serving their sentences in a Landsberg prison, located in Germany but

administered by the U.S. military.  The crucial aspect of the <u>Eisentrager</u> decision, according to

Judge Kollar-Kotelly, was its conclusion that <u>habeas</u> relief could not be granted to individuals in

custody outside the sovereign territory of the United States.  Her opinion emphasized the

importance of the conclusion that the Guantanamo Bay Naval Base is not on sovereign United

States territory, and rejected the argument made by counsel for the detainees that under <u>Ralpho v.</u>

<u>Bell</u>, <u>de facto</u> sovereignty, rather than <u>de jure</u> sovereignty, was sufficient support for <u>habeas</u>

jurisdiction.  While recognizing that Micronesia, the location at issue in <u>Ralpho</u>, was not <u>de jure</u>

sovereign U.S. territory, the District Court concluded that those islands are much more similar in

character and status to sovereign territories than Guantanamo Bay is.  According to the District

Court, "The military base at Guantanamo Bay, Cuba, is nothing remotely akin to a territory of the

United States, where the United States provides certain rights to the inhabitants.  Rather, the

United States merely leases an area of land for use as a naval base." 215 F. Supp.2d at 71.

In reviewing the District Court's decision dismissing the cases for lack of <u>habeas</u>

jurisdiction, the D.C. Circuit took a somewhat different approach, relying more heavily than the

District Court on an analysis of the substantive constitutional rights upon which the detainees'

petitions were based.  The D.C. Circuit interpreted <u>Eisentrager</u> to characterize the right to a writ

of <u>habeas</u> <u>corpus</u> as a "subsidiary procedural right that follows from the possession of substantive

29

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

constitutional rights." 321 F.3d at 1140 (quoting Eisentrager, 339 U.S. at 781). Further noting

that Eisentrager rejected the proposition "that the Fifth Amendment confers rights upon all

persons, whatever their nationality, wherever they are located and whatever their offenses," id.,

the Court of Appeals then commented that this language "may be read to mean that the

constitutional rights mentioned are not held by aliens outside the sovereign territory of the United

States, regardless of whether they are enemy aliens." Id. at 1140-41. Invoking the language in

Verdugo-Urquidez that Eisentrager "rejected the claim that aliens are entitled to Fifth

Amendment rights outside the sovereign territory of the United States" and that such rejection in

Eisentrager was "emphatic," the Court of Appeals then noted its previous reliance on Verdugo-

Urquidez and Eisentrager in earlier cases that made clear that "[t]he law of the circuit now is that

a 'foreign entity without property or presence in this country has no constitutional rights, under

the due process clause or otherwise.'" Id. at 1141 (quoting People's Mojahedin Org. v. Dep't of

State, 182 F.3d 17, 22 (D.C. Cir. 1999), and also citing Harbury v. Deutch, 233 F.3d 596 (D.C.

Cir. 2000), rev'd sub nom. Christopher v. Harbury, 536 U.S. 403 (2002); Pauling v. McElroy,

278 F.2d 252 (D.C. Cir. 1960); and 32 County Sovereignty Comm. v. Dep't of State, 292 F.3d

797 (D.C. Cir. 2002)). Emphasizing that Guantanamo Bay was not part of sovereign U.S.

territory and rejecting any material significance to the U.S. government's practical control over

the area, the court thus concluded in Al Odah:

> The consequence is that no court in this country has jurisdiction to grant
> habeas relief, under 28 U.S.C. § 2241, to the Guantanamo detainees, even if they
> have not been adjudicated enemies of the United States. We cannot see why, or
> how, the writ may be made available to aliens abroad when basic constitutional
> protections are not. This much is at the heart of Eisentrager. If the Constitution
> does not entitle the detainees to due process, and it does not, they cannot invoke

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

> the jurisdiction of our courts to test the constitutionality or the legality of restraints
> on their liberty.  Eisentrager itself directly tied jurisdiction to the extension of
> constitutional provisions . . . .

Id. at 1141.

The D.C. Circuit's decision was reversed in Rasul v. Bush, ___ U.S. ___, 124 S. Ct. 2686

(2004).  In reviewing the decision of the Court of Appeals, the majority opinion addressed two

grounds upon which a detainee traditionally could assert a right to habeas relief:  statutory and

constitutional.  The Rasul majority interpreted Eisentrager to have focused primarily on the

German detainees' lack of a constitutional right to habeas review, and distinguished the material

facts upon which that portion of the Eisentrager decision relied from the circumstances

concerning the Guantanamo Bay detainees.  Among other distinguishing facts, the Rasul opinion

emphasized that the Guantanamo Bay detainees were not citizens of countries formally at war

with the United States, denied committing any war crimes or other violent acts, were never

charged or convicted of wrongdoing, and – most significant to the present motion to dismiss –

are imprisoned in "territory over which the United States exercises exclusive jurisdiction and

control."  124 S. Ct. at 2693.  Next, Rasul turned to the issue of statutory habeas jurisdiction and

ruled that post-Eisentrager precedent required the recognition of statutory jurisdiction even over

cases brought by petitioners held outside the territorial jurisdiction of any federal district court.

Noting that the habeas statute made no distinction between citizens and aliens held in federal

custody, the Court ultimately ruled that "[a]liens held at the base, no less than American citizens,

are entitled to invoke the federal courts' authority under § 2241."  Id. at 2696.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

While conceding as they must in light of the Rasul decision that this Court has habeas

jurisdiction over these cases, the respondents assert in their current motion to dismiss that the

Supreme Court did not grant certiorari to review the D.C. Circuit's decision that the Guantanamo

Bay detainees have no underlying constitutional rights. Accordingly, the respondents argue, the

D.C. Circuit's pronouncement in Al Odah that the detainees lack substantive rights is still

binding on this Court and the portions of the petitions invoking the Constitution must be

dismissed for failure to state a claim upon which relief can be granted. Counsel for the

petitioners, on the other hand, assert that in upholding this Court's habeas jurisdiction, the

Supreme Court also made clear that the Constitution applies to Guantanamo Bay and that the

detainees possess substantive constitutional rights. This Court finds the arguments made on

behalf of the petitioners in this regard far more persuasive.

As an initial matter, the conclusion that the D.C. Circuit's holding on lack of substantive

constitutional rights is no longer the law of the case could be deduced merely from the facts that:

(1) the appellate court's opinion emphasized that the existence of habeas jurisdiction and

substantive constitutional rights were "directly tied," 321 F.3d at 1141; (2) the appellate court

believed Eisentrager applied to the facts of these cases and prevented the detainees from asserting

substantive constitutional rights; and (3) the Supreme Court held that habeas jurisdiction did in

fact exist and that Eisentrager was inapplicable to these cases. Additionally, and on a more

detailed level, careful examination of the specific language used in Rasul reveals an implicit, if

not express, mandate to uphold the existence of fundamental rights through application of

precedent from the Insular Cases.

32

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

On appeal to the D.C. Circuit, counsel for the petitioners argued for the application of
Ralpho v. Bell by challenging the District Court's finding that Guantanamo Bay was simply
another naval base on land leased from a foreign sovereign and nowhere near the legal equivalent
of a United States territory. 215 F. Supp.2d at 71. The D.C. Circuit rejected the challenge and
agreed with the District Court on this point. Although the appellate court conceded that
Micronesia, like Guantanamo Bay, was not technically sovereign U.S. territory, it concluded that
Ralpho nonetheless did not "justify this court, or any other, to assert habeas corpus jurisdiction at
the behest of an alien held at a military base leased from another nation." 321 F.3d at 1144.
Instead, the appellate court found Landsberg prison in Germany to be a more suitable analogy,
and because Eisentrager held that no constitutional rights existed there, the D.C. Circuit
concluded that no constitutional rights could exist at Guantanamo Bay. Rasul, however,
unequivocally rejected the D.C. Circuit's analogy and made clear that Guantanamo Bay cannot
be considered a typical overseas military base.

