REDACTED VERSION FOR PUBLIC FILING CLEARED BY CSO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID M. HICKS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civ. Act. No. 1:02-cv-00299-CKK |
| v. | ) | |
| | ) | Judge Kollar-Kotelly |
| GEORGE W. BUSH, President of the United States; | ) | |
| DONALD RUMSFELD, United States Secretary of | ) | |
| Defense; GORDON R. ENGLAND, Secretary of the | ) | |
| United States Navy; JOHN D. ALTENBURG, JR., | ) | |
| Appointing Authority for Military Commissions, | ) | |
| Department of Defense;  Brigadier General JAY | ) | |
| HOOD, Commander, Joint Task Force, Guantanamo | ) | |
| Bay, Cuba, and Colonel BRICE A. GYURISKO, | ) | |
| Commander, Joint Detention Operations Group, | ) | |
| Joint Task, Guantanamo Bay, Cuba | ) | |
| | ) | |
| Respondents, all sued in their | ) | |
| individual and official capacities. | | |

## REVISED BRIEF IN SUPPORT OF PETITIONER DAVID M. HICKS'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

August 17, 2005

**TABLE OF CONTENTS**

PETITIONER DAVID M. HICKS'S REVISED MOTION FOR PARTIAL SUMMARY
JUDGMENT ...........................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................4

JURISDICTION ........................................................................................................10

STANDARD OF REVIEW ........................................................................................10

ARGUMENT .............................................................................................................11

I.   THE COMMISSION LACKS SUBJECT MATTER JURISDICTION TO HEAR THE
     OFFENSES WITH WHICH HICKS HAS BEEN CHARGED. ...............................11

     A.  Overview of the Sources and Purpose of the Law of War................................12

         1.   The law of war only applies to war and thus does not apply to the conflict with
              al Qaeda. ...............................................................................................14

         2.   The law of war does not criminalize participation in war. ...........................16

     B.  The Commission Lacks Jurisdiction to Try Hicks for "Aiding the Enemy." ....................18

         1.   There is no crime of "aiding the enemy" under the law of war..................18

         2.   Mr. Hicks has not been charged with a statutory crime of aiding the enemy.............19

         3.   No statute authorizes charging non-citizens, such as Mr. Hicks, with aiding
              the enemy. ..............................................................................................20

     C.  The Commission Lacks Jurisdiction to Try Hicks for Attempted Murder "While
         He Did Not Enjoy Combatant Immunity." .......................................................22

         1.   The charge against Hicks for attempted murder  "while he did not enjoy
              combatant immunity" is invalid under the law of war................................23

         2.   No act of Congress delegates authority for prosecuting "attempted murder" of
              combatants to a military commission. .......................................................29

     D.  The Commission Lacks Jurisdiction to Try Hicks for "Conspiracy." ..............................29

         1.   Conspiracy is not a crime under the law of war........................................29

i

2. Theories of Individual Responsibility for Group Crimes Do Not Provide a Basis for Commission Jurisdiction Over the Conspiracy Charge...............................35

3. The purported objects of the alleged conspiracy do not violate the law of war. .........37

4. No act of Congress delegates authority for prosecuting conspiracy to a military commission...................................................................................38

E. Hicks May Not Be Tried For Offenses Created *Ex Post Facto*.........................................38

II. THE STRUCTURE OF THE MILITARY COMMISSIONS VIOLATES THE CONSTITUTIONAL GUARANTEE OF DUE PROCESS....................................................39

A. This Court Has Already Found That The Due Process Clause Is Applicable to Mr. Hicks's Case....................................................................................................................41

B. The Commissions Violate The Due Process Of Law Guaranteed By The Fifth Amendment To The U.S. Constitution. ...............................................................................43

1. The private interest at stake in this case -- Hicks's physical liberty -- is the most fundamental of all. ...........................................................................................44

2. The shortcomings that exist in the commission procedures are so egregious as to provide an enormous risk of an erroneous deprivation of Mr. Hicks's liberty interest..........................................................................................................................45

a. The commission process is not impartial.................................................................46

b. The commission does not provide for an adequate review process.......................50

c. The commission will rely on unreliable evidence obtained through torture and unsworn statements, and thereby increase the risk of error. ...........................54

3. Respondents cannot present an interest that outweighs the liberty interest at stake for Mr. Hicks. ...................................................................................................56

III. THE NOVEMBER 13, 2001 EXECUTIVE ORDER IMPERMISSIBLY DISCRIMINATES BETWEEN CITIZENS AND NON-CITIZENS IN VIOLATION OF THE FIFTH AMENDMENT AND 42 U.S.C. § 1981. ................................................................................57

A. The Order Has No Rational Basis.....................................................................................58

B. The PMO Is Subject to Strict Scrutiny. ..........................................................................61

IV. THE MILITARY COMMISSION IS INVALIDLY CONSTITUTED...................................66

ii

A.  The Structure of the Commission's Decisionmaking Violates the President's Military Order. ....................................................................................................66

B.  The Commissions Violate Statutory Requirements for Involvement of a Judge Advocate General....................................................................................................68

C.  Military Commissions Cannot Sit in Guantanamo. ............................................68

D.  The Appointing Authority Lacked Authority to Appoint the Commission.......................70

V.  RESPONDENTS HAVE DENIED HICKS THE RIGHT TO A SPEEDY TRIAL AS REQUIRED BY THE UCMJ AND THE UNITED STATES CONSTITUTION. ................71

A.  Respondents Detained Hicks for Over 32 Months Without Trial......................................71

B.  Respondents' Actions Have Violated Hicks's Right to A Prompt Trial under the UCMJ..........................................................................................................71

C.  Hicks Is Entitled to Dismissal of the Charges. ................................................77

CONCLUSION................................................................................................77

# TABLE OF AUTHORITIES

## CASES

*Adrand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)................................................63

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................10

*Barker v. Wingo*, 407 U.S. 514 (1972) ...................................................................75, 76

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................10

*Chan Gun v. United States*, 9 App. D.C. 290 (D.C. Cir. 1896)....................................62

*Chandler v. United States*, 171 F.2d 921 (1st Cir. 1948)..............................................21

*Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) .........................................60

*Colespaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956)................................................33

*Doggett v. United States*, 505 U.S. 647 (1992)............................................................75

*Duane v. GEICO*, 37 F.3d 1036 (4th Cir. 1994)..........................................................65

*In re Flesche*, 16 Ann. Dig. & Rep. of Pub. Int'l L. Cases 266 (Neth. Spec. Ct. of Cassation 1949)......................................................................................................27

*Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950) .............................................20

*Graham v. Richardson*, 403 U.S. 365 (1971) ..............................................................63

*Griffin v. Illinois*, 351 U.S. 12 (1956)....................................................................60, 64

*In re Griffiths*, 413 U.S. 717 (1973)............................................................................56

*In re Guantanamo Detainees Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) ......................................................................................39, 41, 42, 43, 44, 54, 56

*Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004)............................................9

*Hamdan v. Rumsfeld*, 415 F.3d 33, 2005 WL 1653046 (D.C. Cir. 2005) .............1, 2, 9, 14, 16, 71

*Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004) ...................3, 4, 40, 43, 44, 45, 47, 55, 58, 60, 64, 74

iv

*Harisiades v. Shaugnessy*, 342 U.S. 580 ( .................................................................64

*Johnson v. Eisentrager*, 339 U.S. 763 (1950).....................................................28, 68

*Kayishema and Ruzindana,* ICTR-95-1-T  (Trial Chamber), May 21, 1999...............................34

*Khouzan v. Ashcroft*, 361 F.3d 161 (2d Cir. 2004) ..........................................................5

*La Compania Ocho, Inc. v. U.S. Forest Service*, 874 F. Supp. 1242 (D.N.M. 1995)...................65

*Lawrence v. Texas*, 539 U.S. 558 (2003) ......................................................................60

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ...........................................................................60

*Madsen v. Kinsella*, 343 U.S. 341 (1952) ......................................................................68

*Mathews v. Diaz*, 426 U.S. 67 (1976) ......................................................................42, 63

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...............................................40, 43, 44, 47, 56

*Ex parte Milligan*, 71 U.S. 2 (1866) .............................................................................68

*Mudd v. Caldera*, 134 F. Supp. 2d 138 (D.D.C. 2001)....................................................33

*In re Murchison*, 349 U.S. 133 (1954)...........................................................................52

*National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001) ..............................................................................................................65

*Prosecutor v. Furundzija*, Case No. IT-95-17/1-A (ICTY Appeals Chamber July 21, 2000) ...................................................................................................................34

*Prosecutor v. Krstic*, Case No. IT-98-33-T (ICTY Trial Chamber Aug. 2, 2001) ......................34

*Prosecutor v. Kvocka et al.*, Judgment, Case No. IT-98-30/1,T.Ch. I, 2 Nov 2001 ....................34

*Prosecutor v. Milutinovic*, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction, Case No. IT-99-37-AR72 (ICTY Appeals Chamber, May 21, 2003)................34

*Prosecutor v. Alfred Musema*, Case No. ICTR-96-13 A, Judgment and Sentence (27 Jan. 2000) .................................................................................................................36

*Prosecutor v. Eliezer Niyitegeka*, Case No. ICTR-96-14-T, Judgment and Sentence (16 May 2003) ................................................................................................36

*Prosecutor v. Juvenal Kajelijeli*, Case No. ICTR-98-44A, Judgment 787 (1 Dec. 2003)............36

*Ex parte Quirin*, 317 U.S. 1 (1942) ................................................12, 26, 27, 33, 59, 68

*Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977) ......................................................41, 42

*Rasul v. Bush*, 124 S. Ct. 2686 (2004) ..........................................................4, 41, 42, 64

*Reid v. Covert*, 354 U.S. 1 (1957)........................................................................11, 68

*Rinaldi v. Yeager*, 384 U.S. 305 (1966) ................................................................60

*Rodriguez-Silva v. INS*, 242 F.3d 243 (5th Cir. 2001)................................................61

*Rogers v. Richmond*, 365 U.S. 534 (1961) ............................................................55

*Romer v. Evans*, 517 U.S. 620 (1996)....................................................................60

*Smith v. Hooey*, 393 U.S. 374 (1969) ....................................................................75

*State v. Bond*, 713 A.2d 906 (Conn. App. Ct. 1998) ..............................................36

*Strunk v. United States*, 412 U.S. 434 (1973) ......................................................76

*Takahashi v. Fish and Game Commission*, 334 U.S. 410 (1948)................................65

*Tate v. United States*, 359 F.2d 245 (D.C. Cir. 1966)................................................57

*Tennessee v. Lane*, 541 U.S. 509 (2004)................................................................60

*Tumey v. Ohio*, 273 U.S. 510 (1926) ....................................................................52

*Turner v. Fouche*, 396 U.S. 346 (1970)................................................................60

*United States v. Acireno*, 15 M.J. 570 (A.C.M.R. 1982) ......................................72, 73

*United States v. Birge*, 52 M.J. 209 (C.A.A.F. 1999) ............................................72, 75

*United States v. Bray*, 52 M.J. 659 (A.F. Ct. Crim. App. 2000)................................73, 76

*United States v. Burrell*, 13 M.J. 54 (C.M.A. 1982)................................................72

*United States v. Calloway*, 505 F.2d 311 (D.C. Cir. 1974) ........................................................75

*United States v. Clay*, 1 U.S.C.M.A. 77 (1951) ........................................................................2

*United States v. Cooper*, 58 M.J. 54 (C.A.A.F. 2003) ..........................................................72, 74

*United States v. Davis*, 19 U.S.C.M.A. 217 (1970) ..................................................................2

*United States v. Earls*, 2003 CCA LEXIS 92 (A.F.C.C.A. Mar. 24, 2003) ................................72

*United States v. Edmond*, 41 M.J. 419 (1995) ........................................................................76

*United States v. Goode*, 54 M.J. 836 (2001) ..........................................................................74

*United States v. Gouveia*, 467 U.S. 180 (1984) ......................................................................72

*United States v. Hatfield*, 44 M.J. 22 (C.A.A.F. 1996) ........................................................74, 76

*United States v. Kossmann*, 38 M.J. 258 (C.M.A. 1993) ..............................................72, 74, 76

*United States v. Laminman*, 41 M.J. 518 (C.G. Ct. Crim App. 1994) ......................................74

*United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002) ................................................57

*United States v. Marion*, 404 U.S. 307 (1971) ........................................................................75

*United States v. Olson*, 7 U.S.C.M.A. 460 (1957) ..................................................................21

*United States v. Sippel*, 4 U.S.C.M.A. 50 (1954) ......................................................................2

*United States v. Thompson*, 504 U.S. 505 (1992) ....................................................................38

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ........................................................62

*United States v. West*, 504 F.2d 253 (D.C. Cir. 1974) ............................................................75

*United States v. Wiklinson*, 27 M.J. 645 (1988) ......................................................................72

*United States v. Williams*, No. ACM 35122, 2004 WL 388773 (A.F. Ct. Crim. App. 2004) ........................................................................................................................................75

*United States v. Wilterberger*, 18 U.S. 76 (1820) ....................................................................38

*United States v. Young*, 61 M.J. 501 (A. Ct. Crim. App. 2005) ................................................72

vii

*Weiss v. United States*, 510 U.S. 163 (1994) ......................................43, 46, 47, 48, 49, 51, 53, 54,

*Withrow v. Williams*, 507 U.S. 680 (1993) ...................................................................................55

*Wong Wing v. United States*, 163 U.S. 228 (1896)............................................................47, 61, 63

*In re Yamashita*, 327 U.S. 1 (1946) ...............................................................28, 32, 67, 68, 69

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ...................................................................................58

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...............................................................................62, 64

## CONSTITUTIONS, STATUTES AND RULES

U.S. Const. art. I, § 9, cl. 3....................................................................................................38

UCMJ art. 2(a)(12), 10 U.S.C. § 802(a)(12).......................................................................71

10 U.S.C. § 802(9)...................................................................................................................71

UCMJ, art. 10, 10 U.S.C. § 810.......................................................................................71, 72

10 U.S.C. § 816(1)(a)..............................................................................................................50

10 U.S.C. § 821........................................................................................................................11

10 U.S.C. § 822........................................................................................................................69

10 U.S.C. § 825(d)(2)..............................................................................................................49

10 U.S.C. § 831(d)................................................................................................................2, 54

10 U.S.C. § 837........................................................................................................................48

10 U.S.C. § 850(a) .....................................................................................................................2

10 U.S.C. § 852(a)(1)..............................................................................................................49

10 U.S.C. § 864........................................................................................................................52

10 U.S.C. § 864(a)....................................................................................................................48

10 U.S.C. § 866(b)....................................................................................................................52

10 U.S.C. § 867 ................................................................................................................52

10 U.S.C. § 867(a) ...........................................................................................................53

10 U.S.C. § 869(a) ...........................................................................................................53

UCMJ art. 104, 10 U.S.C. § 904 ......................................................................................19

UCMJ art. 106, 10 U.S.C. § 906 ......................................................................................19

10 U.S.C. § 3037(c) ..........................................................................................................67

10 U.S.C. § 8037(c) ..........................................................................................................67

18 U.S.C. § 2441 ..............................................................................................................31

28 U.S.C. § 1331 ..............................................................................................................10

28 U.S.C. § 1361 ..............................................................................................................10

28 U.S.C. § 2241 ........................................................................................................10, 13

28 U.S.C. § 2339A .............................................................................................................3

42 U.S.C. § 1981 ........................................................................................................56, 65

1 Stat. 112 ........................................................................................................................21

Crime Act, 1914 § 24AA (Austl.) ...................................................................................21

Fed. R. Civ. P. 56(c) .......................................................................................................

## LEGISLATIVE MATERIALS

*DOJ Oversight: Preserving our Freedoms while Defending Against Terrorism: Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. (Nov. 28, 2001) (statement of Hon. William Barr, former U.S. Attorney General), *available at* http://judiciary.senate.gov/hearing.cfm?id=126 ....................................................11

Senate, Legal and Constitutional Legislation Committee, Estimates, Canberra, Australia (Feb. 16, 2004) ..........................................................................................................21

# MISCELLANEOUS

Articles 27 & 28, American Articles of War 1775 ................................................................. 21

Richard Barrett & Laura Little, *Lessons of Yugoslav Rape Trials: A Role for Conspiracy Law in International Tribunals,* 88 Minn. L. Rev. 30 (2003) ........................................... 32, 35

Richard R. Baxter, *So-called "Unprivileged Belligerency": Spies, Guerrillas and Saboteurs,* 1952 Brit. Y.B. Int'l L. 323, *reprinted in* Mil. L. Rev. (Bicentennial Issue) 487 (1975) ................................................................................................................... 24, 26

Antonio Cassese, *International Criminal Law* (2003) ................................................... 29

Charter of the International Military Tribunal, Aug. 8, 1945, art. 6, 59 Stat. 1544, 82 U.N.T.S. 279 ................................................................................................................... 30

Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (with Protocols I, II and III), 10 October 1980, 19 I.L.M. 1523, Protocol IV, 13 October 1995, 35 I.L.M. 1218, Amended Protocol II, 3 May 1996, 35 I.L.M. 1209 ............. 17

Convention Relative to the Protections of Civilian Persons in Time of War, Aug. 12, 1949, arts. 64-66, 75 U.N.T.S. No. 973 ........................................................................ 24, 31

Crim. App. Rules of Practice & Procedure ..................................................................... 53

C.A.A.F. Rules of Practice & Procedure ........................................................................ 53

Dep't of Defense Order No. 651-04 (July 7, 2004) ...................................................... 52

Dept. of Defense, Release No. 826-04 (Aug. 25, 2004) available at http://www.defenselink.mil/releases/2004/nr20040825-1169.html ............................. 8

Dep't of the Army, *Field Manual 27-10, The Law of Land Warfare* (1956) ................ 26

Yoram Dinstein, *The Conduct Of Hostilities Under The Law Of International Armed Conflict* (2004) ......................................................................................................... 24, 25, 26

Louis Fisher, Congressional Research Service, *Military Tribunals: Historical Patterns and Lessons* (2004) ...................................................................................................... 59

George P. Fletcher, *Rethinking Criminal Law* (2000) .................................................. 29

Stephen J. Fortunato, Jr., *A Court of Cronies*, IN THESE TIMES (June 28, 2004), *available at* http://www.inthesetimes.com/site/main/article/ a_court_of_cronies ...................................50

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949...................................................................16, 24, 31

Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949.......................................16, 31

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 75 U.N.T.S. 135 ..............................................................................................22, 23, 31, 71

David Glazier, *Note, Kangaroo Court or Competent Tribunal?: Judging the 21st Century Military Commission,* 89 Va. L. Rev. 2005 (2003) ..................................................59

http://www.defenselink.mil/news/Oct2004/d20041021panel.pdf ..................................66

http://www.defenselink.mil/news/Nov2004/d20041118reg2.pdf...................................66

http://www.whitehouse.gov/news/releases/2001/11/20011113-27.html .......................65

Hague Convention IV Respecting The Laws And Customs Of War On Land, Regulations Annexed, Oct. 18, 1907, art. 23 ..................................................................16, 17, 30

John Hendren, *Trial and Errors at Guantanamo: Military Tribunal's First Week Trying Suspects Is Marked by Confusion and Inexperience*, L.A. TIMES, Aug. 29, 2004, at A1, 2004 WL 55934140 ................................................................................................45

IMT Nuremberg Transcript Vol. 1...............................................................................36

International Committee of the Red Cross, Direct Participation in Hostilities under International Humanitarian Law (2003) (available at http://www.icrc.org/Web/eng/siteeng0.nsf/htmlall/5TALL8/$File/Direct%20participa tion%20in%20hostilities-Sept%202003.pdf ).........................................................28

International Convention for the Suppression of the Financing of Terrorism, Jan. 10, 2000, art. 2, S. Treaty Doc. No. 106-49, 39 I.L.M. 270 .......................................32

International Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, S. Treaty Doc. No. 106-6, 37 I.L.M. 249....................................................................32

Robert H. Jackson, *Report to the International Conference on Military Tribunal* (1949)............31

Derek Jinks, *The Declining Status of POW Status*, 45 Harv. Int'l L.J. 367 (2004)......................24

Law of War Workshop Deskbook, International and Operational Law Department, The Judge Advocate School (2000) available at http://www.au.af.mil/au/awc/awcgate/law/low-workbook.pdf................................................15

Letter from Robert Cornall, Australian Attorney General's Department (Feb. 8, 2002) ...............6

Neil A. Lewis, *2 Prosecutors Faulted Trials for Detainees*, N.Y. Times, Aug. 1, 2005 ........45, 46

MCI No. 9 § 4(C)(4) (Dec. 26, 2003), *available at* http://www.fas.org/irp/doddir/dod/.pdf ........51

Maj. Timothy C. MacDonnell, *Military Commissions and Courts-Martial*, ARMY LAW, Mar. 2002 ....................................................................................................................68

Manual for Courts-Martial (2002) .......................................................................................19, 69

Myres S. McDougal & Florentino P. Felciano, *Law and Minimum World Public Order* (1961) ..................................................................................................................................25

1 Virginia Morris & Michael P. Scharf, *An Insider's guide to the International Criminal Tribunal for the Former Yugoslavia* (1995) ........................................................................32

Neely, *The Fate of Liberty* 162-3 (1991) ...............................................................................67

W. Hays Parks, *Special Forces' Wear of Non-Standard Uniforms*, 4 Chi. J. Int'l L 493 (2003) ................................................................................................................................27

Jordan J. Paust et al., *International Criminal Law, Cases and Materials* (2d ed. 2000)...............16

Stanislaw Pomorski, *Conspiracy and Criminal Organization*, *in The Nuremberg Trial and International Law* 213 (George Ginsburgs & V.N. Kudriavisev eds., 1990)...................30

Presidential Military Order, 66 Fed. Reg. 57833 (Nov. 13, 2001) .................................5, 6, 49, 57

Procedures for Trials by Military Commissions of Certain Non-United States Citizens in the War Against Terrorism, Gen. Counsel, Dep't of Defense, Military Commission Order No. 1 (March 21, 2002) ........................................................6, 11, 46, 50, 51, 53, 55, 66

Procedures for Trials by Military Commissions of Certain Non-United States Citizens in the War Against Terrorism, Gen. Counsel, Dep't of Defense, Military Commission Instruction No. 2 (Apr. 30, 2003) ..............................................7, 17, 18, 20, 21, 26, 32, 35, 49

Protocol Additional to the Geneva Convention 12 Aug. 1949, and Relating to the Protection of Veterans of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 53................................................................................................................................16, 17

Jean-Francois Queguiner, *Woring Paper: Direct Participation in Hostilities under International Humanitarian Law* (Nov. 2003), *available at* http://www.ihlresearch.org/ihl/pdfs/briefing3297.pdf................................................................................................25

Reply brief for Petitioner, *Rumsfeld v. Padilla*, 124 S. Ct. 2711 (2004) (No. 03-1027) ..............59

1998 Rome Statute of the International Criminal Court, art. 8(b), UN Doc. A/CONF. 183/9 * (1998), *reprinted in* 37 I.L.M. 999 (1998)...................................................13

Fergus Shiel, *Ex-detainees allege Habib and Hicks abused*, THE AGE, Aug. 5, 2004, *available at* http://www.theage.com.au/articles/2004/08/04/ 1091557920149.html...............54

Spectrum Conflict Graphic, Appendix A, Chapter 3, Law of War Workshop Deskbook, International and Operational Law Department, The Judge Advocate School (2000) available at http://www.au.af.mil/au/awc/awcgate/law/low-workbook.pdf ...........................15

Statute of the ICTR, S.C. Res. 955, U.N.SCOR, 49th Sess., 34534d mtg., U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598................................................................................32, 35

Statute of the ICTY, S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg. at 2, U.N. Doc. S/RES/827 (1993), 32 I.L.M. 1203...............................................................................32, 35

Statute of the Special Court for Sierra Leone, art. 1 ........................................................................