In his concurring opinion in Rasul, Justice Kennedy unambiguously repudiated the D.C.
Circuit's analogy of Guantanamo Bay to Landsberg prison, and he made a Ralpho-type
conclusion that Guantanamo Bay was, for all significant purposes, the equivalent of sovereign
U.S. territory. He explained:

> Guantanamo Bay is in every practical respect a United States territory, and it is
> one far removed from any hostilities. . . . [The Guantanamo Bay lease] is no
> ordinary lease. Its term is indefinite and at the discretion of the United States.
> What matters is the unchallenged and indefinite control that the United States has
> long exercised over Guantanamo Bay. From a practical perspective, the indefinite
> lease of Guantanamo Bay has produced a place that belongs to the United States,
> extending the "implied protection" of the United States to it.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Id. at 2700 (Kennedy, J., concurring) (citing Eisentrager, 339 U.S. at 777-78).  Although the

majority opinion was not as explicit as Justice Kennedy's concurrence, it too found significant

the territorial nature of Guantanamo Bay and dismissed the D.C. Circuit's characterization of

Guantanamo Bay as nothing more than a foreign military prison.  For example, in refusing the

application of Eisentrager's constitutional analysis to these cases, the majority took special note

that, unlike the German prisoners, the Guantanamo detainees "have been imprisoned in territory

over which the United States exercises exclusive jurisdiction and control."  124 S. Ct. at 2693.

Additionally, in rejecting an argument made by respondents that applying the habeas statute to

prisoners at Guantanamo Bay would violate a canon of statutory interpretation against

extraterritorial application of legislation, the majority wrote:

> Whatever traction the presumption against extraterritoriality might have in other
> contexts, it certainly has no application to the operation of the habeas statute with
> respect to persons detained within the "territorial jurisdiction" of the United
> States. . . .  By the express terms of its agreements with Cuba, the United States
> exercises "complete jurisdiction and control" over the Guantanamo Bay Naval
> Base, and may continue to exercise such control permanently if it so chooses.

124 S. Ct. at 2696 (citing Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949), in which the

Court refused to interpret a statute mandating an eight hour work day to have application to an

American citizen working for a contractor in Iran and Iraq absent evidence that the "United

States had been granted by the respective sovereignties any authority, legislative or otherwise,

over the labor laws or customs of Iran or Iraq." ).

These passages alone would be sufficient for this Court to recognize the special nature of

Guantanamo Bay and, in accordance with Ralpho v. Bell, to treat it as the equivalent of sovereign

U.S. territory where fundamental constitutional rights exist.  But perhaps the strongest basis for

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

recognizing that the detainees have fundamental rights to due process rests at the conclusion of

the Rasul majority opinion. In summarizing the nature of these actions, the Court recognized:

> Petitioners' allegations – that, although they have engaged neither in combat nor in acts
> of terrorism against the United States, they have been held in Executive detention for
> more than two years in territory subject to the long-term, exclusive jurisdiction and
> control of the United States, without access to counsel and without being charged with
> any wrongdoing – unquestionably describe "custody in violation of the Constitution or
> laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Cf. United States v.
> Verdugo-Urquidez, 494 U.S. 259, 277-278, 110 S. Ct. 1056, 108 L.Ed.2d 222 (1990)
> (Kennedy, J., concurring), and cases cited therein.

124 S. Ct. at 2698 n.15. This comment stands in sharp contrast to the declaration in Verdugo-

Urquidez relied upon by the D.C. Circuit in Al Odah that the Supreme Court's "rejection of

extraterritorial application of the Fifth Amendment [has been] emphatic." 494 U.S. at 269.

Given the Rasul majority's careful scrutiny of Eisentrager, it is difficult to imagine that the

Justices would have remarked that the petitions "unquestionably describe 'custody in violation of

the Constitution or laws or treaties of the United States'" unless they considered the petitioners to

be within a territory in which constitutional rights are guaranteed. Indeed, had the Supreme

Court intended to uphold the D.C. Circuit's rejection in Al Odah of underlying constitutional

rights, it is reasonable to assume that the majority would have included in its opinion at least a

brief statement to that effect, rather than delay the ultimate resolution of this litigation and

require the expenditure of additional judicial resources in the lower courts. To the contrary,

rather than citing Eisentrager or even the portion of Verdugo-Urquidez that referenced the

"emphatic" inapplicability of the Fifth Amendment to aliens outside U.S. territory, the Rasul

Court specifically referenced the portion of Justice Kennedy's concurring opinion in Verdugo-

Urquidez that discussed the continuing validity of the Insular Cases, Justice Harlan's concurring

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

opinion in <u>Reid v. Covert</u>, and Justice Kennedy's own consideration of whether requiring

adherence to constitutional rights outside of the United States would be "impracticable and

anomalous." This Court therefore interprets that portion of the opinion to require consideration

of that precedent in the determination of the underlying rights of the detainees.

There would be nothing impracticable and anomalous in recognizing that the detainees at

Guantanamo Bay have the fundamental right to due process of law under the Fifth Amendment.

Recognizing the existence of that right at the Naval Base would not cause the United States

government any more hardship than would recognizing the existence of constitutional rights of

the detainees had they been held within the continental United States. American authorities are

in full control at Guantanamo Bay, their activities are immune from Cuban law, and there are few

or no significant remnants of native Cuban culture or tradition remaining that can interfere with

the implementation of an American system of justice.[28] The situation in these cases is very

different from the circumstances in <u>Verdugo-Urquidez</u>, where the defendant claimed the United

States government was required to get a warrant to perform a search in Mexico, a sovereign

country that employs an entirely different legal system, lacks officials to issue warrants, and has

potentially different concepts of privacy. Similarly, the imposition of constitutional rights would

be less difficult at Guantanamo Bay than it was in any of the Insular Cases, where the courts were

_____

[28] Ironically, the Cuban government has alleged that the U.S. military is violating the
human rights of the detainees at Guantanamo Bay and has demanded more humane treatment of
the prisoners. The U.S. government, however, does not appear to have conceded the Cuban
government's sovereignty over these matters. See <u>What's News</u>, The Wall Street Journal,
Jan. 20, 2005, at A1(2005 WL 59838432); <u>Cuba Demands US Stop Alleged Abuses at "Illegally
Occupied" Guantanamo Base</u>, Agence France Presse, Jan. 19, 2005 (2005 WL 69517025).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

required to determine whether imposition of American rights such as the right to trial by jury and

indictment by grand jury were even possible in places such as the Philippines and Puerto Rico

with native legal systems and populations previously unexposed to American jurisprudence.

Of course, it would be far easier for the government to prosecute the war on terrorism if it

could imprison all suspected "enemy combatants" at Guantanamo Bay without having to

acknowledge and respect any constitutional rights of detainees. That, however, is not the

relevant legal test. By definition, constitutional limitations often, if not always, burden the

abilities of government officials to serve their constituencies. Although this nation

unquestionably must take strong action under the leadership of the Commander in Chief to

protect itself against enormous and unprecedented threats, that necessity cannot negate the

existence of the most basic fundamental rights for which the people of this country have fought

and died for well over two hundred years. As articulated by the Supreme Court after the

conclusion of the Civil War:

> The Constitution of the United States is a law for rulers and people, equally in war
> and in peace, and covers with the shield of its protection all classes of men, at all
> times, and under all circumstances. No doctrine, involving more pernicious
> consequences, was ever invented by the wit of man than that any of its provisions
> can be suspended during any of the great exigencies of government. Such a
> doctrine leads directly to anarchy or despotism, but the theory of necessity on
> which it is based is false; for the government, within the Constitution, has all the
> powers granted to it, which are necessary to preserve its existence; as has been
> happily proved by the result of the great effort to throw off its just authority.

Ex Parte Milligan, 71 U.S. 2, 120-21 (1866). See also United States v. Robel, 389 U.S. 258, 264

(1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the

subversion of one of those liberties . . . which makes the defense of the Nation worthwhile.").

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

In sum, there can be no question that the Fifth Amendment right asserted by the Guantanamo detainees in this litigation – the right not to be deprived of liberty without due process of law – is one of the most fundamental rights recognized by the U.S. Constitution. In light of the Supreme Court's decision in Rasul, it is clear that Guantanamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply. Accordingly, and under the precedent set forth in Verdugo-Urquidez, Ralpho, and the earlier Insular Cases, the respondents' contention that the Guantanamo detainees have no constitutional rights is rejected, and the Court recognizes the detainees' rights under the Due Process Clause of the Fifth Amendment.