St. Petersburg Declaration Renouncing the Use, in Time of War, of Explosive Projectiles under 400 Grammes Weight, Dec. 11, 1868, 1 AM. J. INT'L. L. 95 ........................................17

*Nazi Saboteur Military Commission Session 1*, Transcript of Proceedings Before the Military Commission to Try Persons Charges with Offenses Against the Law of War and the Articles of War (July 8, 1942), *available at* http://www.soc.umn.edu/~samaha/nazi_saboteurs/nazi01.htm..............................................69

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Article 1, opened for signature February 4, 1985, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85............................................................................5

U.S. Army, Judge Advocate General's School, *International & Operational Law Department, Operational Law Handbook* (2003)..............................................................14, 15

U.S. Army, Judge Advocate General's Legal Center and School, *Operational Law Handbook* (2005) ....................................................................................................................26

United States Navy, *The Commander's Handbook on the Law of Naval Operations*, MCWP 5-12.1/NWP 1-14M ¶ 5.41 (1995), http://www.cpf.navy.mil///%201-14/.htm ..........13

*United States v. Pohl*, No. 4 (Nuremberg Mil. Tribunal II Nov. 3, 1947), *reprinted in* TRIALS OF WAR CRIMINALS BEFORE THE NURENBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 (1950), *available at* http://www.marzal.org/archive/nmt/05/NMT05-T0961.htm...................................................31

Gerhard Werle, *Völkerstrafrecht* (2003) .......................................................................................29

William Winthrop, *Military Law and Precedents* (2d ed. 1920).......................................33, 68, 70

## PETITIONER DAVID M. HICKS'S REVISED MOTION FOR
## PARTIAL SUMMARY JUDGMENT

Petitioner David M. Hicks, an Australian national who has been unlawfully detained by Respondents at Guantanamo Bay for nearly four years, respectfully submits this Revised Brief in Support of his Motion for Partial Summary Judgment on his Second Amended Petition for Writ of Habeas Corpus and Complaint for Injunctive, Declaratory, and Other Relief.  Hicks requests that the Court find illegal the operation of a military commission seeking to try him for newly-invented military crimes (such as conspiracy).[1]

Hicks is entitled to judgment as a matter of law, because the military commission lacks the authority to try him.  First, the substantive "crimes" with which Hicks is charged are not criminal violations at all, much less violations of the law of war within the jurisdiction of military commissions.  Second, the commission is not the impartial tribunal required under the Due Process Clause.  Third, the executive order establishing the commission does not apply to citizens accused of similar "crimes" to those alleged against Hicks, such as Yasser Hamdi, John Walker Lindh, or Jose Padilla, and thus is unlawfully discriminatory in violation of the Equal Protection Clause.  Fourth, the military commission is invalidly constituted under statutory, regulatory and constitutional law.  Finally, the government's failure to try Hicks for years after his capture violates his right to a speedy trial.

None of these arguments is affected by the D.C. Circuit's recent decision in *Hamdan v. Rumsfeld*, 415 F.3d 33, 2005 WL 1653046 (D.C. Cir. July 2005), which  resolved three different substantive issues:  (1) whether the President was authorized by Congress to establish military

---

[1] Hicks seeks summary judgment that the military commission seeking to try him for war crimes are invalid but does not seek summary judgment concerning the issue of whether he can be held as an enemy combatant.  The government filed a motion to dismiss on that issue, which was rejected by Judge Green, whose decision is now on appeal.

commissions; (2) whether the Geneva Conventions are self-executing and require confrontation of witnesses; and (3) whether all of the procedural requirements applicable to courts-martial under the Uniform Code of Military Justice (UCMJ) must also be applied to military commissions.[2]   In fact, in two critical respects, Hicks's argument has been strengthened in the intervening months since he filed his initial summary judgment motion.   To begin with, *Hamdan* itself answers the primary contention the government made in response to Mr. Hicks's summary judgment motion -- that this Court should abstain from resolving Hicks's challenges to the commission proceedings until after they have been completed.   Under *Hamdan*, this Court must consider ahead of time challenges to the authority of military commissions to try Mr. Hicks at all, *see Hamdan*, 2005 WL 1653046, at *1, *7, a category into which all of Mr. Hicks's challenges fall.

---

[2] Hicks also raised these issues in his initial summary judgment filing and believes the D.C. Circuit decided these issues incorrectly for the reasons set forth therein.  *See* Docket #102, at 31-37 (absence of presidential authority to establish commission), 60-71 (applicability and requirements of Geneva conventions), and 48-51 (general applicability of the UCMJ).  Here, however, he merely preserves these issues as agreed in the status conference on August 5, 2005.  In addition, Mr. Hicks notes that the petitioner in *Hamdan* asserted only the general applicability of the UCMJ to military commissions.  In deciding *Hamdan*, the D.C. Circuit acknowledged that certain sections of the UCMJ expressly apply to military commissions as well as courts martial and other military tribunals.  *Hamdan*, 2005 WL 1653046, at *8. Chief among these UCMJ provisions expressly covering military commissions are Articles 49 and 50. 10 U.S.C. § 849(d) (setting stringent conditions for the introduction of deposition testimony before "any military court or military commission"); *id.* § 850(a) (strictly limiting the conditions under which testimony previously presented to a court of inquiry may subsequently be used before "a court martial or military commission").  The nation's highest military court has long recognized Articles 49 and 50 as embodying the right to confrontation in trials before military tribunals.  *See United States v. Clay*, 1 U.S.C.M.A. 74, 77 (1951) (recognizing that, in enacting the UCMJ, "Congress granted to an accused the [right] . . . to be confronted by witnesses testifying against him."); *United States v. Davis*, 19 U.S.C.M.A. 217, 224 (1970) (recognizing that Article 49 embodies a military right of confrontation); *United States v. Sippel*, 4 U.S.C.M.A. 50, 56 (1954) (recognizing that Article 50 requires that an accused be "afforded an opportunity to confront the witness whose testimony is sought to be admitted").  Unlike the petitioner in *Hamdan*, Mr. Hicks has alleged specific violations of his right to confrontation.  However, recognizing that these issues may not be considered ripe for decision by the civil courts *see Hamdan*, 2005 WL 1653046, at *7, Mr. Hicks seeks only to preserve these arguments so that they may be raised in subsequent proceedings.

In addition, since Hicks filed his initial summary judgment brief, Judge Green has rejected the government's primary substantive response to several of Mr. Hicks's arguments. Along with his challenge to military commissions, Hicks has challenged the authority of the government to hold him as a so-called enemy combatant based on the Combatant Status Review Tribunal ("CSRT") the government set up to make that determination. Judge Green determined that Mr. Hicks is protected by the Constitution and that the CSRTs do not comport with Due Process. The rejection of Respondents' claim that Mr. Hicks lacks constitutional rights equally dooms Respondents' defense of military commissions, as they have no basis to claim that the commissions, as presently constituted, comport with the Constitution. Indeed, in critical respects they are worse than CSRTs, as they are being used as a basis of a *criminal* prosecution.

Respondents have invoked the "war on terror" to justify the egregious violations of Hicks's rights that will occur through use of the military commission structure. But as the Supreme Court recently explained in *Hamdi v. Rumsfeld*, "[i]t is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad." 124 S. Ct. 2633, 2648 (2004). This admonition applies with additional force to the instant situation: *Hamdi* concerned the detention of an individual only during the course of formal hostilities; here, Respondents seek to imprison Hicks for life -- affording him no trial in an Article III court for a violation of domestic law, *see, e.g.*, 28 U.S.C. § 2339A (criminalizing the provision of material support to terrorists), but instead, a trial by an invalid military commission for fictional "war crimes." The charges against Hicks are based on allegations that he fought against the United States as a foot soldier in Afghanistan -- allegations that, even if true, do not constitute a crime under the law of war or under any statute over which the

commission has jurisdiction.  The Court should not permit Respondents to fabricate criminal law after the fact.  Nor should it sanction a commission that violates the basic safeguards against a wrongful conviction.  The very individuals who are prosecuting the "war on terror" -- and who dreamed up the specious charges against Mr. Hicks -- will adjudicate those charges:  the commission's members are appointed by a designate of the Secretary of Defense, review of its proceedings will be by other designates of the Secretary of Defense, and ultimate review will be by the Secretary and/or the President.  Such a partial tribunal offers no chance for a fair trial that would comport with Due Process.

There is no genuine issue of material fact to prevent a determination that the military commission is unlawful.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

In the aftermath of the terrorist attacks on American targets on September 11, 2001, Respondent President Bush announced that the United States was engaged in a "war on terror." On or about October 7, 2001, the United States commenced air strikes against Taliban and "al Qaeda" targets within Afghanistan, followed with ground operations on October 19, 2001.  *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004).  The United States was supported by the Northern Alliance, a group of armed and organized Afghan opponents of the Taliban.  *Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004).  Also contributing to the campaign against the Taliban were military delegations from other nations (the "Coalition Forces").

During the campaign, the Northern Alliance took into custody a number of persons allegedly associated with the Taliban and/or al Qaeda.  Resp. Br. at 8.  Among those prisoners was Petitioner David M. Hicks, an Australian national.  *Id.*  At the time of his apprehension,

4

Hicks was not engaged in combat against the United States or any of its allies.  Hicks Supp. Aff. ¶ 2 (Ex. 1).  Hicks never fired a shot against anyone in Afghanistan.  *Id.*

Within ninety days of the commencement of military strikes, the United States, the Northern Alliance, and the Coalition Forces defeated the Taliban.  The Northern Alliance then transferred custody of Hicks to the United States.  *Id.* ¶ 3.  Hicks was confined for several weeks on U.S. Navy vessels, where he was extensively questioned by military or intelligence personnel. *Id.* ¶ 4.

In January 2002, Hicks was transported by U.S. aircraft to Guantanamo Bay, and was placed in Camp X-Ray, a special facility reserved for alien detainees denominated "enemy combatants."  *Id.* ¶ 5.  Hicks was subjected to intensive and continuous interrogation while at Guantanamo.  Hicks Aff. ¶¶ 3-27 (Ex. 2).  The coercive and abusive interrogation methods employed against Hicks and other Guantanamo detainees, constitute torture in violation of various provisions of international law.  *See id.*; *see also* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Article 1 & 2, opened for signature February 4, 1985, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85; *see also Khouzan v. Ashcroft*, 361 F.3d 161, 168-69 (2d Cir. 2004).  Hicks was not brought before a competent tribunal to determine his status, as required by Article 10 of the UCMJ, Article 5 of the Geneva Convention (III), and Army Reg. 190-8 § 1-6.  Hicks Aff.

In July 2003, Respondents declared Hicks eligible for "trial" before a military commission on criminal charges punishable by life imprisonment. Hicks Aff. ¶ 26 (Ex. 2).  The military commission in question was established by Presidential Military Order on November 13, 2001.  *See* Presidential Military Order, 66 Fed. Reg. 57833 (Nov. 13, 2001) ("PMO") (Ex. 3).

After issuance of the PMO, the General Counsel of the Department of Defense ("DOD") established by order the "Procedures for Trials by Military Commissions of Certain Non-United States Citizens in the War Against Terrorism."   *See* Gen. Counsel, Dep't of Defense, Military Commission Order No. 1 ("MCO No. 1") (March 21, 2002) (Ex. 4).   This order established that the Executive Branch would serve as prosecutor, judge, jury and reviewing court.   Pursuant to the order, the Secretary of Defense designates an Appointing Authority, who in turn appoints individuals to serve on the commissions.   *See id.* ¶¶ 2, 4(A)(1).   The commission decides questions of both law and fact, although only the presiding officer is required to have legal experience.   PMO ¶ 4(c)(2) (Ex. 3); MCO No. 1, ¶ 4(A)(3), (4) (Ex. 4).   A review panel appointed by the Secretary of Defense, and then the Secretary himself or the President, reviews the determinations of the commission.   MCO No. 1, ¶ 6(H)(4).   Only non-citizens are to be tried before the commissions.   *See* PMO generally.   Unsworn testimony and confessions obtained through torture "shall" be admitted at the commissions' "trials," limited only by the general rule that they be of probative value to a reasonable person.   MCO No. 1, ¶ 6(D)(1), (3).

For nearly two years after he was first detained -- and for five months after he was designated eligible for "trial" before the commission -- Respondents failed to afford Hicks legal representation.   Hicks Supp. Aff. ¶ 6 (Ex. 1).   In response to repeated entreaties for visits and communication by Hicks's family and their retained Australian counsel, the Australian government responded: "Your request for Mr. Hicks's family to have access to him was referred to the United States authorities.   The United States has advised that, at this stage, no family access will be allowed any of the detainees held at Guantanamo Bay."   Letter from Robert Cornall, Australian Attorney General's Department (Feb. 8, 2002).   On November 28, 2003, Major Michael D. Mori of the United States Marine Corps was, at last, formally detailed to serve

as Hicks's military defense counsel.[3]   Subsequently, Joshua L. Dratel, Esq., was approved as

Hicks's Civilian Defense Counsel, and Stephen Kenny of Australia was approved as his Foreign

Attorney Consultant. Resp. Br. at 9; Mori Aff. ¶¶ 2, 10 (Ex. 5).

After Hicks was finally allowed visits by counsel, yet another six months elapsed before

any official account was given for his detention:  on June 10, 2004, Hicks was charged with the

following "offenses":

> *Count One* --   Conspiracy to commit the following offenses:  attacking civilians
> attacking civilian objects; murder by an unprivileged belligerent; destruction of
> property by an unprivileged belligerent; and terrorism.
>
> *Count Two* --   Attempted Murder by an Unprivileged Belligerent.
>
> *Count Three* --Aiding the Enemy.

Charge Sheet ¶¶ 19-22 (Ex. 7).  These "offenses" are not part of the laws of war, *see* Bassiouni

Aff. ¶ 5 (Ex. 8); they were defined for the first time in an order issued by the Department of

Defense on April 30, 2003.  *See* MCO No. 2, ¶ 6 (Ex. 9).

The government has alleged facts in support of these spurious charges amounting to

nothing more than that Hicks was part of an organization fighting against United States troops.

There is no allegation that Hicks participated in any attacks on civilians, planned any such

attacks, or even had advance knowledge of any such attacks.  *See* Charge Sheet.  The

government does not even allege that Hicks personally killed, injured, fired upon, or directed fire

---

[3] Major Mori was flown in from his post in Hawaii the week of July 14, 2003, in anticipation of his
assignment to Hicks's case.  *See* Mori Aff. ¶ 6; *see also* Mem. from Dep't of Defense, Office of the Chief
Defense Counsel, to … Maj. Mori (July 23, 2004), (detailing Maj. Mori to represent Hicks) (Ex. 6).
Nevertheless, Maj. Mori's representation of Hicks was not formalized for another four and a half months.
*See* Mori Aff. ¶¶ 10-11 (Ex. 5).

upon, any U.S. or Coalition forces or the Northern Alliance forces.[4]  *See* Charge Sheet.  In fact, he did not.  Hicks Supp. Aff. ¶ 2 (Ex. 1).  In short, there is no basis for Hicks's trial before a military commission.

Hicks's attorneys appeared before the commission on August 25, 2004 to determine a schedule for further proceedings, and to present the indictment.  Dept. of Defense, Release No. 826-04 (Australian citizen is the second commissions case) (Aug. 25, 2004) *available at* http://www.defenselink.mil/releases/2004/nr20040825-1169.html.   At that appearance, Hicks pleaded not guilty to all charges.  *Id.*  Hicks's "trial" before the commission was scheduled for January 2005.  *Id.* On September 17, 2004, Respondents convened a Combatant Status Review Tribunal ("CSRT") which purported to determine whether Hicks could be held as an enemy combatant.  The CSRT did not evaluate whether Hicks was a privileged combatant entitled to prisoner of war status or an unprivileged combatant.[5]  Hicks did not participate in the CSRT because of the inadequacy of CSRT procedures, because he was not permitted to speak to his legal counsel regarding the CSRT, and because his un-counseled testimony potentially could have been used against him in the criminal proceedings before the commission.  The week of Hicks's CSRT hearing, a member of Hicks's commission defense team was forbidden to enter Guantanamo Bay to meet with Hicks.  Hicks Supp. Aff. ¶ 10 (Ex. 1).

_____

[4] As recently as November 2004, during a conference with all parties and the Presiding Officer, the prosecution conceded that they do not intend to offer any evidence during the military commission that Mr. Hicks fired a weapon at any person in Afghanistan.

[5] Briefing on the CSRT proceeded on a different schedule, and Judge Green ultimately found the CSRTs to be fundamentally flawed, a decision that is on appeal.  That appeal does not control this motion. Regardless of whether David Hicks may be detained as an enemy combatant for the course of the war, he may not be tried by the commission for "war crimes" punishable by life imprisonment for the reasons detailed herein.

The instant action was commenced with Hicks's petition for writ of habeas corpus on February 19, 2002. *See* DOCKET # 1.  On August 31, 2004, Hicks filed a motion for leave to file a Second Amended Petition for Writ of Habeas Corpus and Complaint for Injunctive, Declaratory, and Other Relief, which was subsequently granted.  *See* DOCKET # 77 ("Second Am. Pet.").  He challenged both the authority of Respondents to hold him as an enemy combatant and their authority to try him before a military commission.  *Id.*

On January 31, 2005, Judge Green determined that the CSRTs used to evaluate whether Hicks and ten other detainees were enemy combatants were unlawful.  I*n re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (DDC 2005).  Judge Green held that the detainees have Due Process rights.  She further concluded that the CSRTs failed to provide the detainees with Due Process because they denied the detainees both access to the classified information used against them and an attorney who could review the classified information.   Moreover, she explained, the CSRTs relied on statements allegedly obtained through torture or coercion without even a thorough inquiry into their reliability.  *Id*.  Respondents appealed Judge Green's January 31, 2005 Order.

On November 8, 2004, in a separate action concerning the legality of commission proceedings against a different detainee, Judge James Robertson issued a memorandum opinion and order that the procedures for trying Guantanamo detainees for alleged war crimes by military commission were unlawful for failing to comply with the requirements for courts martial set forth in the UCMJ or with the Geneva Conventions.  *Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004).   Although those arguments do not form the predominant basis of Hicks's challenge to military commissions here, because they invalidated the commission process, this Court subsequently issued a decision holding the present motion (challenging the commission

proceedings against Hicks) in abeyance until after the appeal in *Hamdan*, Docket # 143, 170. That appeal resulted in reversal of Judge Robertson's decision. *Hamdan v. Rumsfeld*, 415 F.3d 33, 2005 WL 1653046 (D.C. Cir. July 15, 2005).