## B.    SPECIFIC REQUIREMENTS OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

Having found that the Guantanamo detainees are entitled to due process under the Fifth Amendment to the United States Constitution, the Court must now address the exact contours of that right as it applies to the government's determinations that they are "enemy combatants." Due process is an inherently flexible concept, and the specific process due in a particular circumstance depends upon the context in which the right is asserted. Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Resolution of a due process challenge requires the consideration and weighing of three factors: the private interest of the person asserting the lack of due process; the risk of erroneous deprivation of that interest through use of existing procedures and the probable value of additional or substitute procedural safeguards; and the competing interests of the

38

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

government, including the financial, administrative, and other burdens that would be incurred were additional safeguards to be provided.  Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The Supreme Court applied a Mathews v. Eldridge analysis in Hamdi v. Rumsfeld, ___ U.S. ___, 124 S. Ct. 2633 (2004), a decision issued the same day as Rasul which considered an American citizen's due process challenge to the U.S. military's designation of him as an "enemy combatant."  Although none of the detainees in the cases before this Court is an American citizen, the facts under Hamdi are otherwise identical in all material respects to those in Rasul.  Accordingly, Hamdi forms both the starting point and core of this Court's consideration of what process is due to the Guantanamo detainees in these cases.

In addressing the detainee's private interest in Hamdi for purposes of the Mathews v. Eldridge analysis, the plurality opinion called it "the most elemental of liberty interests – the interest in being free from physical detention by one's own government."  124 S. Ct. at 2646.  Although the detainees in the cases before this Court are aliens and are therefore not being detained by their own governments, that fact does not lessen the significance of their interests in freedom from incarceration and from being held virtually incommunicado from the outside world.  There is no practical difference between incarceration at the hands of one's own government and incarceration at the hands of a foreign government; significant liberty is deprived in both situations regardless of the jailer's nationality.

As was the case in Hamdi, the potential length of incarceration is highly relevant to the weighing of the individual interests at stake here.  The government asserts the right to detain an "enemy combatant" until the war on terrorism has concluded or until the Executive, in its sole

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

discretion, has determined that the individual no longer poses a threat to national security. The government, however, has been unable to inform the Court how long it believes the war on terrorism will last. See December 1, 2004 Transcript of Motion to Dismiss (hereinafter "Transcript") at 22-23. Indeed, the government cannot even articulate at this moment how it will determine when the war on terrorism has ended. Id. at 24. At a minimum, the government has conceded that the war could last several generations, thereby making it possible, if not likely, that "enemy combatants" will be subject to terms of life imprisonment at Guantanamo Bay. Id. at 21; Hamdi, 124 S. Ct. at 2641. Short of the death penalty, life imprisonment is the ultimate deprivation of liberty, and the uncertainty of whether the war on terror – and thus the period of incarceration – will last a lifetime may be even worse than if the detainees had been tried, convicted, and definitively sentenced to a fixed term.

It must be added that the liberty interests of the detainees cannot be minimized for purposes of applying the Mathews v. Eldridge balancing test by the government's allegations that they are in fact terrorists or are affiliated with terrorist organizations. The purpose of imposing a due process requirement is to prevent mistaken characterizations and erroneous detentions, and the government is not entitled to short circuit this inquiry by claiming ab initio that the individuals are alleged to have committed bad acts. See Hamdi, 124 S. Ct. at 2647 ("our starting point for the Mathews v. Eldridge analysis is unaltered by the allegations surrounding the particular detainee or the organizations with which he is alleged to have associated"). Moreover, all petitioners in these cases have asserted that they are not terrorists and have not been involved in terrorist activities, and under the standards provided by the applicable rules of procedure, those

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

allegations must be accepted as true for purposes of resolving the government's motion to dismiss.

On the other side of the Mathews v. Eldridge analysis is the government's significant interest in safeguarding national security. Having served as the Chief Judge of the United States Foreign Intelligence Surveillance Court (also known as "the FISA Court"), the focus of which involves national security and international terrorism,[29] this Judge is keenly aware of the determined efforts of terrorist groups and others to attack this country and to harm American citizens both at home and abroad. Utmost vigilance is crucial for the protection of the United States of America. Of course, one of the government's most important obligations is to safeguard this country and its citizens by ensuring that those who have brought harm upon U.S. interests are not permitted to do so again. Congress itself expressly recognized this when it enacted the AUMF authorizing the President to use all necessary and appropriate force against those responsible for the September 11 attacks. The Supreme Court also gave significant weight to this governmental concern and responsibility in Hamdi when it addressed the "interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States." 124 S. Ct. at 2647. The plurality warned against naivete regarding the dangers posed to the United States by terrorists and noted that the legislative and executive branches were in the best positions to deal with those dangers. As articulated by the plurality, "[T]he law of war and the realities of combat may render ... detentions both necessary and appropriate, and our due process analysis need not blink at those realities. Without doubt, our

---

[29] See 50 U.S.C. § 1803 (2003).

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Constitution recognizes that core strategic matters of warmaking belong in the hands of those

who are best positioned and most politically accountable for making them." Id. Indeed, a

majority of the Court affirmed the Executive's authority to seize and detain Taliban fighters as

long as the conflict in Afghanistan continues, regardless of how indefinite the length of that war

may be. See the plurality opinion, id. at 2641-42, and the dissenting opinion of Justice Thomas,

id. at 2674.

Given the existence of competing, highly significant interests on both sides of the

equation – the liberty of individuals asserting complete innocence of any terrorist activity versus

the obligation of the government to protect this country against terrorist attacks – the question

becomes what procedures will help ensure that innocents are not indefinitely held as "enemy

combatants" without imposing undue burdens on the military to ensure the security of this nation

and its citizens.   The four member Hamdi plurality answered this question in some detail, and

although the two concurring members of the Court, Justice Souter and Justice Ginsburg,

emphasized a different basis for ruling in favor of Mr. Hamdi, they indicated their agreement

that, at a minimum, he was entitled to the procedural protections set forth by the plurality.  Id. at

2660.

According to the plurality in Hamdi, an individual detained by the government on the

ground that he is an "enemy combatant" "must receive notice of the factual basis for his

classification, and a fair opportunity to rebut the Government's factual assertions before a neutral

decisionmaker."  Id. at 2648.  Noting the potential burden these requirements might cause the

government at a time of ongoing military conflict, the plurality stated that it would not violate

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

due process for the decision maker to consider hearsay as the most reliable available evidence. Id. at 2649. In addition, the plurality declared it permissible to adopt a presumption in favor of "enemy combatant" status, "so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." Id. For that presumption to apply and for the onus to shift to the detainee, however, the plurality clarified that the government first would have to "put[] forth credible evidence that the [detainee] meets the enemy-combatant criteria." Id.[30]

After setting forth these standards, the plurality suggested the "possibility" that constitutional requirements of due process could be met by an "appropriately authorized and properly constituted military tribunal" and referenced the military tribunals used to determine whether an individual is entitled to prisoner of war status under the Geneva Convention. Id. at 2651 (citing Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8, § 1-6 (1997)). In the absence of a tribunal following constitutionally mandated procedures, however, the plurality declared that it was the District Court's obligation to provide those procedural rights to the detainee in a habeas action. Again recognizing the enormous significance of the interests of both detainees and the government, the plurality affirmed the proper role of the judiciary in these matters, stating "We have no reason to doubt that courts faced with these sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations

---

[30] Justice Souter, whose opinion was joined by Justice Ginsburg, indicated he did not believe that such a presumption was constitutionally permissible when he wrote, "I do not mean to imply agreement that the Government could claim an evidentiary presumption casting the burden of rebuttal on [the detainee]." Id. at 2660.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

safeguarding essential liberties that remain vibrant even in times of security concerns." Id. at

2652. The plurality concluded by affirming that the detainee "unquestionably [had] the right to

access to counsel in connection with the proceedings on remand." Id.