After the D.C. Circuit's decision in *Hamdan* and representations from the government that proceedings against Mr. Hicks were likely to resume in September, this court lifted the stay and entered a briefing schedule on Hicks's and Respondents' cross-motions for summary judgment. Because no genuine issue of material fact exists in this case with respect to the legality of the military commission proceeding against Hicks, this Court should grant partial summary judgment to Hicks on his challenge to the commission process.

## JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1361 (mandamus) and 28 U.S.C. § 1331 (federal question) as well as 28 U.S.C. § 2241 (habeas corpus).

## STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). To defeat a motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). The moving party is "entitled to a judgment as a matter of law" when the nonmoving party "has failed to

make a sufficient showing on an essential element of [its] case with respect to which [it] has the

burden of proof." *Celotex Corp.*, 477 U.S. at 323.

<u>**ARGUMENT**</u>

I. **THE COMMISSION LACKS SUBJECT MATTER JURISDICTION TO HEAR THE OFFENSES WITH WHICH HICKS HAS BEEN CHARGED.**

The military commission before which Hicks is scheduled to be "tried" lacks the

jurisdiction to hear or to adjudicate the charges against him.  As a plurality of  the Supreme

Court held in *Reid v. Covert*, military commissions possess only "a very limited and

extraordinary jurisdiction … intended to be only a narrow exception to the normal and preferred

method of trial in courts of law."  354 U.S. 1, 21 (1957).  The charges against Hicks clearly fall

outside those limits; indeed, the Executive Branch fabricated the charges out of whole cloth and

applied them retroactively to Hicks.

Because Congress understood the extraordinary nature of military commissions, it limited

the jurisdiction of even properly constituted commissions to adjudication of only two kinds of

charges:  (1) those that Congress has expressly authorized them to adjudicate, and (2) those that

are recognized as crimes under the traditional law of war.[6]  Article 21 of the UCMJ, on which

Respondent President Bush relied in enacting the PMO which established military commissions,[7]

thus specifies that military commissions shall not have jurisdiction over offenses other than those

"that *by statute* or *by the law of war* may be tried by military commissions." 10 U.S.C. § 821

(emphasis added).  The Executive Branch acknowledges these limits in MCO No. 1, which

---

[6] We show in Part IV that the military commissions here were not properly constituted and thus have no jurisdiction to try even these two kinds of charges.

[7] *See DOJ Oversight: Preserving our Freedoms while Defending Against Terrorism: Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. (Nov. 28, 2001) (statement of  Hon. William Barr, former U.S. Attorney General), *available at* http://judiciary.senate.gov/ hearing.cfm?id=126.

reiterates them, *see* MCO No. 1 § 3(B); and Respondents acknowledge these limitations here. Respondents' Brief (DOCKET # 88) at 26-28 [hereinafter Resp. Br.][8]; s*ee also Ex parte Quirin*, 317 U.S. 1, 29 (1942) (the first inquiry for a court is "whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial.")

The charges against Hicks do not fall within the purview of any valid military commission.   Hicks is charged with three offenses: conspiracy, attempted murder by an unprivileged belligerent, and aiding the enemy.   *See* Charge Sheet, ¶¶ 19 - 22 (Ex. 7).   None of these three charges is subject to review by a military tribunal: none has been expressly delegated to military commissions by Congress, and none has been recognized under the law of war.   In addition, to the extent these charges concern Mr. Hicks's alleged connection with al Qaeda, rather than the war against the Taliban, they do not concern a "war" within the meaning of international law at all.

### A.        Overview of the Sources and Purpose of the Law of War.

As a preliminary matter, a summary of the sources and purposes of the law of war is in order.

The law of war is one part of international law.   The law of war was originally a system of "common law" based on "*universal* agreement and practice."   *Quirin*, 317 U.S. at 30

---

[8] While both Petitioner and Respondents are filing new briefs in response to this Court's Order, we nonetheless refer throughout to Respondents' prior brief and reply brief to best address Respondents' position as we currently understand it.   *See* Respondents' Response and Motion to Dismiss or for Judgment As A Matter of Law With Respect to Challenges to the Military Commission Process Contained in Petitioner's Second Amended Petition for Writ of Habeas Corpus Complaint for Injunctive, Declaratory, and Other Relief ("Resp. Br.") (DOCKET #88); Response to Petitioner's Br. in Opp. to Resp's Mot. to Dismiss and in Support of Pet. David M. Hicks' Cross-Motion for Partial Summ. J. at 13-16 ("Reply Br.") (DOCKET #102).

(emphasis added).  When the practice of military forces "attains a degree of regularity and is accompanied by the general conviction among nations that behavior in conformity with the practice is obligatory, it can be said to have become a rule of customary law binding on all nations."  UNITED STATES NAVY, THE COMMANDER'S HANDBOOK ON THE LAW OF NAVAL OPERATIONS, MCWP 5-12.1/NWP 1-14M ¶ 5.41 (1995) [hereinafter, "LAW OF NAVAL OPERATIONS"], *available at* http://www.cpf.navy.mil///%201-14/.htm.  Beginning in the late 19th Century, much of the law of war has been set forth in international conventions and treaties.  *See id.* ¶ 5.4.  Chief among those treaties are the four Geneva Conventions.  The international bodies that interpret and apply those conventions (such as international war crimes tribunals), further develop the law of war.  For example, the statutes, rules of procedures and decisions reached by the International Criminal Tribunal for the former Yugoslavia ("ICTY"), the International Criminal Tribunal in Rwanda ("ICTR"), and the International Criminal Court ("ICC"), contribute to the body of jurisprudence known as the law of war.  The teachings of scholars also are considered a source of authority to identify the content of the law of war.  Schmitt Aff. ¶ 4, Ex. 2; Bassiouni Aff. ¶ 6 (Ex. 8).

Not all violations of the law of war are war crimes.  Those that are "war crimes" consist of  "grave breaches of the Geneva Conventions of 12 August 1949" and "other serious violations of the laws and customs [of international and internal armed conflict] … within the established framework of international law."[9]  *See* 1998 Rome Statute of the International Criminal Court,

---

[9] Moreover, Congress has recently defined the law of war more narrowly than international law would have it.  In the War Crimes Act, Congress defined "war crimes" to consist of "a grave breach" of one of three sources of law:  the 1949 Geneva Convention; specific Articles of the Hague Convention; and the 1996 amendments to the Geneva Convention.  18 U.S.C. § 2441.  Respondents do not and cannot show that Petitioner violated any of these conventions.  For that reason alone, the commission has no jurisdiction.

art. 8(b), U.N. Doc. A/CONF. 183/9 * (1998), *reprinted in* 37 I.L.M. 999 (1998) [hereinafter, "Rome Stat."] (defining "War Crimes" as grave breaches of the 1949 Geneva Conventions and "other serious violations of the laws and customs applicable in international armed conflict, within the established framework of international law").   Finally, war crimes should not be confused with crimes as defined by other bodies of law in the international system -- such as crimes against humanity (*e.g.*, genocide), or crimes against the peace.   Schmitt Aff. ¶¶ 2, 3, 25 & n.33 (Ex. 10); *see also* Rome Stat. art. 5, 6 & 7; Bassiouni Aff. ¶¶ 8-9 (Ex. 8).   While these international crimes can be committed during armed conflict or peace time, war crimes can only be committed during an armed conflict that is regulated by the laws of war.   While these other bodies of law are general in nature, the law of war is a subset of international criminal law with a very specific purpose:   to provide rules for war in order to civilize it, not to eliminate it.

> **1.     The law of war only applies to war and thus does not apply to the conflict with al Qaeda.**

The law of war only applies to war.   Only the Afghanistan war, not the "war on terror," constitutes an armed conflict under which the *law of wa*r would govern.   *See* Schmitt Aff. ¶¶ 11, 21 (Ex. 10); Cassese Aff. at 2 (Ex. 11).

The two types of war under international law are international armed conflicts, under Common Article 2 to the Geneva Conventions, and civil wars, under Common Article 3. Schmitt Aff. ¶¶ 5-6 (Ex. 10).   The conflict with al Qaeda does not fall within either category. Indeed, the D.C. Circuit found that the Geneva Conventions do not apply to the conflict with al Qaeda precisely because it is not an international conflict nor an armed conflict not of an international character.   *Hamdan*, 2005 WL 1653046, at *6-*7.   Indeed, as the Handbook of the U.S. Judge Advocate General's School explains, any other sort of conflict would "not trigger the application of the traditional law of war regimes because of a lack of the legally requisite armed

conflict needed to trigger such regimes."[10]   The Deskbook of the Judge Advocate's School includes a graphic showing just that.[11]   As Professor Cassesse explains, "[t]he only war in which the United States was involved that would give rise to application of the laws of war was the war in Afghanistan, which began on 7 October 2001."  Cassesse Aff. at 3 (Ex. 11).

U.S. military doctrine has a term to describe the broad range of military operations that fall outside the traditional definition of "armed conflict"; Military Operations Other Than War (MOOTW).  Such operations are covered not by the law of war, but by the following bodies of law: fundamental human rights law, domestic laws of the nation in which the conflict occurs, or any international law conventions, should they be triggered, but they are not covered by the law of war.  Significantly, combating terrorism is a MOOTW.  *See Operational Law Handbook* at 52-55 (2003)*;* Department of the Army, Field Manual 100-5, Operations chapters 2 and 13 (14 June 1993) (Combating terrorism is included as an operation other than war).[12]   The subjective intent of the belligerents is irrelevant."[13]   The international laws of war cannot be triggered by a unilateral pronouncement of a head of state, such as the U.S. President, where the objective international law criteria for a war are not met.  *See* Schmitt Aff. ¶  21 (Ex. 10).

---

[10] *Operational Law Handbook, International and Operational Law Department*, The Judge Advocate General's School, 51 (2003) ("Operational Law Handbook").

[11] Spectrum Conflict Graphic, Appendix A, Chapter 3, Law of War Workshop Deskbook, International and Operational Law Department, The Judge Advocate School (2000) *available at* http://www.au.af.mil/au/awc/awcgate/law/low-workbook.pdf.  (Ex. 12).

[12] The military defines combating terrorism (both anti-terrorism and counter-terrorism operations) as a MOOTW.  *See* Joint Publication 3-07, "Joint Doctrine for Military Operations Other Than War", 16 June 1995, Chapter 3.

[13] *Law of War Workshop Deskbook, International and Operational Law Department*, The Judge Advocate School (2000) p. 29 *available at* http://www.au.af.mil/au/awc/awcgate/law/low-workbook.pdf.

Respondents have asserted in the past that Mr. Hicks is being held as a member of or affiliated with al Qaeda.[14]  If that is why Mr. Hicks is being held (and most of the allegations in the charge sheet pertain solely to Mr. Hicks's alleged affiliation with al Qaeda before the war with Afghanistan even began) and if the conflict with al Qaeda is separate from the conflict with Afghanistan, as the D.C. Circuit held, *see Hamdan*, 2005 WL 1653046, at *7 ("the Presidents' decision to treat our conflict with the Taliban separately from our conflict with al Qaeda [as] the sort of political-military decision constitutionally committed to him."), then none of the charges against Mr. Hicks is based on the law of war and none can provide a basis for commission jurisdiction.  The laws of war do not regulate the conduct of either side in the conflict with al Qaeda.

### 2.   The law of war does not criminalize participation in war.

The law of war did regulate the conflict with Afghanistan.  As in any armed conflict, however, the law of war did not criminalize participation in the hostilities.  Rather, it sought "to mitigate the effects of war, first in that it limits the choice of means and methods of conducting military operations, and secondly, in that it obliges the belligerents to spare persons who do not or no longer participate in hostile actions."  JORDAN J. PAUST ET AL., INTERNATIONAL CRIMINAL LAW, CASES & MATERIALS 806 (2d ed. 2000) (citations omitted).  Thus, for example, the law of war limits attacks on combatants who are "*hors de combat*," or "out of combat," either because they have surrendered, because they are sick or wounded, or because they are shipwrecked.[15]

---

[14] *See* Respondents' Factual Return to Petition For Writ of Habeas Corpus by Petitioner David M. Hicks at 11 (DOCKET # 83); *see also* Charge Sheet (Ex. 7).

[15] *See, e.g.*, Hague Convention IV Respecting The Laws And Customs Of War On Land, Regulations Annexed, Oct. 18, 1907, art. 23 [hereinafter HIVR] (combatants who have surrendered); Protocol Additional to the Geneva Convention 12 Aug. 1949, and Relating to the Protection of Veterans of International Armed Conflicts, June 8, 1977 art. 41, 1125 U.N.T.S. 53 [hereinafter Geneva Protocol I]

The law of war also limits the methods of warfare, for example by prohibiting methods resulting in unnecessary suffering or superfluous injury, and the use of specific weapons such as poison or blinding lasers.[16]   Similarly, the law of war limits attacks on civilians who have not directly participated in hostilities.  *See* Geneva Protocol I, art. 51.  *But the law of war does not make it illegal simply to participate in a war.*  Nor does it govern activities outside the context of a war.

As we will see in the following sections, two of the charges against Mr. Hicks -- aiding the enemy and attempted murder by an unprivileged belligerent -- represent an effort to criminalize participation in the armed conflict in Afghanistan.  The other charge -- conspiracy -- is an attempt to import an American crime into the law of war even though the international community has expressly rejected that crime.  Bassiouni Aff. ¶ 10 (Ex. 8).  Importantly, the Executive Branch recognized this when it listed the war crimes over which military commissions would have jurisdiction in MCI No. 2.  This instruction divides offenses into three distinct groups: War Crimes; Other Offenses Triable by Military Commission; and Other Forms of Liability and related Offenses.  MCI No. 2 § 6(A), (B), (C).  The "War Crimes" section of MCI No. 2 defines offenses that qualify as violations of the law of war triable before the commissions, such as willful killing of protected persons, pillaging, and torture.  But the crimes with which Mr.

---

(sick or wounded combatants); Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 12 [hereinafter Geneva Convention (I)] (same); Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, art. 12 [hereinafter Geneva Convention (II)] (same); Geneva Protocol I, arts. 10, 42 (same); Geneva Convention (II), art. 12 (shipwrecked combatants); Geneva Protocol I, art. 10 (same).

[16] *See, e.g.*, St. Petersburg Declaration Renouncing the Use, in Time of War, of Explosive Projectiles under 400 Grammes Weight, Dec. 11, 1868, 1 AM. J. INT'L. L. 95 (methods resulting in superfluous injury); HIVR art 23 (same); Geneva Protocol I, art. 35 (same); Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (with Protocols I, II and III), 10 October 1980, 19 I.L.M. 1523, Protocol IV, 13 October 1995, 35 I.L.M. 1218, Amended Protocol II, 3 May 1996, 35 I.L.M. 1209 (specific weapons).

Hicks is charged -- conspiracy, attempted murder by an unprivileged belligerent, and aiding the enemy -- are nowhere mentioned in the "War Crimes" section.  Rather, they fall under the "Other Offenses Triable by Military Commission," and the "Other Forms Of Liability" sections.  This being so, according to MCI No. 2 itself, no offense with which Mr. Hicks is charged qualifies as a violation of the law of war.  Therefore, since none of these offenses has been delegated to the authority of military commissions by Congress, none is within the jurisdiction of the commission.

**B.      The Commission Lacks Jurisdiction to Try Hicks for "Aiding the Enemy."**

One of the three charges that Respondents bring against Hicks is the charge of "aiding the enemy," which presupposes that Mr. Hicks had an obligation of loyalty to the United States.  Charge Sheet ¶ 22 (Ex. 7).  But there is no crime of "aiding the enemy" under the law of war; nor does the domestic crime of aiding the enemy, under Article 104 of the Uniform Code of Military Justice, apply to Australian citizens, such as Mr. Hicks.

**1.      There is no crime of "aiding the enemy" under the law of war.**

Although they have charged Mr. Hicks with aiding the enemy, Respondents have never contended that "aiding the enemy" constitutes a violation of the law of war.  That is for good reason.  Aiding the enemy is not a grave breach, or any breach, of the Geneva Conventions, nor is it found in any convention or treaty regulating land warfare.  The claim that Mr. Hicks aided the enemy amounts to the claim that he joined a unit participating in combat against the United States in Afghanistan – a foreign country that the United States had invaded (albeit after the 9/11 attacks).  But as we have seen, this is not illegal under the laws of war.  As explained above, the law of war leaves an individual free to participate in hostilities and regulates only the means and methods used in combat.  Prohibition of participation in combat or aid to those who participate in

18

combat is a matter for domestic law (e.g. laws relating to treason by civilians, or to military discipline of its armed forces), and not the law of war.

Indeed, not a single international treaty lists "aiding the enemy" as a violation of the law of war. Nor is such a theory supported by other sources. As discussed above, *see supra* Part I.A, even the instructions setting up "crimes" to be tried by the commission, MCI No. 2, does not list aiding the enemy as a violation of the law of war. Indeed, the very notion that aiding the enemy could be a violation of the law of war is an absurdity: the law of war is intended to establish neutral rules that apply equally to both sides in combat. *See supra* Part I.A. Thus, from the perspective of the law of war, there is no "enemy." Surely Respondents do not believe that American soldiers could have been tried by the Taliban government of Afghanistan for "aiding the enemy" simply for fighting against the Taliban. Yet that would be the consequence of the view that a country could try all opposing soldiers for "aiding the enemy."

### 2. Mr. Hicks has not been charged with a statutory crime of aiding the enemy.

In addition to the law of war, statutory authorization is one of the two bases of commission jurisdiction. But it too provides no basis of jurisdiction over the charge of aiding the enemy against Mr. Hicks. Although "aiding the enemy" is one of two offenses over which Congress has expressly conferred jurisdiction to military commissions (the other being espionage),[17] Mr. Hicks has not been charged with this statutory crime, which is part of the Uniform Code of Military Justice ("UCMJ"). The charge sheet makes no reference to the statute. Moreover, the statutory definition of aiding the enemy under the UCMJ is different than the new definition in the military commission instructions setting up the commission. For

---

[17] UCMJ art. 104, 10 U.S.C. § 904 (West 2004); *see also* UCMJ art. 106, 10 § U.S.C. 906 (charge of espionage may be tried by military commissions).

example, the military commission instruction requires that the conduct take place in association with armed conflict, but that is not required under the UCMJ. The two also use different definitions of "enemy." *Compare* DoD MCI No. 2, § 5 (Ex. 9); *with* Manual for Courts-Martial, Part IV, ¶ 23.c(1)(b); *see also United States v. Monday*, 36 C.M.R. 711, 713 (U.S. Army Rev. Bd. 1966) (referencing Manual for Courts-Martial to provide definition of "enemy" for UCMJ provision). Presumably then, the military commission instruction is based on the ostensible authority of the law of war. But, as we have seen, the law of war contains no such crime.

### 3. No statute authorizes charging non-citizens, such as Mr. Hicks, with aiding the enemy.

Even aside from defects in the charge, no act of Congress authorizes a military commission to try opposing soldiers, like Mr. Hicks is alleged to be, as criminals for aiding the enemy – or even makes such opposition criminal at all. Under the Uniform Code of Military Justice, the key element in determining who can be prosecuted for aiding the enemy is that the accused owed a duty of allegiance to the United States. Absent such a duty, it is not illegal under the aiding the enemy statute for an individual to *be* an enemy of the United States, much less to aid the enemy. For example, the Iraqis who fought the United States attacks in 2003 did not violate United States criminal law.

Similarly, Hicks, an Australian national unaffiliated with the U.S. military, had no obligation to the United States that would make his alleged aid to the enemies of the United States a charge subject to adjudication by military commissions. Allegiance is demonstrated either by the fact that the accused was "a citizen at the time of the alleged crime," *Gillars v. United States*, 182 F.2d 962, 981 (D.C. Cir. 1950), the accused was present in United States territory and thus acquired a duty of temporary allegiance, or by the fact that he or she was a member of the U.S. armed forces. *Id.* Indeed, there is no reported case where a non-U.S. citizen

has been convicted for committing the offense of aiding the enemy based on conduct outside the territorial jurisdiction of the United States.

Respondents acknowledge that only someone with a duty of allegiance can be charged with "aiding the enemy," but suggest that allegiance to a United States ally is sufficient. *See* Resp. Br. at 31; MCI No. 2 § 6(B)(5)(b)(3), (Ex. 9) (stating that the accused must only "owe allegiance or some duty to the United States of America or to an ally or coalition partner").[18] They cite not a single source supporting this radically expanded notion of allegiance.[19]  And it is outrageous to suggest that the United States can try an Australian citizen for aiding enemies of the United States -- just as outrageous as if Australia were to bring such a charge against an American citizen.  Surely, if any nation may charge Hicks with aiding the enemy, it is Australia and no other.

---

[18] Respondents subsequently retreated from the clear language of MCI No. 2 and have alternatively suggested that the requirement of allegiance "does not *appear* to pertain to an unlawful belligerent, as Hicks is alleged to be."  Resp. Reply Br. at 18.  The tentativeness of the government's claim entirely undermines the view that this could be a basis of *criminal* liability.  The government's attempt to bootstrap its separate charge of unlawful belligerency into a violation of the "aiding the enemy" statute cannot stand both because (i) unlawful belligerency is not itself a crime, as discussed below, and (ii) nothing suggests that Congress had the international law concept of unprivileged beliigerency in mind in passing a statute that is, after all, not even about belligerents but rather about individuals (whether or not they are belligerents) who aid enemies (whether or not they are belligerents).