Hamdi was decided before the creation of the Combatant Status Review Tribunal, and the

respondents contend in their motion to dismiss that were this Court to conclude that the detainees

are entitled to due process under the Fifth Amendment, the CSRT proceedings would fully

comply with all constitutional requirements. More specifically, the respondents claim that the

CSRT regulations were modeled after Army Regulation 190-8 governing the determination of

prisoner of war status, referenced in Hamdi, and actually exceed the requirements set forth by the

Hamdi plurality. For example, respondents cite the facts that under CSRT rules, tribunal

members must certify that they have not been involved in the "apprehension, detention,

interrogation, or previous determination of status of the detainee[s]," that detainees are provided

a "Personal Representative" to assist in the preparation of their cases, that the "Recorder" – that

is, the person who presents evidence in support of "enemy combatant" status – must search for

exculpatory evidence, that the detainee is entitled to an unclassified summary of the evidence

against him, and that the tribunal's decisions are reviewed by a higher authority. Motion to

Dismiss at 34-35. Notwithstanding the procedures cited by the respondents, the Court finds that

the procedures provided in the CSRT regulations fail to satisfy constitutional due process

requirements in several respects.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

C.     SPECIFIC CONSTITUTIONAL DEFECTS IN THE CSRT PROCESS AS
WRITTEN IN THE REGULATIONS AND AS APPLIED TO THE DETAINEES

The constitutional defects in the CSRT procedures can be separated into two categories.

The first category consists of defects which apply across the board to all detainees in the cases

before this Judge.   Specifically, those deficiencies are the CSRT's failure to provide the

detainees with access to material evidence upon which the tribunal affirmed their "enemy

combatant" status and the failure to permit the assistance of counsel to compensate for the

government's refusal to disclose classified information directly to the detainees.  The second

category of defects involves those which are detainee specific and may or may not apply to every

petitioner in this litigation.  Those defects include the manner in which the CSRT handled

accusations of torture and the vague and potentially overbroad definition of "enemy combatant"

in the CSRT regulations.  While additional specific defects may or may not exist, further inquiry

is unnecessary at this stage of the litigation given the fundamental deficiencies detailed below.

> 1. **General Defects Existing in All Cases Before the Court: Failure to Provide
>    Detainees Access to Material Evidence Upon Which the CSRT Affirmed
>    "Enemy Combatant" Status and Failure to Permit the Assistance of Counsel**

The CSRT reviewed classified information when considering whether each detainee

presently before this Court should be considered an "enemy combatant," and it appears that all of

the CSRT's decisions substantially relied upon classified evidence.  No detainee, however, was

ever permitted access to any classified information nor was any detainee permitted to have an

advocate review and challenge the classified evidence on his behalf.  Accordingly, the CSRT

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

failed to provide any detainee with sufficient notice of the factual basis for which he is being

detained and with a fair opportunity to rebut the government's evidence supporting the

determination that he is an "enemy combatant."

The inherent lack of fairness of the CSRT's consideration of classified information not

disclosed to the detainees is perhaps most vividly illustrated in the following unclassified

colloquy, which, though taken from a case not presently before this Judge, exemplifies the

practical and severe disadvantages faced by all Guantanamo prisoners.  In reading a list of

allegations forming the basis for the detention of Mustafa Ait Idr,[31] a petitioner in Boumediene v.

Bush, 04-CV-1166 (RJL), the Recorder of the CSRT asserted, "While living in Bosnia, the

Detainee associated with a known Al Qaida operative."  In response, the following exchange

occurred:

Detainee:  Give me his name.

Tribunal President:  I do not know.

Detainee:  How can I respond to this?

Tribunal President:  Did you know of anybody that was a member of Al Qaida?

Detainee:  No, no.

Tribunal President:  I'm sorry, what was your response?

Detainee:  No.

Tribunal President:  No?

---

[31]  Although the petition for writ of habeas corpus filed on behalf of this detainee and
related documents refer to him as "Mustafa Ait Idir," the proper spelling of his name appears to
be "Mustafa Ait Idr."

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

> Detainee: No. This is something the interrogators told me a long while ago. I asked the interrogators to tell me who this person was. Then I could tell you if I might have known this person, but not if this person is a terrorist. Maybe I knew this person as a friend. Maybe it was a person that worked with me. Maybe it was a person that was on my team. But I do not know if this person is Bosnian, Indian or whatever. If you tell me the name, then I can respond and defend myself against this accusation.

> Tribunal President: We are asking you the questions and we need you to respond to what is on the unclassified summary.

Respondents' Factual Return to Petition for Writ of Habeas Corpus by Petitioner Mustafa Ait Idir, filed October 27, 2004, Enclosure (3) at 13. Subsequently, after the Recorder read the allegation that the detainee was arrested because of his alleged involvement in a plan to attack the U.S. Embassy in Sarajevo, the detainee expressly asked in the following colloquy to see the evidence upon which the government's assertion relied:

> Detainee: . . . The only thing I can tell you is I did not plan or even think of [attacking the Embassy]. Did you find any explosives with me? Any weapons? Did you find me in front of the embassy? Did you find me in contact with the Americans? Did I threaten anyone? I am prepared now to tell you, if you have anything or any evidence, even if it is just very little, that proves I went to the embassy and looked like that [Detainee made a gesture with his head and neck as if he were looking into a building or a window] at the embassy, then I am ready to be punished. I can just tell you that I did not plan anything. Point by point, when we get to the point that I am associated with Al Qaida, but we already did that one.

> Recorder: It was [the] statement that preceded the first point.

> Detainee: If it is the same point, but I do not want to repeat myself. These accusations, my answer to all of them is I did not do these things. But I do not have anything to prove this. The only thing is the citizenship. I can tell you where I was and I had the papers to prove so. But to tell me I planned to bomb, I can only tell you that I did not plan.

> Tribunal President: Mustafa, does that conclude your statement?

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Detainee: That is it, but I was hoping you had evidence that you can give me. If I was in your place – and I apologize in advance for these words – but if a supervisor came to me and showed me accusations like these, I would take these accusations and I would hit him in the face with them. Sorry about that.

[Everyone in the Tribunal room laughs.]

Tribunal President: We had to laugh, but it is okay.

Detainee: Why? Because these are accusations that I can't even answer. I am not able to answer them. You tell me I am from Al Qaida, but I am not an Al Qaida. I don't have any proof to give you except to ask you to catch Bin Laden and ask him if I am a part of Al Qaida. To tell me that I thought, I'll just tell you that I did not. I don't have proof regarding this. What should be done is you should give me evidence regarding these accusations because I am not able to give you any evidence. I can just tell you no, and that is it.

Id. at 14-15. The laughter reflected in the transcript is understandable, and this exchange might

have been truly humorous had the consequences of the detainee's "enemy combatant" status not

been so terribly serious and had the detainee's criticism of the process not been so piercingly

accurate.[32]

Another illustration of the fundamental unfairness of the CSRT's reliance on classified

information not disclosed to the detainees arises in the government's classified factual return to

the petition filed by Murat Kurnaz in Kurnaz v. Bush, 04-CV-1135 (ESH). Mr. Kurnaz is a

Turkish citizen and permanent resident of Germany who was arrested by police in Pakistan and

turned over to American authorities. The CSRT concluded that he was a member of al Qaeda

---

[32] This is not to say whether or not the government was able to present any inculpatory evidence during the CSRT proceeding against the detainee. The primary purpose of the Memorandum Opinion's reference to the transcript at this stage of the litigation is to illustrate the detainees' lack of any reasonable opportunity to confront the government's evidence against them and not to resolve whether or not this particular detainee did in fact plan to attack the U.S. Embassy.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

and stated that this determination was based on unclassified evidence and on one classified

document, attached to the factual return as Exhibit R19. Respondents' Factual Return to Petition

for Writ of Habeas Corpus by Petitioner Murat Kurnaz (hereinafter "Kurnaz Factual Return"),

filed October 18, 2004, Enclosure (2).[33]

The Court does not find that the unclassified evidence alone is sufficiently convincing in

supporting the CSRT's conclusion that he is a member of al Qaeda.[34] That evidence establishes

that Mr. Kurnaz attended a mosque in Bremen, Germany which the CSRT found to be moderate

in its views but also to have housed a branch of Jama'at-Al-Tabliq (hereinafter "JT"), a

missionary organization alleged to have supported terrorist organizations. Kurnaz Factual

Return, Enclosure (1) at 2. The unclassified evidence also establishes that Mr. Kurnaz had been

friends with an individual named Selcuk Belgin, who is alleged to have been a suicide bomber,

and that the detainee traveled to Pakistan to attend a JT school. Id. at 2-3. Nowhere does the

CSRT express any finding based on unclassified evidence that the detainee planned to be a

suicide bomber himself, took up arms against the United States, or otherwise intended to attack

American interests. Thus, the most reasonable interpretation of the record is that the classified

document formed the most important basis for the CSRT's ultimate determination. That

---

[33] Although the tribunal makes several references to its reliance on Exhibit R12, those references were typographical errors and the document actually relied upon was Exhibit R19, as recognized by the tribunal's Legal Advisor. See October 14, 2004 Memorandum from James R. Crisfield Jr. to the Director, Combatant Status Review Tribunal, attached to the Kurnaz Factual Return.