[19] The American offense of "aiding the enemy" has its origins in Articles 27 and 28 of the Articles of War of 1775, predating the American crime of treason.  Only those "belonging to the continental army" could commit the offense.  Articles 27 & 28, American Articles of War 1775.  After the Revolutionary War, these offenses of "aiding the enemy" and "treason" were enacted by the first Congress of the United States on 30 April 1790.  This Act, 1 Stat. 112, provided that "if any person or person, owing allegiance to the United States of America, shall levy war against them, or shall adhere to their enemies, giving them aid and comfort within the United States or elsewhere, ... such person or persons shall be adjudged guilty of treason ..." *See Chandler v. United States*, 171 F.2d 921, 930 (1st Cir. 1948).  These provisions are considered to be "conceptual forefather[s] of Article War 81 and Article 104 of the [UCMJ]." *See United States v. Olson*, 7 U.S.C.M.A. 460, 466-67 (1957).

And Australia does not even view Mr. Hicks's actions as criminal![20]  Thus, Respondent's attempt to create a duty to the United States by virtue of a duty to a United States ally falters for the additional reason that Mr. Hicks has not even violated any duty he had to Australia.[21]  The charge that Hicks aided the enemy thus does not make out a criminal violation at all, much less one subject to the jurisdiction of the military commission.

### C. The Commission Lacks Jurisdiction to Try Hicks for Attempted Murder "While He Did Not Enjoy Combatant Immunity."

Respondents have also charged Hicks with "attempt[ing] to murder divers [sic] persons by directing small arms fire, explosives, and other means intended to kill American, British, Canadian, Australian, Afghan, and other Coalition forces, while he did not enjoy combatant immunity and such conduct taking place in the context of and associated with armed conflict." Charge Sheet ¶ 21 (Ex. 7).  In essence, this is no different than the preceding charge -- it attempts to punish Mr. Hicks for allegedly engaging in combat with allied forces.  If combat amounts to attempted murder, then all soldiers could be punished as murderers.  This is not a basis for commission jurisdiction.

---

[20] The Australian government has clearly stated that it does not deem any of Hicks's alleged actions to be illegal.  In an Australian Senate Estimate hearing on February 16, 2004, the Assistant Secretary, Security Law and Justice Branch of the Australian Attorney General's office explained:  "The government has consistently said that, on the basis of the evidence available to prosecuting authorities, there are no grounds to prosecute Mr. Hicks … under any laws in Australia that were current at the time of [his] activities."  Senate, Legal and Constitutional Legislation Committee, Estimates, Canberra, Australia (Feb. 16, 2004).

[21] The Australian equivalent of our "aiding the enemy" law is embodied in Section 24 of the Australian *Crimes Act* 1914 making it criminal to assist "a proclaimed enemy of a proclaimed country."  Crimes Act, 1914, § 24AA (Austl.).  No such proclamation existed at the time of the alleged offenses.  The absurdity of a United States prosecution of an Australian citizen, whose allegiance lies to Australia, for aiding the enemy is only increased by the fact that Australia does not view him to have breached that duty of allegiance.

### 1.   The charge against Hicks for attempted murder "while he did not enjoy combatant immunity" is invalid under the law of war.

As discussed above, the law of war does not criminalize participation in war. *See supra* Part I.A.  Respondents do not contend otherwise.  They argue, however, that Hicks's alleged participation in war constituted attempted murder because Hicks was an "unprivileged belligerent."[22]  Resp. Br. at 30.  This is clearly incorrect because unprivileged belligerency -- if Mr. Hicks even is an unprivileged belligerent -- is not a war crime.[23]

The government's assertion that unprivileged belligerency constitutes a war crime over which military commissions have jurisdiction is premised on a complete misunderstanding of the law of war.   In defining war crimes, the law of war is not concerned with the status of the actor but on the type of conduct.  Attacking civilians or using poisoned gas, for example, violates the law of war whether the attacker is a privileged or unprivileged belligerent.  Conversely, however, participating in combat is not a violation of the law of war regardless of the status of the combatant.

The concept of "privileged" combatants under the law of war has two purposes.  First, a privileged combatant is entitled to be treated as a POW when captured.  Second, a privileged

---

[22] The test for combatant immunity is the same as determining the entitlement to POW status under the applicable principles of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 75 U.N.T.S. 135 [hereinafter, "Geneva Convention (III)"].

[23] The government's own allegations, if true, show that Hicks was a privileged belligerent.  There is only one government allegation against Hicks that involves belligerency or combat -- that he was guarding a Taliban tank.  Under the law of war, members of the armed forces, as well as members of militias or volunteer corps that form part of the armed forces, are privileged belligerents.  *See* Geneva Convention (III) art. 4(A)(1), (2), (6).  (In addition to members of the armed forces, privileged belligerents include members of  militias who are under responsible command, who carry arms openly, have a distinctive sign recognizable at a distance," and who are part of a force that operates in accord with the law of war.)  The government's allegation that Hicks was guarding a Taliban tank (i.e., a tank of the recognized government of Afghanistan, a sovereign nation) on its face shows that Hicks's alleged participation in combat was as part of the Afghan armed forces and thus was not unprivileged.

23

combatant *may not be prosecuted for domestic crimes* relating to combat activities of even those states with subject matter and personal jurisdiction over him.  Schmitt Aff. ¶ 38 (Ex. 10).  For example, U.S. soldiers in Iraq have a privilege against prosecution for combat-related deaths under any nation's domestic law.  In contrast, civilians (and other unprivileged belligerents) who have violated a domestic law of a state with subject matter and personal jurisdiction can be prosecuted pursuant to the domestic laws of that state.  But while the law of war does not protect unprivileged belligerents from domestic prosecution for participation in hostilities, *the law of war does not itself make such actions criminal*.  As Professor and former Judge Advocate Schmitt explains, "Simply put, it is not a violation of the law of armed conflict to kill a combatant, even when the individual doing so lacks the combatant privilege to use force."  Schmitt Aff. ¶ 39 (Ex. 10).[24]

For example, members of the French Resistance entering combat were unprivileged belligerents, but were not war criminals, as they would have been under the government's theory.  Similarly, a Polish civilian who planned and participated in an attack on German troops after the invasion of Poland in World War II would have been an unprivileged belligerent but would not have violated the law of war.  Because the Polish citizen would have lacked combatant immunity, he potentially could have been criminally liable under Polish law (or German law if there was jurisdiction).  But as far as the law of war is concerned, the only

---

[24] *See* YORAM DINSTEIN, THE CONDUCT OF HOSTILITIES UNDER THE LAW OF INTERNATIONAL ARMED CONFLICT 234 (2004); Richard. R. Baxter, *So-called "Unprivileged Belligerency": Spies, Guerrillas and Saboteurs*, 1952 BRIT. Y.B. INT'L L. 323, *reprinted in* MIL. L. REV. (Bicentennial Issue) 487 (1975).  It is imperative to distinguish the commissions set up by the PMO from military tribunals established in areas of occupation pursuant to the Geneva Convention  (IV) arts. 64-66.  In an occupied territory, a military commission could try an "unprivileged" belligerent applying the domestic law of that country or appropriately promulgated laws of the occupancy (or martial law).  *Compare* Convention Relative to the Protections of Civilian Persons in Time of War, Aug. 12, 1949, arts. 64-66, 75 U.N.T.S. No. 973 [hereinafter, "Geneva Convention (IV)"] *with* PMO.  This situation does not present itself here.

consequences of the Polish citizen's actions would have been that German troops could attack him without themselves violating the law of war.  *See* Geneva Protocol I, art. 51.3.  The Pole would not have been a war criminal.  *See* Derek Jinks, *The Declining Status of POW Status*, 45 HARV. INT'L L.J. 367, 438 (2004) ("[I]t is inapposite to characterize as 'criminal' the otherwise lawful warlike acts of civilians who take up arms to defend their country against an enemy to whom they owe no allegiance as a formal or sociological matter.").

The distinction between belligerent acts that are unprivileged and acts that constitute crimes under the law of war is well established, and is a critical limit on the jurisdiction of military commissions, leaving domestic crimes to be tried in Article III courts.  As Professor Yoram Dinstein explains, the law of war "merely takes off a mantle of immunity from the defendant, who is therefore accessible to penal charges for any offense committed against the domestic legal system."[25]

Similarly, a recent working paper of Harvard's Humanitarian Law Research Initiative states that while unprivileged belligerents may be prosecuted under domestic law, international law

> does not criminalize direct participation in hostilities per se…. Any interpretation that would result in the conclusion that mere participation in hostilities by civilians could be subject to the principle of universal jurisdiction [based on a serious violation of international human rights law] ["IHL"] would be highly contested, as no provision of IHL treaty law enables such an interpretation.[26]

---

[25] Dinstein, *supra* note 14, at 31; *see also* Myres S. McDougal & Florentino P. Felciano, Law and Minimum World Public Order 712 (1961).

[26] Jean-Francois Queguiner, *Working Paper: Direct Participation in Hostilities under International Humanitarian Law* 10-11 (Nov. 2003), *available at* http://www.ihlresearch.org///. pdf.

The sources the government has cited are not to the contrary. *See* Resp. Br. at 30. The Geneva Convention indicates only that unprivileged belligerents are not entitled to POW status. Similarly, the Law of Land Warfare Manual states only that unprivileged belligerents are not immune from prosecution and trial -- presumably under domestic law  Neither remotely suggests that unprivileged belligerents have violated the law of war. Indeed, contrary to the reading Respondents give to the Law of Land Warfare Manual, a U.S. military handbook makes clear that in the view of the U.S. armed forces, unprivileged belligerents can only be tried under domestic law:

> Unprivileged belligerents may include spies, saboteurs, or civilians who are participating in the hostilities or who otherwise engage in unauthorized attacks or other combatant acts.  Unprivileged belligerents are not entitled to prisoner of war status, and may be prosecuted under the *domestic law* of the captor.

U.S. Army, Judge Advocate General's Legal Center and School, Operational Law Handbook 17 (2005) (emphasis added).

Finally, Respondents' prior citation of *Quirin* is inapposite. *Quirin* did not hold that an individual could be tried under the law of war simply for unprivileged belligerency. *Quirin* held only that **spies** -- "those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property" -- could be tried by military commissions. *Quirin*, 317 U.S. at 35. It explicitly limited its holding to those "particular acts," *id*. at 45-46, after pointing to a long history of commission proceedings against spies. This is a far cry from the offense listed in MCI No. 2 as "murder by an unprivileged belligerent." Critically, spying was one of two statutorily defined domestic crimes over which Congress had expressly conferred jurisdiction on military commissions. *See id.* at 27 (citing 10 U.S.C. §§ 1471-1593). Thus, a domestic statute provided a

lawful basis for commission jurisdiction in *Quirin*.  The law of war could not have done so because spying is uniformly viewed as lawful under the law of war.[27]

    To be sure, the *Quirin* Court blurred the distinction between the law of war and domestic law.[28]  But because domestic law clearly provided authority for trial of spies before military commissions, this distinction was immaterial to the Court's holding.  The same would not be true here.  Because there is no domestic statute conferring jurisdiction on military commissions to try individuals for a purported crime of unlawful belligerency, a decision that such a charge makes out a violation of the law of war would confer jurisdiction on the commission when there otherwise would be none.  And, as we have seen, such a decision would be incorrect under the recognized sources of authority for the law of war.

    Today, it is even clearer than it was at the time of *Quirin* that a person who participates in combat -- even if not privileged -- is not guilty of "attempted murder" under the law of war.  As respondents recognize, the law of war is a system of "common law" based on "universal

---

[27] The contemporary Army Field Manual explained, in a section aptly entitled "Employment of Spies Lawful," that spies are not punished as violators of the law of war.  DEP'T OF THE ARMY, FIELD MANUAL 27-10, THE LAW OF LAND WARFARE ¶ 77 (1956) [hereinafter LAW OF LAND WARFARE]; *see also* DINSTEIN, *supra* note at 14, at 213; *see generally* Baxter, *supra* note 14, at 487.

[28] The *Quirin* Court's suggestion  that spying violates the law of war has been criticized by none other than the current Law of War Chair in the Office of General Counsel for the United States Secretary of Defense, W. Hays Parks:

[T]he Court failed to note ¶ 203 of Field Manual 27-10, *Rules of Land Warfare* (1940), which states that spies are not punished as "violators of the law of war." Rather, the Court erred in stating that "the absence of uniform . . . renders the offender liable to trial for violation of the laws [sic] of war." *Ex parte Quirin*, 317 US at 35–36 n12.... The Hague Convention IV … (a treaty to which the United States was a party during World War II), … states that "[a] spy who, after rejoining the army to which he belongs, is subsequently captured by the enemy, is treated as a prisoner of war, and incurs no responsibility for his previous acts of espionage."  Were absence of uniform a violation of the law of war, criminal liability would remain even after a soldier returned safely to his own lines**.**

W. Hays Parks, *Special Forces' Wear of Non-Standard Uniforms*, 4 CHI. J. INT'L L 493, 510 n.31 (2003). As noted by the Dutch Special Court of Cassation in the 1949 *Flesche* case, "espionage…is a recognized means of warfare and therefore is neither an international delinquency on the part of the State employing the spy nor a war crime proper on the part of the individual concerned."  *In re Flesche*, 16 Ann. Dig. & Rep. of Pub. Int'l L. Cases 266, 272 (Neth. Spec. Ct. of Cassation 1949).

agreement and practice." *Quirin*, 317 U.S. at 30.  Indeed, in its reply brief on enemy combatants in the district court, the government explained that "[c]ustomary international law is constantly evolving,"  EC Reply at 43, and that "[c]ustomary international law results from a general, consistent, and widely accepted practice of states, followed out of a sense of legal obligation and not merely because the practice may be politically desirable, morally required or just a good idea."

Since Quirin, nations have completely re-written the Geneva Conventions and its' Additional Protocols; established the ICTY, the ICTR, and the ICC, each of which has jurisdiction over crimes under the laws of war and each of which sets out what those crimes are. These are now the foundational conventions underpinning the laws of war, and it is just such conventions that the Supreme Court looked to in both *Yamashita*, and *Eisentrager* to see if a valid law of war violation had been alleged.[29]  None of those authorities define participation in hostilities by an unprivileged belligerent as a law of war violation.  Indeed, in their earlier filings, Respondents were been unable to cite any international criminal law statute, convention, treaty or case, in which participating in combat against an individual who was himself a combatant was deemed to be a war crime.  It is thus clear that there is not today a "general, consistent and widely accepted practice," EC Reply at 43, finding unprivileged belligerency to be a war crime, as would be necessary for military commissions to have jurisdiction.  Indeed, at a seminar on Direct Participation in Hostilities conducted by the International Committee of the Red Cross

---

[29] *In re Yamashita*, 327 U.S. 1, 13-16 (1946) (noting that "[n]either Congressional action nor military orders constituting the Commission authorized it to place Petitioner on trial unless the charge preferred against him is a violation of the law of war," and looking to the Hague Conventions and the Genera Red Cross Convention of 1929 to determine that the law of war supported both the substantive charges against General Yamashita and the "command responsibility" theory under which he was held liable); *Johnson v. Eisentrager*, 339 U.S. 763, 787-88 n.13 (1950) (looking to the Fourth Hague Convention of 1907 to determine whether the act charged was a violation of the law of war).

with a wide range of experts, "[n]o one contested that direct participation in hostilities by a civilian could not be considered a war crime." International Committee of the Red Cross, Direct Participation in Hostilities under International Humanitarian Law 9 (2003) (*available at* http://www.icrc.org/Web/eng/siteeng0.nsf/htmlall/5TALL8/$File/Direct%20participation%20in %20hostilities-Sept%202003.pdf ).

> **2.      No act of Congress delegates authority for prosecuting "attempted murder" of combatants to a military commission.**

There is no other basis for commission jurisdiction. As discussed in the preceding subsection of this brief, unprivileged belligerency is not one of the two crimes over which Congress has expressly conferred jurisdiction on military commissions.

**D.      The Commission Lacks Jurisdiction to Try Hicks for "Conspiracy."**

Finally, Respondents seek to subject Hicks to "trial" by the commission for "conspiracy," Charge Sheet ¶ 19 (Ex. 7). This charge also falls outside the jurisdiction of military commissions.

> **1.      Conspiracy is not a crime under the law of war.**

Because the government is unable to bring any charges that Hicks himself committed any war crimes, the government attempts to make Hicks guilty by association. The government charges that Hicks is criminally liable for allegedly joining a group that had the purpose of violating the laws of war by, among other things, attacking civilians and civilian objects. The government does not allege that Hicks himself shared the purpose of attacking civilians, that he planned any attacks against civilians or civilian objects, that he participated in any such attacks, much less that he was a leader of such attacks. Instead, the government charges Hicks with the crime of conspiracy based on the American view that he can be held liable for joining a group

that has a criminal purpose so long as someone in the group commits an overt act towards fulfillment of that purpose.

But conspiracy is not recognized as a substantive, independent crime under the law of war. Conspiracy is not a serious (or any) breach of the Geneva Convention; nor is it a breach of customary international law. Legal scholars, one important source of the law of war, regularly write that there is no doctrine of conspiracy in the law of war. *See, e.g.*, ANTONIO CASSESE, INTERNATIONAL CRIMINAL LAW 191 (2003); GEORGE P. FLETCHER, RETHINKING CRIMINAL LAW 646 (2000); GERHARD WERLE, VÖLKERSTRAFRECHT 165 (2003); Schmitt Aff. ¶¶ 22-26; (Ex. 10); Bassiouni Aff. ¶¶ 5, 7-10 (Ex. 8). As Professor Cassese, former President of the International Criminal Tribunal for the former Yugoslavia and current Chairman of the United Nations International Commission of Inquiry into Genocide in Darfur, explains: "the conspiracy offense listed in MCI No. 2 and charged against Mr. Hicks is not a valid offense under international criminal law." Cassese Aff. at 1 (Ex. 11).

International legal history conclusively proves the point. Before World War II, there was no concept of conspiracy in international criminal law at all, much less in the law of war. There is no conspiracy charge whatsoever in Article 23 of the Hague Convention IV, for example, which provides a laundry list of criminal violations but does not list conspiracy. *See* HIVR art. 23; Bassiouni Aff. ¶ 7 (Ex. 8). This is because conspiracy is not recognized in civil law systems (as opposed to common law systems). Schmitt Aff. ¶ 22 (Ex. 10); Bassiouni Aff. ¶ 10 (Ex. 8)

After World War II, Americans attempted to introduce the notion of conspiracy as part of their plan of war-crime prosecution. Stanislaw Pomorski, *Conspiracy and Criminal Organization*, *in* THE NUREMBERG TRIAL AND INTERNATIONAL LAW 213, 216-17 (George Ginsburgs & V.N. Kudriavisev eds., 1990). Because the concept of conspiracy is not part of

civil law, much of the international community resisted this attempt.  *Id.* at 218; Bassiouni Aff.

¶ 10 (Ex. 8).   Ultimately, the term conspiracy appeared only in the definition of the first of the

three crimes within the jurisdiction of the International Military Tribunal at Nuremburg, crimes

against the peace (specifically, the crimes of "planning, preparation, initiation or waging of a war

of aggression"), not crimes of war or crimes against humanity.  *See* Charter of the International

Military Tribunal, Aug. 8, 1945, art. 6, 59 Stat. 1544, 82 U.N.T.S. 279.   The Tribunal explained

that "the Charter does not define as a separate crime any conspiracy except the one to commit

acts of aggressive war."[30]   This point was reinforced in the trials conducted by the United States-

constituted Nuremberg Military Tribunal pursuant to Allied Control Council Law No. 10 (1945):

"[T]he Tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered

as a separate substantive offense."  *United States v. Pohl*, No. 4 (Nuremberg Mil. Tribunal II

Nov. 3, 1947), *reprinted in* TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY

TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, at 958, 961 (1950), *available at*

http://www.marzal.org/archive/nmt/05/NMT05-T0961.htm; *see also* Bassiouni Aff. ¶ 8 (Ex. 8).[31]

---

[30] Thus, contrary to the view of Respondents, Resp. Br. at 30 n.30, the Tribunal did reject conspiracy to commit war crimes as a valid charge and expressly distinguished them from crimes against peace.  *The Nurnberg Trial*, 6 F.R.D. 69, 111 (Int'l Mil. Tribunal 1946).  The Tribunal thereby rejected the argument that a non-specific reference included in the last sentence of the Charter, which, in defining the substantive crimes, created liability for conspiracy to commit war crimes. Indictment at III, *The Nurnberg Trial*, 6 F.R.D. 69 (Int'l Mil. Tribunal 1946), *available at* http://www.yale.edu/lawweb/avalon/imt/proc/count1.htm.

[31] The government has quoted Justice Jackson's view of the negotiations leading up to the Nuremberg proceedings.  But Justice Jackson recognized that his view of the agreement "seems not to have conveyed to the mind of the judges. . .for, while the legal concept of conspiracy was accepted by the Tribunal, it was given a very limited construction in the judgment."  Robert H. Jackson, *Report to the International Conference on Military Tribunals*, Preface at 4 (1949).  Indeed, the Tribunal held that there was no crime of conspiracy under the law of war.  Subsequent international conventions make clear that it is the Tribunal's view of the law of war, not Justice Jackson's that has prevailed.