[34] In fact, for reasons stated later in this opinion, even if all of the unclassified evidence were accepted as true, it alone would not form a constitutionally permissible basis for the indefinite detention of the petitioner. See infra section II.C.2.b.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

document, however, was never provided to the detainee, and had he received it, he would have

had the opportunity to challenge its credibility and significance.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

call into serious question the nature and thoroughness of the prior "multiple levels of review" of "enemy combatant" status referenced in Deputy Secretary of Defense Paul Wolfowitz's July 7, 2004 Order establishing the CSRT system.  At a minimum, the documents raise the question of

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Interpreted in a light most favorable to the petitioners, the CSRT's decision to deem Exhibit R19

the most credible evidence without a sufficient explanation for ████████████████████

████████████████████████████████████  supports the petitioners' allegation that

the "CSRTs do not involve an impartial decisionmaker." Al Odah Petitioners' Reply to the

Government's "Response to Petitions for Writ of Habeas Corpus and Motion to Dismiss," filed

in Al Odah v. United States, 02-CV-0828 (CKK), on October 20, 2004, at 23-24. But however

the record in Kurnaz is interpreted, it definitively establishes that the detainee was not provided

with a fair opportunity to contest the material allegations against him.

The Court fully appreciates the strong governmental interest in not disclosing classified

evidence to individuals believed to be terrorists intent on causing great harm to the United States.

Indeed, this Court's protective order prohibits the disclosure of any classified information to any

of the petitioners in these habeas cases. Amended Protective Order and Procedures for Counsel

Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, 344 F. Supp.2d

174 (D.D.C. 2004) at ¶ 30. To compensate for the resulting hardship to the petitioners and to

ensure due process in the litigation of these cases, however, the protective order requires the

disclosure of all relevant classified information to the petitioners' counsel who have the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

appropriate security clearances. Id. at ¶¶ 17-34. Although counsel are not permitted to share any

classified information with their clients, they at least have the opportunity to examine all

evidence relied upon by the government in making an "enemy combatant" status determination

and to investigate and ensure the accuracy, reliability and relevance of that evidence. Thus, the

governmental and private interests have been fairly balanced in a manner satisfying constitutional

due process requirements. In a similar fashion, the rules regulating the military commission

proceedings for aliens – rules which the government so vigorously defended in Hamdan v.

Rumsfeld – expressly provide that although classified evidence may be withheld from the

defendant, it may not be withheld from defense counsel. Procedures for Trials by Military

Commissions of Certain Non-United States Citizens in the War Against Terrorism, 32 C.F.R.

§ 9.6(b)(3) ("A decision to close a proceeding or portion thereof may include a decision to

exclude the Accused, Civilian Defense Counsel, or any other person, but Detailed Defense

Counsel may not be excluded from any trial proceeding or portion thereof."). In contrast, the

CSRT regulations do not properly balance the detainees' need for access to material evidence

considered by the tribunal against the government's interest in protecting classified information.

The CSRT regulations do acknowledge to some extent the detainees' need for assistance

during the tribunal process, but they fall far short of the procedural protections that would have

existed had counsel been permitted to participate. The implementing regulations create the

position of "Personal Representative" for the purpose of "assist[ing] the detainee in reviewing all

relevant unclassified information, in preparing and presenting information, and in questioning

witnesses at the CSRT." July 29, 2004 Implementing Regulations at Enclosure (1), ¶ C. (3). But

**UNCLASSIFIED VERSION
FOR PUBLIC RELEASE**

notwithstanding the fact that the Personal Representative may review classified information considered by the tribunal, that person is neither a lawyer nor an advocate and thus cannot be considered an effective surrogate to compensate for a detainee's inability to personally review and contest classified evidence against him. Id. at Enclosure (3), ¶ D. Additionally, there is no confidential relationship between the detainee and the Personal Representative, and the Personal Representative is obligated to disclose to the tribunal any relevant inculpatory information he obtains from the detainee. Id. Consequently, there is inherent risk and little corresponding benefit should the detainee decide to use the services of the Personal Representative.

The lack of any significant advantage to working with the Personal Representative is illustrated by the record of Kurnaz. Despite the existence of ███████████████ ███████ the Personal Representative made no request for further inquiry regarding ██ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████ Kurnaz Factual Return, Enclosure (5). Clearly, the presence of counsel for the detainee, even one who could not disclose classified evidence to his client, would have ensured a fairer process in the matter by highlighting weaknesses in evidence considered by the tribunal and helping to ensure that erroneous decisions were not made regarding the detainee's "enemy combatant" status. The CSRT rules, however, prohibited that opportunity.

In sum, the CSRT's extensive reliance on classified information in its resolution of "enemy combatant" status, the detainees' inability to review that information, and the prohibition of assistance by counsel jointly deprive the detainees of sufficient notice of the factual bases for

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

their detention and deny them a fair opportunity to challenge their incarceration. These grounds alone are sufficient to find a violation of due process rights and to require the denial of the respondents' motion to dismiss these cases.

### 2. Specific Defects That May Exist in Individual Cases: Reliance on Statements Possibly Obtained Through Torture or Other Coercion and a Vague and Overly Broad Definition of "Enemy Combatant"

Additional defects in the CSRT procedures support the denial of the respondents' motion to dismiss at least some of the petitions, though these grounds may or may not exist in every case before the Court and though the respondents might ultimately prevail on these issues once the petitioners have been given an opportunity to litigate them fully in the <u>habeas</u> proceedings.

### a. Reliance on Statements Possibly Obtained Through Torture or Other Coercion

The first of these specific grounds involves the CSRT's reliance on statements allegedly obtained through torture or otherwise alleged to have been provided by some detainees involuntarily. The Supreme Court has long held that due process prohibits the government's use of involuntary statements obtained through torture or other mistreatment. In the landmark case of <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), the Court gave two rationales for this rule: first, "because of the probable unreliability of confessions that are obtained in a manner deemed coercive," and second "because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction,

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

wrings a confession out of an accused against his will.'" 378 U.S. at 386 (quoting Blackburn v.

Alabama, 361 U.S. 199 (1960)).  See also Lam v. Kelchner, 304 F.3d 256, 264 (3rd Cir. 2002)

("The voluntariness standard is intended to ensure the reliability of incriminating statements and

to deter improper police conduct.").  Arguably, the second rationale may not be as relevant to

these habeas cases as it is to criminal prosecutions in U.S. courts, given that the judiciary clearly

does not have the supervisory powers over the U.S. military as it does over prosecutors, who are

officers of the court.  Cf. United States v. Toscanino, 500 F.2d 267, 276 (2d Cir. 1974) (the

supervisory power of the district courts "may legitimately be used to prevent [them] from

themselves becoming 'accomplices in willful disobedience of law'") (quoting McNabb v.

United States, 318 U.S. 332, 345 (1943)).  At a minimum, however, due process requires a

thorough inquiry into the accuracy and reliability of statements alleged to have been obtained

through torture.  See Clanton v. Cooper, 129 F.3d 1147, 1157-58 (10th Cir. 1997) ("[B]ecause the

evidence is unreliable and its use offends the Constitution, a person may challenge the

government's use against him or her of a coerced confession given by another person.");

Buckley v. Fitzsimmons, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their

makers may be less reliable than voluntary confessions, so that using one person's coerced

confession at another's trial violates his rights under the due process clause.").