In the sixty years since Nuremberg, the crime of conspiracy has remained an extremely limited concept even in the more general international criminal law, and it has simply never been applied to the laws of war.  The sole references to conspiracy in international criminal law conventions since Nuremberg have appeared in connection to genocide (a crime against humanity), not the law of war.  Bassiouni Aff. ¶ 7.  There is no conspiracy charge at all in any of the four Geneva Conventions despite a long list of substantive crimes in each convention.  *See* Geneva Convention (I), art. 50; Geneva Convention (II), art. 51; Geneva Convention (III), art. 130; Geneva Convention (IV), art. 147.[32]  And the conventions establishing the International Criminal Tribunals in Yugoslavia and Rwanda list conspiracy as a substantive crime only with respect to genocide.  *See* United Nations, Statute of the ICTY, art. 4(3)(b), S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg. at 2, U.N. Doc. S/RES/827 (1993), 32 I.L.M. 1203; Statute of the ICTR, art. 2(3)(b), S.C. Res. 955, U.N.SCOR, 49th Sess., 34534d mtg. at 3, U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598, 1600 (same); Bassiouni Aff. ¶ 9 (Ex. 8).[33]  Indeed, of the 281 conventions applicable to 28 categories of international crimes, only five contain a reference to conspiracy.  *See* Bassiouni Aff. ¶ 7.  Moreover, the international community has recently withdrawn whatever recognition it previously gave to liability for conspiracy.  The Rome Statute -- the most recent multilateral statement of international law on conspiracy -- mentions neither the word conspiracy, nor the concept of an agreement to commit a crime.  The omission was

---

[32] Significantly, the U.S. War Crimes Act of 1996, 18 U.S.C. § 2441 (2000), which incorporates into our criminal code grave breaches of the Geneva Convention, also does not mention conspiracy although other crimes in Title 18, unrelated to war crimes, including torture (§ 2340A(c)) and terrorism (§ 2332(b)), do so.

[33] The major treaties on terrorism are not part of the law of war.  But they also do not mention conspiracy.  *See* International Convention for the Suppression of the Financing of Terrorism, Jan. 10, 2000, art. 2, S. Treaty Doc. No. 106-49, 39 I.L.M. 270; International Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, S. Treaty Doc. No. 106-6, 37 I.L.M. 249.

deliberate.  The concept of conspiracy appeared in initial drafts of the statute, but all references to conspiracy were removed during negotiations.[34]

Thus, it is clear that "conspiracy" is not a recognized crime in the law of war.[35]  Indeed, as we have seen, the government itself does not list "conspiracy" as a substantive crime in MCI No. 2, the instructions the Executive Branch established purporting to delineate the law of war violations with which detainees can be charged.  *See* MCI No. 2 § 6(A), (B) (Ex. 9); *In re Yamashita*, 327 U.S. 1, 10 (1946) (evaluating whether the commander's order establishing the commission "conformed with the established policy of the Government and to higher military commands authorizing his action").

Respondents nonetheless have previously asserted that conspiracy has long been recognized as a substantive offense under the law of war.  But the authorities they cited do not show this.  The Winthrop Treatise refers to conspiracy during the Civil War as a crime that could be tried by military commissions only because the courts were closed -- in other words, a domestic crime, not a crime *triable as a violation of the laws of war*.[36]  *Mudd v. Caldera*, 134 F. Supp. 2d 138 (D.D.C. 2001), involved a defendant convicted of "of aiding and abetting as an accessory" to the assassination of President Lincoln for providing shelter, medicine and a method

---

[34] Richard Barrett & Laura Little, *Lessons of Yugoslav Rape Trials: A Role for Conspiracy Law in International Tribunals*, 88 MINN. L. REV. 30, 80 (2003) (citing Report of the Preparatory Committee on the Establishment of an International Criminal Court, U.N. GAOR, 51st Session, Supp. No. 22A, at 94-95, U.N. Doc. A/51/22 (1996)); *see also* 1 Virginia Morris & Michael P. Scharf, *An Insider's guide to the International Criminal Tribunal for the former Yugoslavia* 96 (1995) ("there is no generally applicable provision recognizing conspiracy as a separate and distinct crime" in the statute creating the ICTY).

[35] Conspiracy is also conspicuously absent from most countries' domestic criminal laws.  Of the 192 states in the world, 148 do not have the crime of conspiracy.  *See Bassiouni* Aff. ¶ 10 (Ex. 8).

[36] 2 WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 839 & n.5 (2d ed. 1920).  Winthrop notes that some conspiracy trials were also in part trials based on violations of the laws of war, but he provides no indication that there were any commission proceedings based on a charge that conspiracy itself constituted a substantive violation of the laws of war.

of escape to John Wilkes Booth -- thus, the substantive crime appeared to have been assassination with the term "conspiracy" loosely used as a theory of individual responsibility, *see infra* Part I.D.2, that actually consisted of aiding and abetting, a recognized theory of individual responsibility. *See id.* at 140. Moreover, because that case occurred in the context of the army's decision not to change the individual's military records, it involved deferential review, that is not warranted here. Finally, *Colespaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956), contains absolutely no discussion as to whether conspiracy violates the law of war or the source for such a proposition.

Certainly, these few domestic sources, involving convictions 50 or 150 years ago, cannot establish the "*universal* agreement and practice" necessary to show a violation of the law of war as it exists today. *Quirin*, 317 U.S. at 30. In the last 60 years, statutes establishing international criminal tribunals have never made conspiracy to violate the laws of war an offense and have twice (at Nuremberg and at Rome) explicitly rejected proposals to do so.[37] Thus, the charge of conspiracy against Hicks does not serve as a valid source of commission jurisdiction.

---

[37] The *Krstic* and *Furndzija* decisions that respondents previously cited do not change this. They involved charges of genocide, murder, and torture, not conspiracy. *Prosecutor v. Krstic*, Case No. IT-98-33-T, ¶ 3 (ICTY Trial Chamber Aug. 2, 2001); *Prosecutor v. Furundzija*, Case No. IT-95-17/1-A, ¶ 119 (ICTY Appeals Chamber July 21, 2000). Moreover, even the theory of individual responsibility by which Krstic and Furndzija were held liable was not conspiracy, but rather "joint criminal enterprise." *Krstic* ¶ 611; *Furundzija* ¶ 119; *see also Prosecutor v. Milutinovic*, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction, Case No. IT-99-37-AR72 ¶ 26 (ICTY Appeals Chamber, May 21, 2003) (stating that "[c]riminal liability pursuant to a joint criminal enterprise is not a liability for. . .conspiring to commit crimes."). These cases certainly do not undermine Petitioners showing that conspiracy is not even a recognized theory of individual responsibility under the law of war, much less a substantive crime.

###### 2. Theories of Individual Responsibility for Group Crimes Do Not Provide a Basis for Commission Jurisdiction Over the Conspiracy Charge.

While MCI No. 2 properly does not list conspiracy as a substantive crime, it does list conspiracy as a theory of individual responsibility.  This provides no support for the charge against Mr. Hicks.

A theory of individual responsibility under international law is one in which an individual charged with a particular substantive crime can be held responsible for that crime.  For example, both the ICTY and the ICTR have used "joint criminal enterprise," "aiding and abetting," or "command responsibility" as theories to establish an individual's responsibility for a crime perpetrated by a group.  *See*, *e.g.*, *Prosecutor v. Kvocka*, Judgment, Case No. IT-98-30/1,(ICTY Trial Chamber Nov. 2, 2001); *Kayishema and Ruzindana,* ICTR-95-1-T, ¶¶ 203-205 (ICTY Trial Chamber May 21, 1999).  Thus, an individual could be charged with a particular substantive offense -- such as use of poison gas -- and then held liable as, for example, a member of a joint criminal enterprise that perpetrated that crime.  *But he could not be charged with the non-existent substantive crime of "joint criminal enterprise."*  This is very different than the American concept of conspiracy in which an individual can be charged with (and found guilty of) both the underlying offense and a separate substantive crime of conspiracy. Hence, Respondents' attempt to charge Hicks with a substantive crime of conspiracy is inconsistent with their own description of conspiracy in MCI No.2, which recognizes that conspiracy is not a substantive crime under the law of war.

In fact, even MCI No. 2 overstates the place of conspiracy in the law of war.  Conspiracy is not even a recognized theory of individual responsibility in the law of war.  While each of the

international criminal conventions lists theories of individual responsibility, none lists conspiracy. *See* ICTY at art. 7; ICTR at art. 6; Barrett & Little at 37.

Finally, it is worth noting that even had Respondents charged Mr. Hicks with a substantive crime and invoked one of the legitimate theories of individual responsibility under the law of war to establish liability, such a charge would fail. The theories of individual responsibility under the law of war, such as the theory of joint criminal enterprise, extend liability only to persons who know of the specific crime and who directly participate in the perpetration of that crime and only after the crime is carried out.[38] Similarly, even in the two very narrow instances in international law (not the law of war) in which conspiracy has been recognized as criminal -- conspiracy to wage an aggressive war and conspiracy to commit genocide -- liability has extended only to group leaders who planned the crime.[39] There is no

---

[38] For example, the statute establishing the ICC states that an individual can be held guilty of a crime based on his participation as a member of the criminal enterprise, but only if he "contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose," and either has the "aim of furthering the criminal activity or criminal purpose of the group" or has "knowledge of the intention of the group to commit the crime." *See* Rome Stat., art. 25(3)(d)(i), (ii).

[39] For example, the ICTY and ICTR have concluded that a defendant to a charge of conspiracy to commit genocide must have "the intent to commit genocide, that is to destroy, in whole or in part, a national, ethnic, racial or religious group, as such," and must have been integrally involved in the planning and execution of specific acts of genocide. *Prosecutor v. Alfred Musema*, Case No. ICTR-96-13 A, Judgment and Sentence at 192 (27 Jan. 2000) (emphasis added); *see also Prosecutor v. Eliezer Niyitegeka*, Case No. ICTR-96-14-T, Judgment and Sentence (16 May 2003). *See also* Statute of the Special Court for Sierra Leone, art. 1 (limiting the court's jurisdiction to those "who bear the *greatest responsibility* for serious violations of international humanitarian law."). Conspiracy to wage aggressive war -- a crime against the peace at Nuremberg, *see supra* pp. 24-25 -- likewise consisted of demanding criteria. *See* IMT Nuremberg Transcript Vol. 1, p. 225 (establishing that conspiracy to wage aggressive war required proof personal guilt on the part of an individual defendant, a concrete plan of war that was actually carried out, and knowing participation by defendant that was not too far removed from the time of decision and action). The eight persons convicted at Nuremberg of conspiracy to wage aggressive war were all Nazi leaders -- Goering, Ribbentrop, Keitel, Jodl, Rosenberg, Raeder, Hess, and von Neurath. These individuals were also convicted of the substantive crime of waging an aggressive war, and were integrally involved in the planning and execution of the aggressive war that actually took place. *See* IMT Nuremberg Transcript Vol. 1, p. 225. Finally, the limited crime of conspiracy under international criminal law requires an agreement. *See Prosecutor v. Juvenal Kajelijeli*, Case No. ICTR-98-44A,

allegation that Mr. Hicks was such a leader, or, indeed, anything more than a foot soldier.  For this reason, too, the charge of conspiracy against Mr. Hicks does not provide a basis for commission jurisdiction.

More fundamentally, however, Respondents are not attempting to use conspiracy as a theory of individual responsibility to establish his liability for a separate substantive crime.  They are attempting to establish a stand alone crime of conspiracy.  But no stand alone crime of group liability exists under the law of war.

>3.    **The purported objects of the alleged conspiracy do not violate the law of war.**

The conspiracy charge fails to confer jurisdiction on military commissions for another reason as well:  none the alleged objects of the conspiracy violate the laws of war.  Two alleged objects of the conspiracy -- murder by an unprivileged belligerent and destruction of property by an unprivileged belligerent -- do not violate the laws of war.  *See supra* Part I.C.  The third alleged object of the conspiracy, terrorism, is not a crime tied to war and thus not a war crime that confers jurisdiction on military commissions.  *See* Schmitt Aff. ¶¶ 28-30 (Ex. 10).

In its prior briefs in this case, the government did not show that unprivileged belligerency or terrorism objects of the conspiracy qualify as war crimes.  In response Hicks's challenge, Respondents argued only that "al Qaeda's attacks on American civilian targets were obviously law of war violations."  Resp. Reply Br. at 20.  In that regard, the other two alleged objects of the conspiracy, attacking civilians and civilian objects, are the only ones that potentially could be war crimes.  *See* Schmitt Aff. ¶ 27.

---

Judgment 787 (1 Dec. 2003) ("[T]he evidence must show that an agreement has been reached.  The mere showing of a negotiation in process will not do.")  Indeed, even under domestic standards, conspiracy is a specific intent crime.  *State v. Bond*, 713 A.2d 906, 913 (Conn. App. Ct. 1998).

But Respondents do not allege that Hicks had *any* connection to these attacks.  Moreover, attacking civilians and civilian objects during peacetime, while punishable as acts of terrorism, are not violations of the laws of *war*.  Respondents do not allege that Hicks -- or, for that matter, any alleged member of al Qaeda -- attacked civilians during the Afghanistan war, which began on October 7, 2001.  As has been shown above, *see supra* Part I.A.1, only the Afghanistan war, not the "war on terror," constitutes an international armed conflict under which the *law of wa*r would govern.  *See* Schmitt Aff. ¶¶ 11, 21 (Ex. 10); Cassesse Aff. at ¶ 2 (Ex. 11).

Thus, even if conspiracy could be a violation of the laws of war, the objects about which Hicks is accused of having conspired are not.  Indeed, because the conflict with al Qaeda is not one to which the laws of war apply, none of the charges against Hicks related to that conflict give rise to commission jurisdiction.

> ### 4.      No act of Congress delegates authority for prosecuting conspiracy to a military commission.

As noted in section I(D) of this brief, *supra*, Congress has not invested military commissions with the authority to adjudicate charges of conspiracy.  Because conspiracy also does not violate the law of war, the charge of conspiracy pending against Hicks is beyond the jurisdiction of the commission.

> ### E.      Hicks May Not Be Tried For Offenses Created *Ex Post Facto*.

Not only are they beyond the Commission's jurisdiction, the charges against Petitioners are also not crimes in the first instance.  The Executive defined them for the first time in MCI No. 2, which was promulgated on June 21, 2003.  This violates the fundamental prohibition against *ex post facto* laws, *see* U.S. Const. art. I, § 9, cl. 3, as well as the principle of separation of powers, according to which only Congress has the power to legislate, including the power "[t]o define and punish. . .Offences against the Law of Nations."  *Id.* art. I, § 8.

These fundamental principles strongly counsel against interpreting the law of war to apply expansively to categories beyond which it has previously been applied.  It must be remembered that this is a *criminal* prosecution.  "The rule that penal laws are to be construed strictly is perhaps not much less old than construction itself."  *United States v. Wilterberger*, 18 U.S. 76, 95 (1820) (Marshall, C.J.); *see also United States v. Thompson*, 504 U.S. 505, 518 (1992) ("[It] is proper. . . to apply the rule of lenity and resolve the ambiguity in [the accused's] favor.") (citing *Crandon v. United States*, 494 U.S. 152, 168 (1990); *Commissioner v. Acker*, 361 U.S. 87, 91 (1959)).  Thus, even were this Court to conclude that there is some ambiguity as to whether the law of war, or an act of Congress, subjects Hicks to the commission's jurisdiction on the charges which Respondents have brought, the Court is obligated to resolve that ambiguity in Hicks's favor and declare the charges beyond the purview of the commission.

This does not mean that the government cannot prosecute terrorists.  What it does mean is that the government cannot make up charges intended to bring a defendant within the narrow jurisdiction of military commissions.  It must either charge the defendant with a domestic crime prosecutable in U.S. courts, charge an actual violation of the law of war before a military commission, or determine that the defendant has committed no crime at all and thus must be released -- or held as an enemy combatant (if proven to be such) only for the duration of hostilities.

## II.      THE STRUCTURE OF THE MILITARY COMMISSIONS VIOLATES THE CONSTITUTIONAL GUARANTEE OF DUE PROCESS.

Respondents cannot proceed to try Mr. Hicks because the basic structure of the military commissions set up for this purpose precludes an impartial evaluation of guilt or innocence or an

impartial review of any such determination.  The military commission structure is thus flatly

inconsistent with the Due Process of law guaranteed by the Fifth Amendment.[40]

In their prior briefs in this case, Respondents made no attempt to argue that the

commission structure ensured impartial adjudication or somehow otherwise comported with Due

Process.  Instead, they argued that Mr. Hicks is not entitled to invoke any constitutional rights,

and that they are free to try Mr. Hicks and other detainees using whatever procedures they

choose.  The Respondents' view appears to be that Mr. Hicks is entitled to no procedural

protections but those they deign to give him.  Under this theory, they could execute Mr. Hicks or

any other detainee held in Guantanamo without according any process at all.

However, the Respondents' view -- that the Due Process Clause does not apply to

detainees -- is clearly incorrect and for that reason already has been rejected in another part of

Mr. Hicks's case, in which the Court applied the logic of the Supreme Court's decision in *Rasul*.

*See In re Guantanamo Detainees Case,* 355 F. Supp. 2d 443, 453-64 (D.D.C. 2005).

Now that it has been decided Mr. Hicks is protected by the Constitution, it is clear that

the commission proceedings cannot continue without according Due Process.  In *Hamdi*, the

Supreme Court held that such a Due Process challenge should be analyzed under the *Mathews v.

Eldridge* balancing test, a decision followed by Judge Green in her evaluation of the CSRTs.  *Id.*

at 465-68; *Hamdi*, 124 S. Ct. 2633, 2646 (2004).  Under this test, the current structure of the

commission trials cannot stand.  Mr. Hicks's most basic interest, his interest in lifelong liberty,

will be at stake in his commission proceedings.  These proceedings will fail to provide even the

most basic safeguards against wrongful convictions: an impartial fact-finder and interpreter of

---

[40] Such a trial would also result in gross violations of Mr. Hicks's rights under the UCMJ and the Geneva Conventions.  *See supra* FN2.

law; an adequate, impartial review process; and a guarantee that evidence adduced bears the most basic hallmarks of reliability and acceptability -- condoning admission even of evidence obtained through torture.   Finally, the government's purported competing interests cannot outweigh the extreme risks to Mr. Hicks as the government has no interest in a wrongful conviction.

In what follows, we first discuss the clear applicability of Due Process to Mr. Hicks in light of Judge Green's opinion, and then discuss how Mr. Hicks's claim satisfies each of the requirements for a successful challenge.

**A.       This Court Has Already Found That The Due Process Clause Is Applicable to Mr. Hicks's Case.**

In their previous filings in this case, Respondents did not assert the commission procedures will accord Mr. Hicks any actual Due Process of law.  Instead, they asserted that he has no constitutional rights at all, Resp. Br. at 36, and thus that, presumably, they are free to treat him completely arbitrarily in a proceeding in which his lifelong liberty is at stake.   But this remarkable proposition has now decided against the government in this very case.   In addition to Mr. Hicks's challenges as to the structure of the military commission trials that this Court is currently considering, Mr. Hicks's habeas claims originally challenged the process designed to determine whether he is an enemy combatant.   This Court consolidated Mr. Hicks's enemy combatant challenge with the habeas petitions of several other Guantanamo detainees, and these challenges were considered by Judge Joyce Hens Green, who rejected the very view Respondents assert here.  *See In re Guantanamo Detainees Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005).

Judge Green held unambiguously that Hicks had a "valid claim[] under the Fifth Amendment to the United States Constitution," *In re Guantanamo Detainee Cases*, 355 F. Supp.

2d at 445, and noted further that this conclusion followed directly from the Supreme Court's opinion in *Rasul*. *Id.* at 453-65. The Rasul majority rejected the premise underlying Respondents' argument that detainees have no Due Process rights, explaining that this argument "has no application . . . with respect to persons detained within the territorial jurisdiction of the United States" and that Guantanamo is within territorial jurisdiction of the United States under the terms of the lease from Cuba. *Rasul*, 124 S. Ct. at 2696. Justice Kennedy likewise noted that "Guantanamo Bay is in every practical respect a United States territory[;] . . . the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it." *Id.* at 2700 (Kennedy, J., concurring). Although *Rasul* concerned the classification of Guantanamo for the purposes of the habeas statute, the conclusion that Guantanamo Bay is "in every practical respect a United States territory" necessarily renders the Constitution applicable as well. Consequently, Judge Green held, *Rasul* required "this Court to recognize the special nature of Guantanamo Bay and, in accordance with *Ralpho v. Bell*, to treat it as the equivalent of sovereign U.S. territory where fundamental constitutional rights exist." *In re Guantanamo Detainees*, 355 F. Supp. 2d at 462-63; *see also Rasul*, 124 S. Ct. at 2698 n.15 ("Petitioners' allegations . . . unquestionably describe custody in violation of the Constitution or laws or treaties of the United States.") (internal quotation omitted); *In re Guantanamo Detainees*, 355 F. Supp. 2d at 463 (describing this footnote as "the strongest basis for recognizing that the detainees have fundamental rights to due process").