     Interpreting the evidence in a light most favorable to the petitioners as the Court must

when considering the respondents' motion to dismiss, it can be reasonably inferred that the

CSRT did not sufficiently consider whether the evidence upon which the tribunal relied in

making its "enemy combatant" determinations was coerced from the detainees.  The allegations

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

and factual return of Mamdouh Habib, a petitioner in Habib v. Bush, 02-CV-1130 (CKK) are

illustrative in this regard.  Mr. Habib has alleged that after his capture by allied forces in

Pakistan, he was sent to Egypt for interrogation and was subjected to torture there, including

routine beatings to the point of unconsciousness.  Petitioner's Memorandum of Points and

Authorities in Support of His Application for Injunctive Relief, filed with the Court Security

Officer on November 23, 2004 and on the public record on January 5, 2005.  Additionally, the

petitioner contends that he was locked in a room that would gradually be filled with water to a

level just below his chin as he stood for hours on the tips of his toes.  Id.  He further claims that

he was suspended from a wall with his feet resting on the side of a large electrified cylindrical

drum, which forced him either to suffer pain from hanging from his arms or pain from electric

shocks to his feet.  Id.  The petitioner asserts that as a result of this treatment, he made numerous

"confessions" that can be proven false.  Id. at n.3.  According to the classified factual return for

Mr. Habib, █████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████ and the CSRT found the allegations of torture serious enough to refer

the matter on September 22, 2004 to the Criminal Investigation Task Force.  Id., Enclosure (1) at

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

3. ███████████████████████████████████████████████████

███████████████████████████████████████ Examined in the

light most favorable to the petitioner, this reliance cannot be viewed to have satisfied the

requirements of due process.

     Mr. Habib is not the only detainee before this Court to have alleged making confessions

to interrogators as a result of torture. ████████████████████████

████████████████████████████████████████████████████████

███████████████ Notwithstanding the inability of counsel for petitioners to take formal

discovery beyond interviewing their clients at Guantanamo Bay, they have introduced evidence

into the public record indicating that abuse of detainees occurred during interrogations not only

in foreign countries but at Guantanamo Bay itself.  One illustration of alleged mistreatment

during interrogation by U.S. authorities is Exhibit D to the petitioners' Motion for Leave to Take

Discovery and for Preservation Order, filed in several of these cases with the Court Security

Officer on January 6, 2005 and filed on the public record on January 10, 2005.  In that document,

dated August 2, 2004, the author, apparently affiliated with the Federal Bureau of Investigation

but whose identity has been redacted, summarized his or her observations of interrogation

activities at Guantanamo Bay as follows:

> On a couple of occassions [sic], I entered interview rooms to find a detainee
> chained hand and foot in a fetal position to the floor, with no chair, food, or water.
> Most times they had urinated or defecated [sic] on themselves, and had been left
> there for 18-24 hours or more.  On one occassion [sic], the air conditioning had
> been turned down so far and the temperature was so cold in the room, that the
> barefooted detainee was shaking with cold.  When I asked the MP's what was
> going on, I was told that interrogators from the day prior had ordered this
> treatment, and the detainee was not to be moved.  On another occassion [sic], the

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

A/C had been turned off, making the temperature in the unventilated room probably well over 100 degrees. The detainee was almost unconcious [sic] on the floor, with a pile of hair next to him. He had apparently been literally pulling his own hair out throughout the night. On another occassion [sic], not only was the temperature unbearably hot, but extremely loud rap music was being played in the room, and had been since the day before, with the detainee chained hand and foot in the fetal position on the tile floor.

The identities of the detainees referenced in this document are unknown to the Court and therefore, it is not certain whether they are even petitioners in any of these cases and, if so, whether the results of the above-described interrogations were used against them in CSRT proceedings. Of course, the veracity of Exhibit D itself must be investigated before it can be definitively relied upon. Indeed, at this stage of the litigation it is premature to make any final determination as to whether any information acquired during interrogations of any petitioner in these cases and relied upon by the CSRT was in fact the result of torture or other mistreatment. What this Court needs to resolve at this juncture, however, is whether the petitioners have made sufficient allegations to allow their claims to survive the respondents' motion to dismiss. On that count, the Court concludes that the petitioners have done so.

### b. Vague and Overly Broad Definition of "Enemy Combatant"

Although the government has been detaining individuals as "enemy combatants" since the issuance of the AUMF in 2001, it apparently did not formally define the term until the July 7, 2004 Order creating the CSRT. The lack of a formal definition seemed to have troubled at least the plurality of the Supreme Court in Hamdi, but for purposes of resolving the issues in that case, the plurality considered the government's definition to be an individual who was "'part of or

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

supporting forces hostile to the United States or coalition partners' in Afghanistan <u>and</u> who

'engaged in an armed conflict against the United States' there." 124 S. Ct. 2633, 2639 (<u>quoting</u>

Brief for the Respondents) (emphasis added). The Court agreed with the government that the

AUMF authorizes the Executive to detain individuals falling within that limited definition, <u>id.</u>,

with the plurality explaining that "[b]ecause detention to prevent a combatant's return to the

battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and

appropriate force,' Congress has clearly and unmistakably authorized detention in the narrow

circumstances considered here." <u>Id.</u> at 2641. The plurality cautioned, however, "that indefinite

detention for the purpose of interrogation is not authorized" by the AUMF, and added that a

congressional grant of authority to the President to use "necessary and appropriate force" might

not be properly interpreted to include the authority to detain individuals for the duration of a

particular conflict if that conflict does not take a form that is based on "longstanding law-of-war

principles." <u>Id.</u>

  The definition of "enemy combatant" contained in the Order creating the CSRT is

significantly broader than the definition considered in <u>Hamdi</u>. According to the definition

currently applied by the government, an "enemy combatant" "shall mean an individual who was

part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in

hostilities against the United States or its coalition partners. This <u>includes</u> any person who has

committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

July 7, 2004 Order at 1 (emphasis added). Use of the word "includes" indicates that the

government interprets the AUMF to permit the indefinite detention of individuals who never

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

committed a belligerent act or who never directly supported hostilities against the U.S. or its

allies.  This Court explored the government's position on the matter by posing a series of

hypothetical questions to counsel at the December 1, 2004 hearing on the motion to dismiss.  In

response to the hypotheticals, counsel for the respondents argued that the Executive has the

authority to detain the following individuals until the conclusion of the war on terrorism:

"[a] little old lady in Switzerland who writes checks to what she thinks is a charity that helps

orphans in Afghanistan but [what] really is a front to finance al-Qaeda activities," Transcript at

25, a person who teaches English to the son of an al Qaeda member, id. at 27, and a journalist

who knows the location of Osama Bin Laden but refuses to disclose it to protect her source.  Id.

at 29.

The Court can unequivocally report that no factual return submitted by the government in

this litigation reveals the detention of a Swiss philanthropist, an English teacher, or a journalist.

The Court can also acknowledge the existence of specific factual returns containing evidence

indicating that certain detainees fit the narrower definition of "enemy combatant" approved by

the Supreme Court in Hamdi.  The petitioners have argued in opposition to the respondents'

motion to dismiss, however, that at least with respect to some detainees, the expansive definition

of "enemy combatant" currently in use in the CSRT proceedings violates long standing principles

of due process by permitting the detention of individuals based solely on their membership in

anti-American organizations rather than on actual activities supporting the use of violence or

harm against the United States.  Al Odah Petitioners' Reply to the Government's "Response to

Petitions for Writ of Habeas Corpus and Motion to Dismiss" at 25-26 (citing Scales v. United

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

States, 367 U.S. 203, 224-225 (1961); Carlson v. Landon, 342 U.S. 524, 541 (1952)).

Whether the detention of each individual petitioner is authorized by the AUMF and satisfies the mandates of due process must ultimately be determined on a detainee by detainee basis. At this stage of the litigation, however, sufficient allegations have been made by at least some of the petitioners and certain evidence exists in some CSRT factual returns to warrant the denial of the respondents' motion to dismiss on the ground that the respondents have employed an overly broad definition of "enemy combatant." Examples of cases where this issue is readily apparent are Kurnaz v. Bush, 04-CV-1135 (ESH), and El-Banna v. Bush, 04-CV-1144 (RWR).

As already discussed above, the unclassified evidence upon which the CSRT relied in determining Murat Kurnaz's "enemy combatant" status consisted of findings that he was "associated" with an Islamic missionary group named Jama'at-Al-Tabliq, that he was an "associate" of and planned to travel to Pakistan with an individual who later engaged in a suicide bombing, and that he accepted free food, lodging, and schooling in Pakistan from an organization known to support terrorist acts. Kurnaz Factual Return, Enclosure (1) at 1. While these facts may be probative and could be used to bolster the credibility of other evidence, if any, establishing actual activities undertaken to harm American interests, by themselves they fall short of establishing that the detainee took any action or provided any direct support for terrorist actions against the U.S. or its allies. Nowhere does any unclassified evidence reveal that the detainee even had knowledge of his associate's planned suicide bombing, let alone establish that the detainee assisted in the bombing in any way. In fact, the detainee expressly denied knowledge of a bombing plan when he was informed of it by the American authorities. Id.,

**UNCLASSIFIED VERSION
FOR PUBLIC RELEASE**



Enclosure (3) at 1.