Judge Green's decision that Mr. Hicks has Due Process rights not only eliminates Respondents' argument that such rights are not applicable at Guantanamo; it equally eliminates Respondents' related argument that such rights are inapplicable to individuals who have no voluntary contacts with the United States. That argument boils down to the assertion that the

government is completely unrestrained by constitutional, domestic, or international law in its treatment of a non-citizen transported to territory over which it "exercises 'complete jurisdiction and control,'" *id.* at 462 as long as this is done against the will of its captive.  Fortunately for Hicks, and indeed for all non-citizens, this has never been the law: "it is settled that 'there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law.'"  *Ralpho v. Bell*, 569 F.2d 607, 618-619 (D.C. Cir. 1977) (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 669 n.5 (1974).  "Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).  Judge Green thus properly concluded that Mr. Hicks and other detainees who were involuntarily transported to Guantanamo have constitutional rights.

As a result of Judge Green's decision, Respondents cannot try Petitioner in any manner they choose.  They must comply with the Constitution.  And under the Constitution, the structure the military commissions and its corresponding procedures are flagrantly unlawful.  For these reasons, and for the reasons laid out in Judge Green's opinion, this Court should affirm that Mr. Hicks has a constitutional right to Due Process that Respondents must respect in all proceedings.

**B.     The Commissions Violate The Due Process Of Law Guaranteed By The Fifth Amendment To The U.S. Constitution.**

In light of Judge Green's opinion in Mr. Hicks's case, the Court should find that the military commissions violate Mr. Hicks's constitutional rights.

In *Hamdi*, the Supreme Court held that the calculus to be used in determining whether an alleged enemy combatant was being denied Due Process of law is the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  *See Hamdi*, 124 S. Ct. at 2633.  Under the

43

*Mathews* test, to determine whether a violation of Due Process has occurred, the Court must balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.[41]

Judge Green found that the resolution of a Due Process challenge by a detainee in the context of a military commission proceeding requires review of these three *Mathews* factors. *In re Guantanamo Detainees*, 355 F. Supp. 2d at 465. The structure of the commissions here clearly fail this test.

**1.    The private interest at stake in this case -- Hicks's physical liberty -- is the most fundamental of all.**

In *Hamdi*, the Supreme Court recognized that the freedom from physical detention by governmental powers "is the most elemental of liberty interests." 124 S. Ct. at 2646. The Court explained that the fact of detention weighed more heavily in the *Mathews* balancing test than any other factor. *Id.* at 2646-47 ("[n]or is the weight on this side of the *Mathews* scale offset by the circumstances of war or the accusation of treasonous behavior, for '[i]t is clear that commitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection.'") (quoting *Jones v. United States,* 463 U.S. 354, 361 (1983)); *see also id.* at 2647; *In*

---

[41] In cases involving internal "regulations, procedures and remedies related to military discipline," the Supreme Court rejected the *Mathews* balancing test, instead adopting a more deferential standard to review due process claims. *Weiss*, 510 U.S. 163, 177 (1994) (quoting *Chappell v. Wallace*, 462 U.S. 296, 301 (1983)). Given the nature of these proceedings and the *Hamdi* precedent, this deferential standard is clearly not applicable here. *Hamdi*, 124 S. Ct. at 2651.

*re Guantanamo Detainees*, 355 F. Supp. 2d at 466 ("the liberty interests of the detainees cannot be minimized for purposes of applying the *Mathews v. Eldridge* balancing test by the government's allegations that they are in fact terrorists or are affiliated with terrorist organizations").

Judge Green invalidated the CSRT procedures in part because enemy combatants held for the length of the applicable armed combat potentially could be imprisoned for life. Judge Green, relying on *Hamdi*, said that "the potential length of the incarceration is highly relevant to the weighing of the individual interests at stake." *In re Guantanamo Detainees*, 355 F. Supp. 2d at 465. She found that short of the death penalty, life imprisonment "is the ultimate deprivation of liberty." *Id.* Hicks's interest here is even greater, because the risk of life imprisonment as a result of a military commission sentencing is more certain than as a result of the indefinite length of armed combat. A guilty sentence for Mr. Hicks could subject him to life imprisonment even if the combat ostensibly justifying detention of enemy combatants comes to an end. The need for due process, already great in the context of detention for the course of the combat, is even more significant when the government seeks to put its defeated enemies on trial to impose punishments that will last even after the combat is over.

> **2.    The shortcomings that exist in the commission procedures are so egregious as to provide an enormous risk of an erroneous deprivation of Mr. Hicks's liberty interest.**

In light of the extreme liberty interest at stake in Mr. Hicks's case, carefully scrutiny of the military commission procedures reveals that "the risk of erroneous deprivation of a detainee's liberty interest is unacceptably high." *Hamdi*, 124 S. Ct. at 2648. The Constitution provides specific rights to criminal defendants -- e.g., trial by jury, access to legal counsel, confrontation of witnesses, and freedom from self-incrimination. While all of these specific

guarantees may not apply fully in a commission setting, the Constitution's explicit establishment of these rights nonetheless underscores the importance of structural protections in a criminal proceeding. Rather than using the existing structure of the courts-martial system, Respondents have chosen to set up a new system that falls far short of even these basic protections, underscoring just how deficient the commissions are.[42]   Even members of the military's prosecution team have expressed serious concern that the current structure of the commission proceedings is "rigged" by the government.[43]   The current structure of these military commissions provides far fewer protections than the courts-martial system and is altogether inconsistent with due process.

### a.      The commission process is not impartial.

The Supreme Court has said that "a fair trial in a fair tribunal is a basis requirement of due process," and that "a necessary component of a fair trial is an impartial judge." *Weiss v. United States*, 510 U.S. 163, 178 (1994). The structure of the military commissions lacks the judicial independence that "helps to ensure judicial impartiality." *Id*. at 179.   Instead, this structure fuses together the legislative, executive and judicial functions in a single body, undermining our constitutionalism and with it the rule of law. As noted above, the problems are

---

[42] In addition to the procedures established in the Military Commission Orders issued by the Secretary of Defense beginning on March 21, 2002, it appears that many other aspects of commission procedure will be made up on an ad hoc basis, with the early "trials," including Hicks's own, serving as experiments as to how the later ones will be conducted. The almost-certain disarray will only be magnified because the commission rules have no known analog: the commissions will follow neither judicial rules, nor the rules for court martial proceedings, nor the rules for international military proceedings. That commission members will work in a standardless vacuum was evident even at the initial preliminary hearings, where members were completely flummoxed by questions such as whether a detainee could represent himself, or by what standard a member could be dismissed for cause. John Hendren, *Trial and Errors at Guantanamo: Military Tribunal's First Week Trying Suspects Is Marked by Confusion and Inexperience*, L.A. TIMES, Aug. 29, 2004, at A1, 2004 WL 55934140.

[43] Neil A. Lewis, *2 Prosecutors Faulted Trials for Detainees*, N.Y. Times, Aug. 1, 2005, at A1; *see also* Redacted Carr-Borch Emails (Ex. 13 ).

so egregious that two senior military prosecutors have complained that the trial system was secretly arranged to improve the chance of conviction and to deprive defendants of material that could prove their innocence.[44]

Commission members, including the presiding officer of the commission, are chosen by the Appointing Authority, *see* MCO No. 1 § 4(A)(1), (4) (Ex. 4), who is the designate of the Secretary of Defense. The Secretary of Defense and his handpicked Appointing Authority therefore exert unfettered control over the Commission proceedings and outcome by selecting and supervising the presiding officer and the commission members. The Appointing Authority also approves and refers charges to the commission on behalf of the Executive Branch, *see id.* § 6(A)(2), and approves plea agreements, *see id.* § 6(A)(4). In other words, commission members are chosen by the very same entity that has a strong interest in the result. Commission members are appointed for two years and can be removed by the Appointing Authority with "good cause," giving him the power to hire and fire the commission members. *Id.* § 4(A)(3). Significantly, the accused has no peremptory challenges against commission members.

The impermissible partiality of the commission extends to issues of law. The presiding officer is the only member of the commission who is required to have legal experience, *see id.* § 4(A)(3), (4), leaving laypersons to founder through complex legal questions with little guidance. Other legal decisions, including all case-dispositive questions and defense motions, will be made on an interlocutory basis by the Appointing Authority himself. *See id.* § 4(A)(5)(d). Allowing the Appointing Authority to decide questions of law further conflates the distinction between prosecutorial and judicial functions.

---

[44] *See* Lewis, *2 Prosecutors Faulted*, *supra*, at A1; Redacted Carr-Borch E-mails (Ex. 13).

The partiality of the military commissions is inconsistent with the very notion of a fair trial.  As the Supreme Court has stated:  "It is not consistent with the theory of our government that the legislature should, after having defined an offense as an infamous crime, find the fact of guilt, and adjudge the punishment by one of its own agents."  *Wong Wing v. United States*, 163 U.S. 228, 237 (1896).  The same is true of the Executive.

In *Weiss v. United States*, the Court analyzed the impartiality of the courts-martial structure and its composition.  The Court held that a more deferential standard of review was applicable to the courts-martial process as a result of Congress' constitutional power over military discipline, than the *Mathews* test it held applicable to detainees in *Hamdi*.  510 U.S. at 177.  Under this more deferential standard, the Court held that the failure of the courts-martial system to provide a fixed term of office for judges did not render it unconstitutional.  But the Court emphasized this was so only because the courts martial system by virtue of the UCMJ, and corresponding regulations, insulated military judges from the effects of command influence, and sufficiently preserved judicial impartiality so as to satisfy the Due Process Clause.  *Id*. at 179.

None of the structural safeguards that *Weiss* held as critical to save the courts-martial system from invalidation by the Due Process Clause exist with respect to the military commissions.  In the courts-martial system, the judge is chosen from an extant and limited pool of judges, who are members of an independent judiciary that is outside of the chain of command.  10 U.S.C. § 826(a).  The judge is selected according to prescribed regulations from a pool of judges meeting qualifications dictated by statute. *See* 10 U.S.C. §  826(a), (b), (c); *see also Weiss v. United States*, 510 U.S. 163, 172 (1994).  Thus, unlike the commission system, in the courts-martial system the judge cannot be picked by the Executive based on his likely views in the particular case.  And, unlike the members of military commissions who can be dismissed by the

Appointing Authority and who, in their non-commission jobs, may also be subject to the influence and control by the Administration, military judges are outside the influence of the chain of command.  510 U.S. at 180; *see also* 10 U.S.C. § 837 (protecting military judges from being "censure[d], reprimand[ed], or admonish[ed] … with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of … his functions in the conduct of the proceeding," a provision that explicitly applies only to courts-martial, not military commissions.)  Rather, military judges in courts-martial proceedings are under the control of Judge Advocates General, "who have no interest in the outcome of a particular court-martial." *Weiss*, 510 U.S. at 180.  Finally, the Court of Military Appeals, composed of civilian judges serving a fixed term of 15 years, ensures that the Judge Advocate General's office does not decertify or transfer a military judges based on his findings in a courts-martial proceeding. *Id*. at 181.  No corresponding protection exists to protect commission members from improper evaluation by the Appointing Authority.

Although *Weiss* involved only a challenge to military judges, regulations also help facilitate impartiality of other members of courts-martial in a manner that does not exist for commission members.  Whereas courts-martial members are selected pursuant to structural safeguards referencing their age, education, training, experience, length of service, and judicial temperament, *see* 10 U.S.C. § 825(d)(2), the Appointing Authority's discretion to select members of the military commission is unconstrained, *see* MCO § 4(A)(3).  Similarly, while courts-martial procedures protect against the selection of members with a potential bias in the case, *see* 10 U.S.C. § 825(d)(2), no regulations prohibit the Appointing Authority from selecting accusers or prosecution witnesses as commission members.  *See* MCO § 4(A)(3).  Importantly, the UCMJ allows a defendant to exercise peremptory challenges against the members of the

49

courts-martial who try the facts.  *See id.* § 841.  Further, unlike the commission structure, if the defendant in a court-martial proceeding prefers, he can choose to have his case heard by the judge alone.  *Weiss*, 510 U.S. at 180.

Without any justification whatsoever, the Executive Branch has refused to provide the same impartial tribunals for the commission process -- creating an extremely high risk of a wrongful conviction.

The dangers of a wrongful conviction from this partial tribunal are further increased by the fact that conviction requires only a two-thirds vote, unlike the three-quarters vote required by the UCMJ for any confinement greater than ten years.  *Compare* PMO § (4)(c)(6)-(7) (Ex. 3); *with* 10 U.S.C. § 852(a)(1), (b)(1)-(2).  Moreover, the commission now only has three members (thus, requiring only two votes for conviction),[45] whereas the lawful minimum for a general courts-martial is a panel of five members (thus requiring at least four votes for conviction).  10 U.S.C. § 816(1)(a).  This decrease in the number of members greatly increases the risk of partiality.

> **b.    The commission does not provide for an adequate review process.**

The lack of judicial independence in military commissions extends to the review process. Instead, as noted, the Appointing Authority will decide all interlocutory issues, *see* MCO No. 1 (Ex. 4) § 4(A)(5)(d) and will conduct the first review of the decision of the military commission after its conclusion to ensure that its proceedings were "administratively complete."  MCO No. 1

---

[45] Here, Petitioner challenged four of five original commission members for cause.  The Appointing Officer granted the two challenges that were unopposed but denied the two opposed challenges.  The Appointing Officer did not replace the stricken members.  Since conviction requires a 2/3 vote, reducing the commission from 5 members to 3 requires the same number of members for acquital (two) but requires two less for conviction (two instead of four as existed before any were stricken).  Thus, the decision to strike two members and no others has harmed Petitioner.

§ 6(H)(3).  The Appointing Authority thus serves as an accuser, investigating officer, appointer of judge/jury, and reviewer of the proceedings.[46]

The commission review process after the initial review by the Appointing Authority is equally illegitimate.  The Defense Department has established a review panel consisting of four members appointed by the Secretary of Defense.  Although these members have served in important legal roles, they have not been chosen for their impartiality.  Two members who have been appointed to the review panel served as appointees on the very panel that crafted the trial procedures.  *See* Stephen J. Fortunato, Jr., *A Court of Cronies*, IN THESE TIMES (June 28, 2004), *available at* http://www.inthesetimes.com/site/main/article/a_court_of_cronies.  One of the members of the panel has stated in a recent opinion-editorial:  "It is clear that the September 11 terrorists and detainees, whether apprehended in the United States or abroad, are protected neither under our criminal-justice system nor under the international law of War."  *See id.*  And a fourth member is a  close friend of the Secretary of Defense.  *See id.*[47]  The Review Panel is thus hardly impartial.[48]

Moreover, while the review panel will issue an opinion in all cases, only at its discretion will it review written submissions by the defense and hear oral arguments.  *See* MCI No. 9

---

[46] That Deputy Secretary of Defense Paul Wolfowitz, who undisputedly is a member of President Bush's and Secretary Rumsfeld's inner circle of advisors on military and foreign affairs, served for close to a year as the Appointing Authority highlights that, far from independent, the appointments in the military commission process can be highly political.  *See* Military Commission Order No. 2 (June 21, 2003) (Rumsfeld appointing Wolfowitz as Appointing Authority); Military Commission Order No. 5 (Mar. 15, 2004) (Wolfowitz's designation as Appointing Authority revoked).

[47] The *Weiss* Court specifically recognized that the petitioners did not allege that the judges in their cases were or appeared to be biased.  Although the Court did not specifically state that this allegation would have changed their analysis, the Court did make clear that bias on the part of members of a military court is a violation of the due process protections of the defendant.

[48] *See also* Vaughn Second Index of Documents Withheld at 48-49 (Ex.14) (noting that review panel member who advised DoD on setting up military commission process was also briefed by Chief Prosecutor on "prosecution effort and strategy" in July 2003).

§ 4(C)(4) (Dec. 26, 2003), *available at* http://www.fas.org/irp/doddir/dod/.pdf.  And because the review panel must issue its ruling within 30 days of receipt of the case, *see* MCO No. 1 § 6(H)(4), defense counsel will have almost no time to prepare an appeal and have it included in the review panel's deliberations.  Members of the review panel are appointed for a term not exceeding two years, and can be removed for "good cause."  MCI No. 9 § 4(B)(2).  Thus, the review panel structure presents only a façade of judicial review without providing any genuine opportunity for defense counsel to present claims of error and to have them fairly adjudicated.

Final review of the commission decision is by the Secretary of Defense himself, or by the President.  *See* MCO No. 1 § 6(H)(5), (6).  There is no procedure for direct appeal to federal court.   A trial before commission members appointed by officials who have made these judgments and reviewed by these officials themselves, is hardly the neutral justice for which America has long stood.  The Supreme Court has long held that "[a] situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."  *Tumey v. Ohio*, 273 U.S. 510, 522 (1926).  It is the "general rule" that "officials acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided."  *Id.*  Both the Secretary of Defense and the President, have already decided that Hicks is an enemy combatant who has committed these crimes.[49]   These same

---

[49] The impermissible partiality of the entire commission process is illustrated by the fact that the executive branch has already decided that Hicks is guilty of the "offense" of unprivileged belligerency. *See* Dep't of Defense Order No. 651-04,  a (July 7, 2004), Second Am. Pet. Ex. 8 ("Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.");  Remarks by Respondent Sec'y of Defense Donald Rumsfeld to Greater Miami Chamber of Commerce (Feb. 13, 2004), *available at* www.defenselink.mil ("[T]he people in U.S. custody are … enemy combatants and terrorists who are being detained for acts of war against our country.").

individuals are also Hicks's accusers, and "[h]aving been a part of [the accusatory process] a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused."  *In re Murchison*, 349 U.S. 133, 137 (1954).  Nor can they be disinterested in appointing those who will serve in judicial roles in a case where they have served as accusers.

The defects in the structure of the military commissions are even more apparent when contrasted with Congressional requirements for the structure of review in courts-martial proceedings under the UCMJ.  Review of a guilty finding in a courts-martial case is conducted by a judge advocate who has not "acted in the same case as an accuser, investigating officer, member of the court, military judge, or counsel or has otherwise acted on behalf of the prosecution or defense."  10 U.S.C. § 864.  An appeal of a guilty conviction then goes to the Court of Criminal Appeals consisting of a three judge panel conforming to uniform rules of procedure, *see* 10 U.S.C. § 866, and, subsequently, to the Court of Appeals for the Armed Forces, *see id.* § 867.[50]  Review by both the Court of Criminal Appeals and the Court of Appeals for the Armed Forces is governed by comprehensive procedural rules ensuring impartial and independent consideration.  *See generally* Crim. App. Rules of Practice & Procedure; C.A.A.F. Rules of Practice & Procedure.  For example, the Court of Military Appeals is composed of civilian judges who serve for fixed terms of 15 years, evidencing their impartiality. While *Weiss* did not involve a challenge to the independence of appellate judges in the courts-martial system, it did emphasize the relative independence of those judges as one basis for holding the trial system acceptable.  510 U.S. at 181 ("The entire system, finally, is overseen by

---

[50] Serious cases, such as those in which the sentence extends to death, dismissal, or confinement exceeding one year, are sent to the Court of Criminal Appeals, *see* 10 U.S.C. § 866(b), but even those less serious cases not reviewed by the Court of Criminal Appeals are examined by the office of the Judge Advocate General.  *See* 10 U.S.C. § 869(a).

the Court of Military Appeals, which is composed entirely of civilian judges who serve for fixed terms of 15 years).   Moreover, direct Article III review is also possible by the United States Supreme Court.   *See* 10 U.S.C. § 867a.   The striking contrast between the structure of these two systems highlights the inadequacy of the commissions and further demonstrates that the commissions violate Mr. Hicks's right to Due Process of law.

> c.   **The commission will rely on unreliable evidence obtained through torture and unsworn statements, and thereby increase the risk of error.**

The commission process has further structural problems which render it biased and partial because the Respondents have authorized the commission to accept evidence of torture and unsworn statements that do not meet the standards for acceptability and reliability long established in both criminal and civil proceedings.[51]   In effect, the commissions are set up to allow the same people who extract information from detainees by harmful and unreliable means such as torture and unsworn statements to hear this evidence at trial and weigh this evidence in adjudicating the guilt or innocence of the accused.

Beyond the inconsistency of this evidence under the *Weiss* analysis, Judge Green clearly said that, "due process prohibits the government's use of involuntary statements obtained through torture or other mistreatment."   *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 472; *see also id.* at 472-74 (reviewing allegations of torture).   The inclusion of this evidence and consideration by the same people who improperly elicited it, is therefore a violation of detainees' Due Process rights.

---

[51] Commission procedures permit the admission of evidence merely if it "would have probative value to a reasonable person."   MCO §  6(D)(1).

This violation is assured in Mr. Hicks's case because he has long been a specific target of custodial physical, mental and emotional abuse.[52]  Significant interrogation of Mr. Hicks has also been conducted in the absence of legal counsel:  despite Hicks's repeated requests to be appointed counsel and the availability of military defense counsel to be detailed, Respondents refused to assign or allow Mr. Hicks counsel until November 28, 2003, nearly two years after he was detained.  *See* Resp. Br. at 8-9.

In contrast, Congress forbid the extraction of incriminating statements through compulsion in the courts-martial process, and provided that "[n]o statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."  10 U.S.C. § 831(d).  These protections are designed to ensure the integrity and accuracy of the judicial process.[53]  In their absence, the structure of the commission is impermissibly impartial and a violation of Due Process under *Weiss*.