Absent other evidence,[36] it

---

[35]

[36] It is true that Exhibit R19 to the Kurnaz Factual Return does assert that ▮▮▮▮▮▮▮▮ and the respondents urge this Court to uphold the detention of any petitioner, including Mr. Kurnaz, as long as "some evidence" exists to support a conclusion that he actively participated in terrorist activities. Motion to Dismiss at 47-51. Hamdi, however, holds that the "some evidence" standard cannot be applied where the detainee was not given an opportunity to challenge the evidence in an administrative proceeding, 124 S. Ct. at 2651, and Mr. Kurnaz was never provided access to Exhibit R19. Additionally, in resolving a motion to dismiss, the Court must accept as true the petitioner's allegations and must interpret the evidence in the record in the light most favorable to the nonmoving party. Because Exhibit R19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Court cannot at this stage of the litigation give the document the weight the CSRT afforded it.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

would appear that the government is indefinitely holding the detainee – possibly for life – solely

because of his contacts with individuals or organizations tied to terrorism and not because of any

terrorist activities that the detainee aided, abetted, or undertook himself. Such detention, even if

found to be authorized by the AUMF, would be a violation of due process. Accordingly, the

detainee is entitled to fully litigate the factual basis for his detention in these habeas proceedings

and to have a fair opportunity to prove that he is being detained on improper grounds.

Similar defects might also exist with respect to the detention of Jamil El-Banna, a

petitioner in El-Banna v. Bush, 04-CV-1144 (RWR). At the CSRT proceedings, the tribunal

concluded that the detainee was an "enemy combatant" on the ground that he was "part of or

supporting Al Qaida forces." Respondents' In Camera Factual Return to Petition for Writ of

Habeas Corpus by Petitioner Jamil El-Banna (hereinafter "El-Banna Factual Return"), filed

December 17, 2004, Enclosure (1) at 5. The CSRT reached this conclusion notwithstanding the

Personal Representative's position that it was unsupported by the record before the tribunal.

See October 16, 2004 Memorandum of James R. Crisfield Jr., attached to the El-Banna Factual

Return. During the CSRT proceedings, the tribunal rejected two grounds cited by the Recorder

in support of the detainee's "enemy combatant" status. First, although the detainee was alleged

to have been indicted by a Spanish National High Court Judge for membership in a terrorist

organization, id., Enclosure (3) at 2, the tribunal did not find any evidence relating to that

indictment "helpful in establishing the detainee's association with Al Qaida." Id., Enclosure (1)

at 4. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Second, although the detainee was alleged to have attempted "to board an airplane with equipment that resembled a homemade electronic device," id., Enclosure (3) at 3, ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

████████████████████   Even accepting these factual conclusions as true, a serious legal question exists as to whether such activities would be sufficient to detain the petitioner at Guantanamo Bay indefinitely without formally charging him with a crime. See Hamdi, 124 S. Ct. at 2640 ("The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again.") and at 2642 ("If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding [that the AUMF allows indefinite detention] may unravel."). In any event,

**UNCLASSIFIED VERSION
FOR PUBLIC RELEASE**

however, final resolution of that question must be left for another day because at this stage of the

proceedings, the Court must interpret the facts in the light most favorable to the party opposing a

motion to dismiss.  Under that approach, evidence in the record can be fairly interpreted to

conclude that the petitioner is being detained indefinitely not because ███████████████

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

It may well turn out that after the detainee is given a fair opportunity to challenge his

detention in a <u>habeas</u> proceeding, the legality of his detention as an "enemy combatant" will be

upheld and he will continue to be held at Guantanamo Bay until the end of the war on terrorism

or until the government determines he no longer poses a threat to U.S. security. It is also

possible, however, that once given a fair opportunity to litigate his case, the detainee will

establish that he is being indefinitely detained not because of anything he has done and not to

prevent his return to any "battlefield," metaphorical or otherwise, but simply because ███

███████████████████████████████ such detention is not permissible ██████████

and the respondents' motion to dismiss must therefore be denied.

This concludes the Court's analysis of the due process issues arising from the

respondents' motion to dismiss. Nothing written above should be interpreted to require the

immediate release of any detainee, nor should the conclusions reached be considered to have

fully resolved whether or not sufficient evidence exists to support the continued detention of any

petitioner. The respondents' motion to dismiss asserted that no evidence exists and that the

petitioners could make no factual allegations which, if taken as true, would permit the litigation

of these <u>habeas</u> cases to proceed further. For the reasons stated above, the Court has concluded

otherwise. The Court, however, has not addressed all arguments made by the petitioners in

opposition to the respondents' motion to dismiss, and it may be that the CSRT procedures violate

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

due process requirements for additional reasons not addressed in this Memorandum Opinion. In

any event, and as <u>Hamdi</u> acknowledged, in the absence of military tribunal proceedings that

comport with constitutional due process requirements, it is the obligation of the court receiving a

<u>habeas</u> petition to provide the petitioner with a fair opportunity to challenge the government's

factual basis for his detention. <u>Id</u>. at 2651-52. Accordingly, the accompanying Order requests

input from counsel regarding how these cases should proceed in light of this Memorandum

Opinion.


**D.     CLAIMS BASED ON THE GENEVA CONVENTIONS**

The petitioners in all of the above captioned cases except <u>Al Odah v. United States</u>, 02-

CV-0828, have also asserted claims based on the Geneva Conventions, which regulate the

treatment of certain prisoners of war and civilians. The respondents contend that all Geneva

Convention claims filed by the petitioners must be dismissed because Congress has not enacted

any separate legislation specifically granting individuals the right to file private lawsuits based on

the Conventions and because the Conventions are not "self-executing," meaning they do not by

themselves create such a private right of action. Motion to Dismiss at 68-71. In the alternative,

the respondents argue that even if the Geneva Conventions are self-executing, they do not apply

to members of al Qaeda because that international terrorist organization is not a state party to the

Conventions. <u>Id</u>. at 70 n.80. Finally, although respondents concede that Afghanistan is a state

party to the Conventions and admit that the Geneva Conventions apply to Taliban detainees, they

emphasize that President Bush has determined that Taliban fighters are not entitled to prisoner of

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

war status under the Third Geneva Convention and contend that this decision is the final word on the matter. Id.

The Constitution provides that "all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Unless Congress enacts authorizing legislation, however, an individual may seek to enforce a treaty provision only if the treaty expressly or impliedly grants such a right. See Head Money Cases, 112 U.S. 580, 598-99 (1884). If a treaty does not create an express right of private enforcement, an implied right might be found by examining the treaty as a whole. See Diggs v. Richardson, 555 F.2d 848, 851 (D.C. Cir. 1976).

The Third and Fourth Geneva Conventions do not expressly grant private rights of action, and whether they impliedly create such rights has never been definitively resolved by the D.C. Circuit.[37] The Court of Appeals is currently reviewing the matter in the appeal of Hamdan v. Rumsfeld, 344 F. Supp.2d 152 (D.D.C. 2004), but until that court issues a definitive ruling,[38] this Court must make its own determination. After reviewing Hamdan and the briefs filed by

---

[37] The closest the Court of Appeals came to ruling on the issue was the case of Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984), a suit brought by victims of a brutal attack in Israel by the Palestinian Liberation Organization. The main issue on appeal was whether the District Court correctly ruled that there was no subject-matter jurisdiction to hear the case, and although the three-judge panel ultimately affirmed the lower court's decision, each judge relied on a separate rationale and no judge joined any other judge's opinion. In reaching his own conclusion, Judge Robert Bork determined that the Third Geneva Convention was not self-executing. Id. at 808-09. The other two judges on the panel did not address the issue, however, and the matter remains unsettled as of this date.