In sum, the military commission process contains none of the structural protections which the Supreme Court in *Weiss* found necessary to ensure Due Process for Mr. Hicks.  Each of the procedures the government would dispense with in the commissions have been deemed essential

---

[52] Hicks's interrogation is described in his accompanying supplemental Affidavit and his declaration in support of Amended Complaint and Application for Injunctive Relief at paras. 3-27.  *See also* Fergus Shiel, *Ex-detainees allege Habib and Hicks abused*, THE AGE, Aug. 5, 2004, *available at* http://www.theage.com.au/////.html; *Govt. to examine Hicks abuse claims*, AUST. BROAD. CORP. NEWS ONLINE, *available at* http://www.abc.net.au/news/newsitems/ s1107601.html (May 13, 2004).

[53] With respect to integrity, the Supreme Court has explained, "[C]onfessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand … because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system."  *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961).  As for accuracy, the Court has emphasized that "[i]nvoluntary or compelled statements … are of dubious reliability and are therefore inadmissible for any purpose."  *Withrow v. Williams*, 507 U.S. 680, 703 (1993).

to ensure an impartial trial and thereby, reasonable assurance against erroneous convictions.  The absence of independent triers of fact and interpreters of law, and the use of unreliable evidence obtained through coercion or unsworn statements are inconsistent with the most basic requirements of a fair trial.  The Supreme Court has found the structure of the courts-martial process  constitutional only because "by insulating military judges from the effects of command influence, [they] sufficiently preserve judicial impartiality so as to satisfy the Due Process Clause."  *Weiss*, 510 U.S. at 179.  The structure of the military commissions contains no similar insulation, and thereby grossly violates Mr. Hicks's Due Process rights.

> **3.     Respondents cannot present an interest that outweighs the liberty interest at stake for Mr. Hicks.**

Given the importance of the liberty interest at stake in this case, and the numerous risks of erroneous results, the government must provide an extremely weighty justification for use of the rules proposed in MCO No. 1 to conduct commission proceedings.  Here, the government's interest does not approach that level.

In *Hamdi*, the Court recognized a substantial governmental interest in "ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States."  *Hamdi*, 124 S. Ct. at 2647.  Judge Green also recognized that the government has a "significant interest in safeguarding national security," and that it must do so "by ensuring that those have brought harm upon U.S. interests are not permitted to do so again."  *In re Guantanamo Detainees*, 355 F. Supp. 2d at 466.

Even considering a broad governmental interest in protecting the nation against terrorism that interest simply is not implicated here to the same degree as Mr. Hicks's ultimate liberty interest in facing life imprisonment.  If a given detainee is in fact guilty of a crime, then a fair tribunal should convict and sentence him accordingly.  If, however, a detainee is subjected to a

structure that is impartial in composition, procedure and review, as here, then the detainee's liberty interest is severely compromised.   In a criminal prosecution, where Hicks's lifelong liberty is at stake, the government has no interest sufficient to justify a trial before a biased decision-maker based on unreliable evidence with no guarantee of impartial review.   The military commission procedures thus, do not comport with the requirements of the Due Process Clause under the applicable *Mathews* test -- or for that matter any test.   To allow the Respondents to try Mr. Hicks by this process would virtually ensure an erroneous conviction by which Mr. Hicks risks life imprisonment.

III.   **THE NOVEMBER 13, 2001 EXECUTIVE ORDER IMPERMISSIBLY DISCRIMINATES BETWEEN CITIZENS AND NON-CITIZENS IN VIOLATION OF THE FIFTH AMENDMENT AND 42 U.S.C. § 1981.**

The PMO establishing military commissions also must be invalidated because it expressly discriminates against non-citizens.   Under the terms of this Order, "non-citizens" are subject to trials before the Commission.   In stark contrast, a United States citizen who is alleged to be an unlawful combatant and to have committed the same acts can only be prosecuted in a federal court, guaranteeing him the full protections of our Constitution and judicial system.   This blatant discrimination violates the Equal Protection guarantees of both the Fifth Amendment and 42 U.S.C. § 1981.   *See Griffin v. Illinois*, 351 U.S. 12, 17 (1956) (stressing that "the central aim of our entire judicial system . . . [is that] all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court") (internal quotations omitted); *see also Tate v. United States*, 359 F.2d 245, 250 (D.C. Cir. 1966) (same). This discrimination has no justification whatsoever and thus cannot survive even the rational basis review accorded to all forms of differential treatment, much less the strict scrutiny accorded to differential treatment of non-citizens in criminal proceedings.

A.      **The Order Has No Rational Basis.**

Respondents have argued that laws that differentiate based on alienage are subject to rational basis review.  Resp. Br. at 37.  But even if rational basis review were appropriate, and it is not, *see infra*, the PMO could not survive because no rational explanation exists as to why military commissions must be used to try Hicks, but not to try John Walker Lindh,[54] Yaswer Hamdi, Jose Padilla or other American citizens.  Respondents' *ipse dixit* that "it cannot seriously be argued that the President's action . . .lacks a rational basis,"  Resp. Br. at 38, is not such an explanation.   Nor is the President's finding that it was "necessary" to establish military commissions, Resp. Br. at 36 -- a finding that does not differentiate citizens and non-citizens. The same problem exists with Respondents' assertion that executive power over enemy aliens is important.  Resp. Reply Br. at 27.[55]  This not a rational justification for trying non-citizen enemy aliens under procedures inferior to those used for citizens who commit the same acts.  Finally, Respondents' argument that non-citizens are entitled to fewer rights than citizens is merely a reiteration of their rejected view that Hicks has no constitutional rights at all.  Once it is clear that non-citizens in Guantanamo are entitled to the protection of the Fifth Amendment, including, of course, the Equal Protection Clause, this assertion provides no basis for trying non-citizens under procedures inferior to those used for citizens.  *See supra* Part II.A; *see also Plyler*

---

[54] Like Mr. Hicks, Mr. Lindh was charged with fighting against the United States in Afghanistan. *Lindh*, 212 F. Supp. 2d at 568.  Indeed,  Mr. Hicks's charge sheet specifically alleges that he traveled to Konduz, Afghanistan in November 2001, where "he joined others, including John Walker Lindh, who were engaged in combat against Coalition forces."  Charge Sheet ¶ 20(m) (Ex. 7).  Yet, because Lindh is a United States citizen, the government brought his indictment in federal court, allowing him all of the procedural protections that accompany such a federal criminal proceeding.

[55] Respondents general argument for deference to the Executive cannot excuse them from an obligation to act with a rational basis.  Whatever level of deference is due, the Equal Protection Clause requires, at a minimum, a rational basis for discrimination.  Indeed, even Respondents acknowledge that under *Hamdi*, they do have a "blank check" in this regard.  Resp. Reply Br. at 30-31.  *See also* Resp. Br. at 37 ("Hicks's challenge would be subject to rational basis review.").

*v. Doe*, 457 U.S. 202, 214 (1982) (noting that Fourteenth Amendment's phrase "person within its jurisdiction" "sought expressly to ensure that the equal protection of the laws was provided to the alien population") (citing Cong. Globe, 39th Cong., 1st Sess. 1033 (1866)); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. . . . [Its] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.").

The Executive Branch itself appears to disbelieve there is any reason for differential treatment of citizens and non-citizens.  Throughout the post-September 11 period, the Executive Branch has argued repeatedly that U.S. citizens can be as dangerous as non-citizens and that the President and the military must have the power to detain and prosecute U.S. citizens who engage in hostile acts against our government anywhere in the world.  *See, e.g.*, *Hamdi*, 124 S. Ct. at 2640-41 ("A citizen, no less than an alien, can be 'part of or supporting forces hostile to the United States or coalition partners' and 'engaged in an armed conflict against the United States'").

Congress, too, does not appear to believe there is any reason to distinguish based on alienage.  In the AUMF, Congress authorized  the President "to use all necessary and appropriate force against those nations, organizations or *persons* he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001") (emphasis added);  *see also Rumsfeld v. Padilla*, 124 S. Ct. 2711 (2004) (No. 03-1027) (Reply brief for Petitioner at 17) ("The Authorization supports the President's use of force against any 'organization' or 'person' that 'he determines' aided the September 11 attacks, without suggesting any condition on that authority based on citizenship").

Finally, the assertion that there is a rational basis to distinguish based on citizenship is falsified by history.  The Order under which Mr. Hicks is being prosecuted is an historical first in this country.   There has never been a generally-applicable military commission order in the history of this Nation that authorized the trial of non-citizens before a military tribunal while expressly exempting U.S. citizens alleged to have committed the very same acts.  This has been true from the first time commissions were used in the Mexican American War to the last, during World War II.  *See, e.g.*, Louis Fisher, Congressional Research Service, *Military Tribunals: Historical Patterns and Lessons* 12 (quoting memoir stating that during Mexican American War "all offenders, Americans and Mexicans, were alike punished" under order establishing commissions); Glazier, 89 Va. L. Rev. at 2030 (same); *Ex parte Quirin*, 317 U.S. at 37 (finding that both citizens and non-citizens were subject to World War II military commissions).

Now, after nearly two centuries, the Executive branch, acting unilaterally, without Congress' input or approval, claims the need and legal authority to break from this unbroken historical tradition.  It may be that the Executive branch believes that United States citizens would have rebelled against military commissions if they were subject to them.  But a central purpose of the Equal Protection Clause is to ensure that government may not target unpopular groups without political power, and the Supreme Court has not hesitated to invalidate such discriminatory laws when they lack a rational basis.  *See*, *e.g.*, *Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985) (mentally retarded); *Lawrence v. Texas*, 539 U.S. 558, 580-81 (2003) (O'Connor, J., concurring) (homosexuals); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (same); *Turner v. Fouche*, 396 U.S. 346 (1970) (recent immigrants to a state).

Here, the Supreme Court has already intimated that there is no rational basis, explaining "Nor can we see any reason for drawing such a line here."  *Hamdi*, 124 S. Ct. at 2640.  Indeed,

there is no reason to sanction an unprecedented departure from the most fundamental traditions of fairness underlying our Nation's historic commitment to the rule of law.

**B.     The PMO Is Subject to Strict Scrutiny.**

Even if there were some rational justification for the discriminatory treatment of non-citizens under the PMO -- and there is not -- the discriminatory treatment could not stand, as it is subject to strict scrutiny.

Strict scrutiny is applicable for any law that provides differential access to the courts. *See Tennessee v. Lane*, 541 U.S. 509, 528 (2004) (right of access to the courts "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 125 (1996) (indigent complainant "endeavoring to defend against the State's destruction of her family bonds" may not be denied access to the appellate process). The Supreme Court has been particularly loath to "bolt the door to equal justice," where, as here, the most fundamental right of all is at stake -- the essential right of liberty from confinement. *Griffin*, 351 U.S. at 24. *See, e.g., Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966) ("it is ... fundamental that, once established, these avenues [of criminal appellate review] must be kept free of unreasoned distinctions that can only impede open and equal access to the courts").

The rule is even more strict with respect to distinctions that provide fewer procedural protections to non-citizens in a criminal trial than are available to citizens. Over one hundred years ago, the Supreme Court made clear in *Wong Wing v. United States*, that while the federal government has wide latitude to regulate immigration, and may, in that capacity, differentiate between citizens and non-citizens, where the government "sees fit to . . . subject[] the persons of such aliens to infamous punishment," the ability to discriminate comes to an end: "even aliens

shall not be held to answer for a capital or other infamous crime" without the protections afforded citizens under the Fifth Amendment.  163 U.S. 228, 237-38 (1896).[56]  In *Wong Wing*, the government sought to deport four Chinese citizens for illegal presence in the United States, but first sentenced them to sixty days in jail.  *Id*. at 239.  The Court left the deportation order undisturbed, but emphatically invalidated the 60-day sentence because it had been imposed without the constitutional protections afforded to citizens charged with a criminal offense.  *Id.* at 237-38.

The rule established in *Wong Wing* is categorical, established without any evaluation of the government's purported justification for the discrimination:  the government shall not subject aliens to criminal procedures inferior to those used to try citizens.  *Rodriguez-Silva v. INS*, 242 F.3d 243, 247-48 (5th Cir. 2001) (noting that although the federal government has wide latitude to set "criteria for the naturalization of aliens or for their admission to or exclusion or removal from the United States," it is settled under *Wong Wing* that "an alien may not be punished criminally without the same process of law that would be due a citizen of the United States."). Since *Wong Wing*, courts have repeatedly reaffirmed and expanded upon the principle that while the federal government may discriminate against non-citizens in the immigration areas with a rational justification, it may not punish non-citizens under different procedures.  *See, e.g.*, *id*.; *Zadvydas v. Davis*, 533 U.S. 678, 694 (2001) (citing *Wong Wing* for the rule that, in the context of "punitive measures . . . all persons within the territory of the United States are entitled to the protection of the Constitution") (internal quotation and citation omitted); *see also Chan Gun v. United States*, 9 App. D.C. 290, 298 (D.C. Cir. 1896) (citing *Wong Wing* for the proposition that

---

[56] Significantly, the Court invalidated the jail time even though the government claimed that it had imposed the sentence for the *regulatory purpose* of deterring future illegal immigration, and not to punish.  163 U.S. at 234.

"[w]hen . . . the enactment goes beyond arrest and necessary detention for the purpose of deportation and undertakes also to punish the alien for his violation of the law, the judicial power will intervene and see that due provision shall have been made, to that extent, for a regular judicial trial as in all cases of crime").

Respondents contend that these cases do not apply to Hicks as he is not a lawful alien who voluntarily entered the United States.  Resp. Reply Br. at 29, 30.[57]  Whether a person resides in the United States and pays taxes may be relevant to an Equal Protection claim concerning welfare benefits, however, but it is not relevant when it comes to punishment.  The Chinese immigrants in *Wong Wing* were *illegal* immigrants whom the government was attempting to deport.   The level of Equal Protection scrutiny for someone seized and involuntarily transferred to United States territory in Guantanamo should be at least as high as that for someone who chose to enter the United States illegally.  Surely, the government does not contend, for example, that the saboteurs in *Quirin* who voluntarily entered the United States were entitled to a greater degree of Equal Protection scrutiny than is Mr. Hicks.  *Cf. Mathews v. Diaz*, 426 U.S. 67, 77 (1975) (citing *Wong Wing* for the proposition that "[e]ven one whose presence in this country is unlawful, *involuntary*, or transitory is entitled to" the protection of the Fifth Amendment) (emphasis added ); *Plyler*, 457 U.S. at 210 (citing *Wong Wing* for proposition that even aliens whose presence in this country is unlawful are "persons" under the Fourteenth

---

[57] At most, this is an argument that Guantanamo detainees are not entitled to constitutional protections at all, which has been refuted above.  *See supra* Part II.A.  It is not an argument that although the Equal Protection Clause applies, Hicks is somehow entitled to a lesser degree of protection under that Clause than the Chinese aliens in *Wong Wing*.  Indeed, the primary case on which the government has relied demonstrates this.  *Verdugo* held that the defendant alien had no Fourth Amendment protections against the U.S. government's search of his Mexican residence, *see, e.g., Verdugo*, 494 U.S. at 271-72, but, as Justice Kennedy explained in his concurrence without opposition, once Verdugo had been brought involuntarily to the United States for trial, "[a]ll would agree . . . that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."  494 U.S. at 278 (Kennedy, J., concurring).

Amendment and therefore are guaranteed Due Process of law and are protected from invidious discrimination by Federal Government).[58] *See also supra* Part II.A.

Respondents also ignore *Wong Wing* and its progeny, as well as the more general cases on access to the courts, in their argument that the federal government has wide latitude to discriminate against non-citizens.   Respondents rely primarily on a line of cases stating that the federal government has wide latitude to differentiate between aliens and citizens with respect to benefits based on its power to control immigration.   But the federal government has no similar authority with respect to punishment.[59]   As has been shown, the general rule is that any laws establishing discriminatory access to the courts are subject to strict scrutiny, and this rule applies fully even to areas such as immigration, where deference is ordinarily high.   *See Griffin,* 351 U.S. at 17 ("due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations").   *Wong Wing* itself makes this clear, as it was a case with significant implications for immigration, but that nonetheless barred discriminatory treatment.   *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690, 695 (2001) (although deference to Congress'

---

[58] Respondents further try to distinguish *Wong Wing* by arguing that the accused there received summary punishment, whereas Hicks will be tried by a military commission.   Resp. Br. at 29.   But the *absolute* level of procedural protections Hicks receives is not the issue under the Equal Protection Clause; the relevant question is whether he receives the same level of protection as citizens charged with similar crimes.   And there the answer is indisputably no, which is why Respondents must justify the distinction.

[59] Even outside the area of punishment, distinctions between aliens and citizens  are generally subject to strict scrutiny.   *See Graham v. Richardson*, 403 U.S. 365, 372 (1971); *In re Griffiths*, 413 U.S. 717 (1973) *Graham* and *Griffiths* concern distinctions drawn by states.   The caselaw on which the government relies establishes a limited exception to the general rule that the federal government and states are treated identically under the Equal Protection Clause of the Fourteenth Amendment and the Equal Protection component of the Fifth Amendment's Due Process Clause, *Adrand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995).   The exception is based on the federal government's interest in controlling immigration, which is a unique context because there is an inherent need to differentiate citizens and non-citizens.   This interest is not shared by the states when they differentiate between aliens and citizens of other states. *Mathews v. Diaz*, 426 U.S. 67, 84-85 (1976).   Thus, outside the context of immigration, the rule of strict scrutiny established *Graham* and *Griffiths* is applicable.   It certainly applies to laws differentiating with respect to punishment, as *Wong Wing* makes clear.

judgment in the immigration area is generally applicable, even a non-criminal 'statute permitting indefinite detention of an alien would raise a serious constitutional problem.");  *id.* at 704 (Scalia, J., dissenting) (accepting proposition that aliens under final order of deportation could not be punished without a judicial trial);  *see generally Rasul*, 124 S. Ct. at 2696-97 (holding that aliens detained in Guantanamo must be afforded access to courts through habeas proceedings).  The very cases on which the government has relied themselves invoke this principle.  *See Harisiades v. Shaugnessy*, 342 U.S. 580, 586 n. 9 (1952) (citing *Wong Wing* for the proposition that "in criminal proceedings against [aliens, they] must be accorded the protections of the Fifth and Sixth Amendments").

Finally, the government's repeated appeal to deference based on national security is equally unavailing.  This case concerns foreign affairs in only the loosest sense.  The military commissions seek to *try* Hicks for alleged crimes; their goal is to convict and *punish* him, not to restrain him during the course of a war or seek to engage in core conduct of foreign affairs.  Any deference due the government is vitiated once the government begins a criminal prosecution.

As the Supreme Court recently stated, "It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."  *Hamdi*, 124 S. Ct. at 2648.  There is thus no basis to relax the strict scrutiny generally applicable to laws providing discriminatory access to the courts.  Indeed, courts have always rejected arguments "that cast Article III judges in the role of petty functionaries. . .required to enter as a court judgment an executive officer's decision but stripped of capacity to evaluate independently whether the executive decision is correct."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 198 (D.C. Cir. 2001).  As has been shown, there is no justification -

65

- national security or otherwise -- to treat Mr. Hicks differently than American citizens accused of identical conduct, much less one that could survive strict scrutiny.  The PMO establishing the military commissions is thus invalid under the Equal Protection Clause.[60]

## IV.    THE MILITARY COMMISSION IS INVALIDLY CONSTITUTED.

Even if the charges against Hicks were properly within its purview and the structure of the commission proceedings constitutional, the military commission that will "try" Hicks would still lack jurisdiction for three independent reasons.

### A.    The Structure of the Commission's Decisionmaking Violates the President's Military Order.

The orders, regulations and instructions issued by the Secretary of Defense and Appointing Authority contravene the President's Military Order.  That order requires that the commission sit as triers of law and fact.  PMO (Ex. 3)[61]  But Respondents Rumsfeld and Altenburg created new orders and regulations applicable to military commissions which contradict this requirement of the PMO by permitting the Appointing Authority and the Review Panel to decide issues of fact and law.  This enhances the importance of those closest to the Executive in the decisionmaking process, increasing the problems emphasized in the Due Process section.  *See supra* Part II.

---

[60] For the same reasons, the Order's discriminatory treatment of non-citizens also violates 42 U.S.C. § 1981 (2004), which ensures all "persons" have the "equal benefit of all laws and proceedings" as have "citizens."  This statute has long been understood to protect non-citizens against unequal treatment by both states and the federal government. *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419 (1948) ; *Duane v. GEICO*, 37 F.3d 1036 (4th Cir. 1994) (same); *NAACP v. Levi*, 418 F. Supp. 1109, 1117 (D.D.C. 1976).

Respondents contention that a 1991 amendment narrowed Section 1981 is supported by some caselaw, but is wrong and has been rejected elsewhere.  *See La Compania Ocho, Inc. v. U.S. Forest Service*, 874 F. Supp. 1242, 1251 (D.N.M. 1995).  The amendment's language does not exclude protection from federal misconduct, and the four stated purposes of the 1991 Amendment all were to increase civil rights.  *See* P.L. 102-166 (1991), Sec. 3(4).  Given this, the amendment should not be read to work so radical an alteration of § 1981.

[61] *See* http://www.whitehouse.gov/news/releases/2001/11/20011113-27.html.