[38] Oral argument on the respondents' appeal in Hamdan is currently scheduled for March 8, 2005.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

petitioners and respondents in the instant cases, the Court concludes that the Conventions are

self-executing and adopts the following reasoning provided by Judge Robertson:

> Because the Geneva Conventions were written to protect individuals, because the
> Executive Branch of our government has implemented the Geneva Conventions
> for fifty years without questioning the absence of implementing legislation,
> because Congress clearly understood that the Conventions did not require
> implementing legislation except in a few specific areas, and because nothing in
> the Third Geneva Convention itself manifests the contracting parties' intention
> that it not become effective as domestic law without the enactment of
> implementing legislation, I conclude that, insofar as it is pertinent here, the Third
> Geneva Convention is a self-executing treaty.

Id. at 165.

Although the Court rejects the primary basis argued by the respondents for dismissal of

claims based on the Geneva Conventions, it does accept one of the alternative grounds put forth

in their motion, namely that the Geneva Conventions do not apply to al Qaeda.  Article 2 of the

Third and Fourth Geneva Conventions provides, "In addition to the provisions which shall be

implemented in peacetime, the present Convention shall apply to all cases of declared war or of

any other armed conflict which may arise between two or more of the High Contracting Parties,

even if the state of war is not recognized by one of them."  Clearly, al Qaeda is not a "High

Contracting Party" to the Conventions, and thus individuals detained on the ground that they are

members of that terrorist organization are not entitled to the protections of the treaties.

This does not end the analysis for purposes of resolving the respondents' motion to

dismiss, however, because some of the petitioners in the above-captioned cases are being

detained either solely because they were Taliban fighters or because they were associated with

both the Taliban and al Qaeda.  Significantly, the respondents concede that the Geneva

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Conventions apply to the Taliban detainees in light of the fact that Afghanistan is a High Contracting Party to the Conventions.  Motion to Dismiss at 70-71 n.80 (citing White House Fact Sheet (Feb. 7, 2002), available at http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html).  They argue in their motion to dismiss, however, that notwithstanding the application of the Third Geneva Convention to Taliban detainees, the treaty does not protect Taliban detainees because the President has declared that no Taliban fighter is a "prisoner of war" as defined by the Convention.  Id.  The respondents' argument in this regard must be rejected, however, for the Third Geneva Convention does not permit the determination of prisoner of war status in such a conclusory fashion.

Article 4 of the Third Geneva Convention defines who is considered a "prisoner of war" under the treaty.  Paragraph (1) provides that the term "prisoners of war" includes "[m]embers of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces."  As provided in Paragraph (2), the definition of "prisoners of war" also includes  "[m]embers of other militias and members of other volunteer corps, including those of organized resistance movements," but only if they fulfill the following conditions: "(a) that of being commanded by a person responsible for his subordinates;  (b) that of having a fixed distinctive sign recognizable at a distance;  (c) that of carrying arms openly;  (d) that of conducting their operations in accordance with the laws and customs of war."  If there is any doubt as to whether individuals satisfy the Article 4 prerequisites, Article 5 entitles them to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal."  Army Regulation 190-8 created the rules for the "competent tribunal" referenced in

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Article 5 of the Third Geneva Convention, and the CSRT was established in accordance with that

provision.  See Army Regulation 190-8 § 1-1.b, Motion to Dismiss at 32.

Nothing in the Convention itself or in Army Regulation 190-8 authorizes the President

of the United States to rule by fiat that an entire group of fighters covered by the Third Geneva

Convention falls outside of the Article 4 definitions of "prisoners of war."  To the contrary, and

as Judge Robertson ruled in Hamdan, the President's broad characterization of how the Taliban

generally fought the war in Afghanistan cannot substitute for an Article 5 tribunal's

determination on an individualized basis of whether a particular fighter complied with the laws

of war or otherwise falls within an exception denying him prisoner of war status.  344 F. Supp.2d

at 161-62.  Clearly, had an appropriate determination been properly made by an Article 5 tribunal

that a petitioner was not a prisoner of war, that petitioner's claims based on the Third Geneva

Convention could not survive the respondents' motion to dismiss.  But although numerous

petitioners in the above-captioned cases were found by the CSRT to have been Taliban fighters,

nowhere do the CSRT records for many of those petitioners reveal specific findings that they

committed some particular act or failed to satisfy some defined prerequisite entitling the

respondents to deprive them of prisoner of war status.[39]  Accordingly, the Court denies that

---

[39]  See, e.g.,



This list provides
only examples of petitioners for whom the CSRT did not make a full Article 5 type inquiry

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

portion of the respondents' motion to dismiss addressing the Geneva Convention claims of those

petitioners who were found to be Taliban fighters but who were not specifically determined to be

excluded from prisoner of war status by a competent Article 5 tribunal.


**E.   DISMISSAL OF REMAINING CLAIMS**

Upon review of the remaining causes of action asserted by the various petitioners in these

cases, the Court concludes that the respondents are entitled to dismissal of the claims not

addressed in the preceding sections of this Memorandum Opinion.  The Court agrees with the

respondents that claims based on the Sixth, Eighth, and Fourteenth Amendments to the

Constitution are not sustainable because the Sixth Amendment applies only to criminal

proceedings, because the Eighth Amendment applies only after an individual is convicted of a

crime, and because the Fourteenth Amendment applies only to the states and not to the federal

government.  In addition, any claims based on the Suspension Clause, U.S. Const. art. I, § 9,

cl. 2, must be dismissed because the habeas jurisdiction of this court has not been suspended.

Except as discussed in part II.D above regarding the Geneva Conventions, the Court agrees that

the remaining treaty-based claims and the claim based on Army Regulation 190-8 asserted by the

petitioners should be dismissed primarily for the reasons stated by the respondents in their

motion to dismiss.  See Motion to Dismiss at 71-72.  The Court also agrees with the reasoning of

---

regarding prisoner of war status.  There may be additional petitioners who fought for the Taliban
and who were not given individualized determinations as to their prisoner of war status.  Absence
from this list should not be interpreted to imply that a petitioner can no longer assert his Geneva
Convention claims in this habeas litigation.

UNCLASSIFIED VERSION
FOR PUBLIC RELEASE

Judge Kollar-Kotelly in her original <u>Rasul</u> decision and with Judge Randolph's concurrence in

the <u>Al Odah</u> appeal that the doctrine of sovereign immunity bars claims based on the Alien Tort

Claims Act and that the general waiver of sovereign immunity contained in the Administrative

Procedure Act is inapplicable because of the "military authority" exception in 5 U.S.C.

§ 701(b)(1)(G). <u>Al Odah</u>, 321 F.3d at 1149-50 (Randolph, J. concurring); <u>Rasul</u>, 215 F. Supp.2d

at 64 n.11. Finally, having found that all detainees possess Fifth Amendment due process rights

and that some detainees possibly possess rights under the Geneva Conventions, it is unnecessary

to look to customary international law to resolve the petitioners' claims. <u>See</u> <u>The Paquete</u>

<u>Habana</u>, 175 U.S. 677, 699 (1900) ("where there is no treaty and no controlling executive or

legislative act or judicial decision, resort must be had to the customs and usages of civilized

nations").

### III. CONCLUSION

For the reasons provided above, the Court holds that the petitioners have stated valid

claims under the Fifth Amendment and that the CSRT procedures are unconstitutional for failing

to comport with the requirements of due process. Additionally, the Court holds that Taliban

fighters who have not been specifically determined to be excluded from prisoner of war status by

a competent Article 5 tribunal have also stated valid claims under the Third Geneva Convention.

Finally, the Court concludes that the remaining claims of the petitioners must be denied.

Accordingly, this Memorandum Opinion is accompanied by a separate Order denying in part and

granting in part the respondents' Motion to Dismiss or for Judgment as a Matter of Law.

74

**UNCLASSIFIED VERSION
FOR PUBLIC RELEASE**

This Judge began her participation as the coordinator of these cases on August 17, 2004, and her involvement will soon be ending.  These cases have always remained before the original Judges assigned to them and only particular issues or motions were referred to this Judge for resolution.  Therefore, there will be no need to transfer the cases back to those Judges.  In the interest of the effective management of this litigation, however, the accompanying Order requests briefing from counsel on an expedited basis regarding their views as to how these cases should proceed in light of this Memorandum Opinion and this Judge's imminent departure.

January 31, 2005

JOYCE HENS GREEN
United States District Judge

75