Both Appointing Authority Regulation (AAR) No. 2 and Military Commission Order (MCO) No. 1 Section 4(A)(5)(d) provide that the Appointing Authority, not the Commission, will decide "all interlocutory questions, the disposition of which would effect the termination of proceedings with respect to a charge." Both AAR No. 2 and MCO No. 1, additionally permit the Presiding Officer to certify interlocutory questions as the Presiding Officer may deem appropriate.[62]   Respondent Altenburg, in his role as the Appointing Authority, has already decided issues of fact and law relating to Mr. Hicks military commission. He has determined the appropriate legal standard for challenge for cause of a commission member as well as ruled whether to grant or deny Mr. Hicks' challenge for cause of the commission members he previously appointed.[63]

The divergence of the commission structure from that set forth in the PMO is grounds to conclude that the military commission is not properly constituted. In evaluating whether a military commission was properly constituted in *Yamashita*, the Supreme Court determined whether the commander's order establishing the commission "conformed [with] the established policy of the Government and to higher military commands authorizing his action."[64]   The structure of the commission here does not conform with the higher commands that authorize it.

---

[62] AAR No.2, Section 8(A) "INTERLOCUTORY QUESTIONS."

(A) *Required Certification of Interlocutory Questions.* In accordance with Section 4(a)(5)(d) of reference (c), the Presiding Officer shall certify al interlocutory questions, the disposition of which would effect the termination of the proceedings with respect to a charge, for decision by the Appointing Authority. *Available at* http://www.defenselink.mil/news/Nov2004/ d20041118reg2.pdf.

*See* 8(B) of AAR No.2. (The Presiding Officer has previously submitted five interlocutory questions to the Appointing Authority.)

[63] Appointing Authority decision on the standard of challenges for good cause and his granting and denial of Hicks challenges. *See* http://www.defenselink.mil/news/Oct2004/ d20041021panel.pdf

[64] *In Re Yamashita*, 327 U.S. at 10.

### B.   The Commissions Violate Statutory Requirements for Involvement of a Judge Advocate General.

The PMO, orders, regulations and instructions governing the conduct of military commission violate U.S. statutory requirements for military commissions, as there is no provision for involvement of the Judge Advocate General of the Army or Air Force in those commissions.  10 U.S.C. § 3037(c), directs that the "Judge Advocate General…shall receive, revise and have recorded the proceedings of courts of inquiry and military commissions."[65]  But the Judge Advocate General has no role in these commissions, further diminishing their independence from the prosecutors.  The involvement of the Judge Advocate General has led to the invalidation of commission convictions during the Civil War when the accused was not given a full and fair trial.[66]

### C.   Military Commissions Cannot Sit in Guantanamo.

The military commission set to try Mr. Hicks is far removed from any relevant theater of operations.  A military commission -- even one properly authorized by Congress -- has no jurisdiction except  in (1) the zone of an actual armed conflict, (2) in an area within the command of the convening authority, or (3) within the occupied territory in which the convening authority commands.  *See Ex Parte Milligan*, 71 U.S. 2, 80 (1866); 2 WINTHROP at 836.  It has long been clear that "[t]he jurisdictional boundaries [of military commissions] are affected by the location and nature of the crime, [and] the location of the court that tries the offenders."  Maj. Timothy C. MacDonnell, *Military Commissions and Courts-Martial*, ARMY LAW., Mar. 2002, at 19, 40.  In *Milligan*, the Court unanimously struck down military tribunals created by President Lincoln to try Southern sympathizers in the North during the Civil War in areas where the civilian courts

---

[65] *See* 10 U.S.C. § 3037(c) (2005) for Army JAG.  See 10 U.S.C. § 8037(c) (2005) for Air Force JAG.
[66] Neely, *The Fate of Liberty* 162-3 (1991).

were functioning.  The Court stated: "Martial rule can never exist where courts are open, and in

the proper and unobstructed exercise of their jurisdiction," for the "Constitution of the United

States is a law for rulers and people, equally in war and in peace, and covers with the shield of its

protection all classes of men, at all times, and under all circumstances."  71 U.S. at 76.  The

Court held, therefore, that the exercise of military jurisdiction  must be "confined to the locality

of actual war."  *Id.* at 80.

Since *Milligan*, the Court has never authorized use of military commissions outside the

zone of conflict or occupation; it has approved commissions only in the immediate area of the

relevant conflict or in an area of occupation.  *See, e.g.*, *Reid*, 354 U.S. at 35 n.63; *Madsen v.

Kinsella*, 343 U.S. at 348;[67] *Johnson v. Eisentrager*, 339 U.S. 763, 766 (1950); *Yamashita*, 327

U.S. 1 (1946) (commission sat in an area of occupation and was appointed by the military

commander of that area).  *Quirin* is not to the contrary.  *See* 317 U.S. 1 (1942).  Although the

military commissions in that case sat in Washington, D.C., at the time, the United States had

been broken down into geographical areas with military defense commands, in an effort to

defend against anticipated foreign invasion.  *See* WWII Washington, DC Photos, (Ex. 15).

During the proceedings, in response to a claim that the commission did not have jurisdiction, the

Attorney General stressed the fact that the eastern seaboard "was declared to be under the control

---

[67] Respondents, amazingly, rely on *Madsen*, while the Supreme Court has made it clear that the approval of commission procedures in that case was contingent on its highly particularized circumstances.  The Court later stated:  "*Madsen* [] is not controlling here.  It concerned trials in enemy territory which had been conquered and held by force of arms and which was being governed at the time by our military forces." *Reid*, 354 U.S. at 35 n.63.

of the Army" based on the ongoing threat.  The Supreme Court noted this fact as well.  *Id.* at 22 n.1.[68]

The military commission that will try Hicks has not been created by an exercise of military jurisdiction based on authority of an occupying power.  It is far removed from any theater of operations, and it is not based on conduct that occurred at Guantanamo Bay.  For this reason, too, it has no jurisdiction.

### D.    The Appointing Authority Lacked Authority to Appoint the Commission.

This military commission also has been appointed by an individual not empowered to do so.  The Secretary of Defense has delegated authority to a civilian, Mr. John Altenburg, to appoint members of military commissions, but under the rules for courts-martial, a civilian cannot exercise such authority.  10 U.S.C. § 822; Manual for Courts-Martial, Part I, ¶ 2(a)(4) (2002); *id.* at pmbl.  It has uniformly been the case through American history that only those authorized to appoint courts-martial have the power to appoint military commissions, as Winthrop's treatise explains.  2 WINTHROP, *supra* note 23, at 835.  Thus, the Supreme Court explained in *Yamashita* that the reason General Styer was a competent authority to appoint the commission in question is that he was a commander "competent to appoint a general court-

---

[68] The Attorney General baldly stated:  "that certain area [the eastern seaboard] was declared to be under the control of the Army." and thus he argued that the military commission enjoyed jurisdiction.; *Nazi Saboteur Military Commission Session 1*, Transcript of Proceedings Before the Military Commission to Try Persons Charges with Offenses Against the Law of War and the Articles of War (July 8, 1942), *available at* http://www.soc.umn.edu/~samaha/nazi_saboteurs/nazi01.htm.  The Attorney General submitted as evidence "Public Proclamation No. 1 from the Commanding General of the Eastern Defense Command and First Army."  It stated that :  "Headquarters Eastern Defense Command and First Army . . . to the people within  . . . the *District of Columbia* . . .that portion of the continental United States . . . has been established as the Eastern Defense Command *under my command* . . . [under Executive Order 9066] . . . I, Hugh A. Drum, Lieutenant General, U.S. Army . . . do hereby declare and proclaim that. . . as a matter of military necessity . . . *the District of Columbia [is] a Military Area.* . . . .Willful violation of any such restriction or order by and alien enemy . . . are cause for expulsion or prosecution." *Id.* at 82-88 (emphasis added).

70

martial." 327 U.S. at 10.  Mr. Altenburg is not competent to appoint a courts-martial and thus cannot appoint the members of military commissions.

The military commission established to try Mr. Hicks is thus inconsistent with the Presidential Military Order, with statutes, and with constitutional limitations on the locus of such commissions.  For these reasons as well, it must be enjoined.

## V.   RESPONDENTS HAVE DENIED HICKS THE RIGHT TO A SPEEDY TRIAL AS REQUIRED BY THE UCMJ AND THE UNITED STATES CONSTITUTION.

Respondents are also barred from prosecuting Hicks due to their flagrant violation of his right to a speedy trial as required by Article 10 of the UCMJ.

### A.   Respondents Detained Hicks for Over 32 Months Without Trial.

Petitioner has been detained for nearly four years without trial.  He was originally seized by the Northern Alliance in November 2001 and detained by the United States military in December 2001.  *See* Second Am. Pet. at 2, ¶ 1.  In January 2002, Hicks was transported to Guantanamo Bay, Cuba.  Shortly thereafter Respondents began contemplating charges against Mr. Hicks.  *See* Hicks Aff. ¶ 3; Trial Balloon Worth Bursting, Milw. J. & Sentinel 14, Apr. 25, 2002.  On July 3, 2003, Respondent President Bush announced that Hicks was subject to prosecution before military commissions.  Respondents did not charge Hicks until June 10, 2004 -- 30 months after his original detention -- and he was not brought before Respondents' military commissions for hearing until August 2004 -- over 32 months after he was originally detained.

### B.   Respondents' Actions Have Violated Hicks's Right to A Prompt Trial under the UCMJ.

This delay is inconsistent with Hicks's rights under the UCMJ.  Article 10 of the UCMJ, unequivocally provides that any arrest or confinement of an accused must be terminated unless charges are promptly brought and made known to the accused, and speedy trial afforded for

determination of guilt on such charges.  It states, "When *any person subject to this chapter* is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or dismiss the charges and release him."  10 U.S.C. § 810 (West 2004) (emphasis added).  Hicks *is* unquestionably subject to this chapter because he is a "person[] within an area leased by or otherwise reserved or acquired for the use of the United States which is under the control of the Secretary concerned and which is outside the United States and outside the Commonwealth of Puerto Rico, Guam, and the Virgin Islands." 10 U.S.C. § 802(a)(12).  Furthermore, the UMCJ applies because it governs the treatment and trial of prisoners of war.  *See* 10 U.S.C. § 802(9).[69]

The D.C. Circuit's recent decision in *Hamdan* does nothing to alter Article 10's application here.  Unlike other sections of the UCMJ, Article 10 does not specify that its procedures are for courts-martial.  This is therefore not one of those provisions in which the UCMJ "takes care to distinguish between 'courts-martial' and 'military commissions'" and apply its rules only to the former.  *Hamdan*, 2005 WL 1653046, at *8 (D.C. Cir. 2005).

Under Article 10, it should be clear that the government has been guilty of an egregious speedy trial violation.  Respondents simply have not been "reasonably diligent" in taking "immediate steps to try" Hicks.  *See United States v. Kossman*, 38 M.J. 258, 262-63 (C.M.A. 1993).  The clock for determining whether a detainee has been afforded the right to a speedy trial

---

[69] At a minimum, Hicks is entitled to presumptive treatment as a POW.  *See* Geneva Convention (III), art. 5 ("Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.").  For the purposes of determining whether Hicks is a POW, it is irrelevant that *Hamdan* found the Geneva Convention not to be self executing.  The UCMJ specifies that prisoners of war are subject to the UCMJ's protections, and Article 5 of the Geneva Convention provides the definition of "prisoner of war."

begins to run at the time of his detention.  *See United States v. Earls*, 2003 CCA LEXIS 92 (A.F.C.C.A. Mar 24, 2003) (all time after confinement counts for speedy trial purposes); *United States v. Wiklinson*, 27 M.J. 645 (1988) (same); *United States v. Gouveia*, 467 U.S. 180, 190 (1984) ("[The] Sixth Amendment right [to a speedy trial] may attach before an indictment and as early as the time of 'arrest and holding to answer a criminal charge.'") (quoting *United States v. MacDonald*, 456 U.S. 1, 6-7 (1982)).  Indeed, the very case cited by the government, *United States v. Cooper*, holds that Article 10 should be applied to "the entire period up to trying the accused" and that it is a broad, "open-ended" duty on the Government.  58 M.J. 54, 60; *see also United States v. Birge*, 52 M.J. 209, 212 (C.A.A.F. 1999) (referring to Article 10's requirements as "stringent").

The Government argues that this is not a speedy trial violation, because Hicks was being held as an enemy combatant, so his detention cannot be categorized as "pretrial."  But the government can point to nothing in the statutory language or in any case that would release it from its obligation to take "immediate steps" to inform a person it has detained of the "specific wrong of which he is accused" and "to try him or . . . release him."  10 U.S.C. § 810.  Nor does it offer any authority to suggest that accountability does not begin when the detainee is placed in military control.  *See United States v. Young*, 61 M.J. 501, 504 (A. Ct. Crim. App. 2005).  It is thus arrest or confinement that triggers the speedy trial guarantee.  *Earl*, 2003 CCA LEXIS 92; *United States v. Burrell*, 13 M.J. 437, 440-41 (C.M.A. 1982); *United States v. Acireno*, 15 M.J. 570, 572 (A.C.M.R. 1982).

Even were the Government correct that the clock does not begin to tick automatically upon detention, Hicks's clock would still have begun to tick long ago.  The government has known that it might try Hicks almost as soon as he arrived in Guantanamo in January 2002.

73

Indeed, in spring 2002, the government opened its criminal investigation of Hicks and interrogated him on multiple occasions. *See* Trial Balloon Worth Bursting, Milw. J. & Sentinel 14, Apr. 25, 2002 (noting the administration's efforts to contrive a way to try detainees held at Guantanamo from being brought before military tribunals without specific evidence they had engaged in war crimes); Hicks Aff. ¶ 3 (Ex. 2).  At the very latest, the speedy-trial clock begins when the government should have known of the *possibility* of charges.  *United States v. Bray*, 52 M.J. 659, 661-62 (A.F. Ct. Crim. App. 2000); *see also Acireno*, 15 M.J. at 572-73 (noting Government's heavy burden in showing diligence in processing charges).  Clearly, the government has contemplated trying Hicks since at least spring 2002.

And even were we to give the Government yet another benefit of the doubt and not start the speedy-trial clock until July 3, 2003 when President Bush designated Hicks as a person eligible for trial before a military commission, *see* Second Am. Pet. at 9, ¶ 26, there would still be a speedy trial violation.  (Indeed, the fact that the Government designated him eligible for trial in July 2003 shows that it had researched -- and therefore known of -- the *possibility* of charges well before that date.)  At that point, the Government publicly stated its intention to try Hicks. *See* Charge Sheet ¶ 1 (Ex. 7).  The government further demonstrated this intent that same month by moving him into solitary in Camp Echo, where he was held apart from other detainees who were still designated only as "enemy combatants" and not yet formally designated for trial. Nevertheless, the Government did not formally charge Hicks until June 10, 2004, almost a full year later.  Charge Sheet; Second Am. Pet at 10, ¶ 29.

Respondents assert that even if the UCMJ applies, the length of Hicks's confinement does not violate § 810.  But there is no reasonable explanation for the undue delay.  Respondents cannot reasonably have needed over two years (including one year after Hicks had been deemed

eligible for trial) to gather evidence.  Indeed, the baseline for assessing speedy trial violations under § 810 is *thirty days*.  *See Cooper*, 58 M.J. 54, 60 (C.A.A.F. 2003) (identifying Speedy Trial Act, 18 U.S.C. § 3161(b) as relevant baseline); *Kossman*, 38 M.J. at 261 (observing that "3 months is a long time to languish in a brig awaiting the opportunity to confront one's accusers,"); *United States v. Hatfield*, 44 M.J. 22, 23 (C.A.A.F. 1996) (dismissing case for speedy trial violation based on 106 days of confinement).  As Justices Scalia and Stevens said in unchallenged words, under the Habeas Corpus Act in England, "a second magna carta, and a stable bulwark of our liberties," "imprisonment without indictment or trial for felony or high treason would not exceed approximately three to six months."  *Hamdi*, 124 S. Ct. at 2662 (Scalia, J, dissenting).

It is true that a lengthy delay, standing alone, does not automatically create a speedy trial violation.  However, such a delay triggers Respondents' responsibility to demonstrate good faith.  *United States v. Goode*, 54 M.J. 836 (2001) (finding that delay in trial was partly due to a defense request, actually helped the defendant, and that prosecution had attempted to reduce delay); *United States v. Laminman*, 41 M.J. 518, 520-21 (C.G. Ct. Crim App. 1994) (burden is on government to show it has taken "immediate steps").  Here, Respondents have offered no showing of good faith or that they took any immediate steps to try Hicks.  The generic assertion that conspiracy takes years to investigate is unsupported by any showing that the government made every effort to proceed expeditiously.

Further, Hicks's detention, solitary confinement and abusive treatment while in custody have prejudiced Hicks.  In both the Sixth Amendment and Article 10 contexts, the harms that can amount to prejudice include "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories

75

and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (internal quotation marks omitted; alterations in original); *see also United States v. West*, 504 F.2d 253, 256 (D.C. Cir. 1974); *Barker v. Wingo*, 407 U.S. 514, 532 (1972); *Birge*, 52 M.J. at 212; *United States v. Williams*, No. ACM 35122, 2004 WL 388773, at *4 (A.F. Ct. Crim. App. 2004). Hicks unquestionably has suffered oppressive pretrial incarceration including torture and solitary confinement. *See* Second Am. Pet. at 8-9, ¶¶ 22-27. The needless brutality to which he was subjected necessarily weighs more heavily on the prejudice scale than most detentions. *See* Hicks Affidavit. Hicks has also suffered anxiety and concern as a result of his prolonged uncertain status. *See id*; *see also United States v. Marion*, 404 U.S. 307, 320 (1971); *United States v. Calloway*, 505 F.2d 311, 319 (D.C. Cir. 1974). Finally, because Hicks was not appointed military defense counsel until almost two years into his detention -- and five months after the President's designation -- he was unable to begin preparing his defense at the same time the prosecution was gathering the freshest evidence. *See* Second Am. Pet. at 9, ¶ 27. During the period of Hicks's detention he has been "powerless to exert his own investigative efforts to mitigate the[] erosive effect of the passage of time," *Smith v. Hooey*, 393 U.S. 374, 380 (1969), while Respondents have been free to conduct investigations, contact and interrogate potential witnesses, preserve evidence and communicate with council. Although "time's erosion of exculpatory evidence and testimony can rarely be shown" directly, "excessive delay presumptively compromises the reliability of a trial." *Doggett*, 505 U.S. at 655-56 (internal quotation marks omitted). Moreover, Hicks will be less able to aid his own defense after having endured years of psychological and physical torture. Respondents have thus clearly violated

Article 10,[70] which was intended to prohibit precisely the kind of "foot-dragging" that has characterized Hicks's case from day one.  *Kossman*, 38 M.J. at 262.

### C.        Hicks Is Entitled to Dismissal of the Charges.

The appropriate remedy for a violation of speedy trial rights under federal law is dismissal of the charges against Hicks.  *See*, *e.g.*, *United States v. Hatfield*, 44 M.J. 22, 24-5 (C.M.A. 1996) (dismissing charges for UCMJ Article 10 violation); *Strunk v. United States*, 412 U.S. 434, 439-40 (1973) (dismissal is only proper remedy for Speedy Trial Clause violations); *Bray*, 52 M.J. at 662 ("As the Government failed to comply with the appellant's right to a speedy trial, the remedy is dismissal of the affected charge."); *Kossman*, 38 M.J. at 262 (remedy of Article 10 violation is dismissal of charges with prejudice).  Although an evaluation of prejudice may be part of the determination of whether dismissal is appropriate, dismissal is particularly appropriate in cases where, as here, there has been "truly neglectful" government "attitudes," or "intentional dilatory conduct."  *United States v. Edmond*, 41 M.J. 419, 421 (1995).

### CONCLUSION

For the foregoing reasons, this Court should grant Petitioner's motion for partial summary judgment, and determine now that the commission proceedings against Mr. Hicks are illegal.

---

[70] For the same reasons, Respondents' have violated the Sixth Amendment's speedy trial requirement. *See Barker*, 407 U.S. at 532.

Dated: August 17, 2005                         Respectfully submitted,
Washington, D.C.                               DAVID M. HICKS


                                               By:    /s/ Marc A. Goldman
                                                      One of His Attorneys


Marc A. Goldman, Esq.
District Bar No. 449230
Eric Berger
Jenner & Block LLP
601 13th St. N.W., Suite 1200 South
Washington, DC  20005-3823
(202) 639-6087

Andrew A. Jacobson
David E. Walters
Hillary A. Victor
Andrew W. Vail
(pro hac vice)
Jenner & Block LLP
One IBM Plaza
Chicago, IL  60611
(312) 222-9350

Leon Friedman, Esq.
District Bar No. NY0028
148 East 78th Street
New York, New York  10021
(212) 737-0400

Major Michel D. Mori, U.S. Marine Corps
(pro hac vice pending)
Office of Military Commissions
Office of the Chief Defense Counsel
1931 Jefferson Davis Highway, Suite 103
Arlington, Virginia  22202
(703) 607-1521, ext. 193

Joshua L. Dratel, Esq
Attorney Registration No. 1795954
Joshua L. Dratel, P.C.
Civilian Defense Counsel
14 Wall Street, 28th Floor
New York, New York  10005
(212) 732-0707
*Attorneys for Petitioner David M. Hicks*